## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA

THAI MEDITATION ASSOCIATION OF
ALABAMA, INC., An Alabama Domestic Not-
For-Profit Corporation, SIVAPORN
NIMITYONGSKUL, VARIN
NIMITYONGSKUL, SERENA
NIMITYONGSKUL, and PRASIT
NIMITYONGSKUL,

                    Plaintiffs,

  vs.

CITY OF MOBILE PLANNING
COMMISSION, CITY OF MOBILE CITY
COUNCIL and the CITY OF MOBILE,
ALABAMA,

                   Defendants.

Civil No. _____

COMPLAINT

## COMPLAINT

      Plaintiffs THAI MEDITATION ASSOCIATION OF ALABAMA, INC. (the "Center"),
SIVAPORN NIMITYONGSKUL, VARIN NIMITYONGSKUL, SERENA
NIMITYONGSKUL, and PRASIT NIMITYONGSKUL, by their attorneys, Storzer &
Associates, P.C., hereby complain of Defendants CITY OF MOBILE PLANNING
COMMISSION, CITY OF MOBILE CITY COUNCIL, and the CITY OF MOBILE, Alabama
(collectively, the "City Defendants") as follows:

**NATURE OF ACTION**

1.     This action is commenced by the Plaintiffs to redress violations of their civil rights, as protected by the Free Exercise and Equal Protection Clauses of the United States Constitution, 42 U.S.C. § 1983, the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. § 2000cc *et seq.* ("RLUIPA"), and the Alabama Constitution Article I, section 3.01 ("ARFA"), caused by the City Defendants' burdensome, discriminatory, and unreasonable land use regulations and intentional conduct that have prohibited and continue to prohibit the Center from constructing and using a 6.7-acre parcel located at 2410 Eloong Drive, Mobile, Alabama, Mobile County Land and Tax Map Section 40, T5S, R1W (the "Property"), for religious exercise as a very small meditation center intended to accommodate Buddhist practices for only about fifteen people on average.

2.     The primary focus of the City's Planning Department, Planning Commission and City Council proceedings--which resulted in a decision denying outright the meditation center use--was the Defendants' hostility toward the religious denomination and practices of the Center. The City Planning Commission's own attorney testified to the City Council:

> This is apples and oranges.  This is not a religious facility.  The application was mediation [sic] center of Alabama or whatever.  This is not the Baptist Church or the Episcopal Church.

Mobile Planning Department staff recommended denial of planning approval in their Staff Report based on their position that a Buddhist meditation center was not a "church or religious facility; including parish house, community house and educational buildings."  However, when Plaintiffs requested the basis for the Planning Commission's ultimate denial of planning approval, the Planning Commission's attorney ordered Planning Department staff to "Use what

is in the email, not the Staff Report," referring to a later *post hoc* email statement referring to "compatib[ility]," "access" and "traffic."   Such justifications were pretextual, designed to conceal the actual basis for denial.

3.     Through the imposition and application of the land use regulations of the City of Mobile, and the denial of planning approval by the City's Planning Commission and City Council for a Buddhist meditation center that is to be used solely for Buddhist meditation and other religious activities, the City Defendants have substantially burdened the Plaintiffs' religious exercise and discriminated against them by treating them differently and worse on the basis of their religious denomination and wrongfully determining that Buddhist meditation and other religious activity was not entitled to the legal status of a religious use under the City's land use regulations, and as protected under federal and state law.

## PARTIES

4.     Plaintiff THAI MEDITATION ASSOCIATION OF ALABAMA, INC., also known as the Meditation Center of Alabama, is a Domestic Not-for-Profit Corporation formed under the laws of the State of Alabama.

5.     Plaintiff SIVAPORN NIMITYONGSKUL is a Director of the Thai Meditation Association of Alabama, Inc. and is an owner of real property commonly known as 2410 Eloong Drive in Mobile, Alabama (the "Property").

6.     Plaintiff VARIN NIMITYONGSKUL a participant in the religious activities of the Thai Meditation Association of Alabama, Inc. and is an owner of real property commonly known as 2410 Eloong Drive in Mobile, Alabama.

3

7.     Plaintiff SERENA NIMITYONGSKUL is the Secretary of the Thai Meditation Association of Alabama, Inc. and is an owner of real property commonly known as 2410 Eloong Drive in Mobile, Alabama.

8.     Plaintiff PRASIT NIMITYONGSKUL is a Director of the Thai Meditation Association of Alabama, Inc. and is an owner of real property commonly known as 2410 Eloong Drive in Mobile, Alabama.

9.     Defendant CITY OF MOBILE PLANNING COMMISSION is a Municipal Planning Commission created under the Planning, Zoning and Subdivision Law of the State of Alabama and the City of Mobile Code of Ordinances, section 44-51, having offices at 205 Government Street, Mobile, Alabama, 36602-0001.

10.     Defendant CITY OF MOBILE CITY COUNCIL is a City Council existing under the laws of the State of Alabama, Alabama Code 1975 section 11-43-43, having offices at 205 Government Street, Mobile, Alabama, 36602-0001, which exercises legislative power within the City of Mobile.

11.     Defendant CITY OF MOBILE, ALABAMA is a municipal corporation organized and existing under the laws of the State of Alabama, Alabama Code 1975 section 11-40-1, having offices at 205 Government Street, Mobile, Alabama, 36602-0001, which, through the governing body, adopted the land use regulations in question in this matter.

## JURISDICTION AND VENUE

12.     The subject matter jurisdiction of this Court is founded upon 28 U.S.C. § 1331 (federal question jurisdiction) in that this action is brought under 42 U.S.C. § 2000cc *et seq.* and

4

42 U.S.C. § 1983.  This Court also has supplemental jurisdiction over Counts VI and VII under

28 U.S.C. § 1367(a) for claims brought under the laws of the State of Alabama.

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) in that all of the

events giving rise to the claims herein occurred in this District, and the City Defendants are

subject to personal jurisdiction in this District as of the commencement of this action.


**FACTUAL ALLEGATIONS**

Plaintiffs' Religious Exercise

14.     The Center was incorporated on January 19, 2007.

15.     The Center was founded for the purpose of providing a traditional meditation

center for members of the Buddhist faith or those interested in learning about Buddhism and

Buddhist meditation.

16.     The Center was incorporated for the purposes of "teaching and research into

growth and development of mind and spirit through meditation and to expand the knowledge of

Buddhism."

17.     In its 2007 application for recognition of exemption under Section 501(c)(3) of

the Internal Revenue Code, the Center included attachments titled "Buddhism Belief Summary,"

"Forms of Worship," "Code of doctrine and discipline of Buddhism," "Distinct religious history"

of their particular school of Buddhism, and "Ordination," describing Plaintiffs' religious beliefs

and practices.

18.     The Center currently operates within a shopping mall located at 3821 Airport

Boulevard in Mobile.  Other businesses in this shopping mall include a travel agency and the

Bangkok Thai Restaurant. This location is proximate to an automotive shop, a Japanese steakhouse, a formal wear shop, and a Taco Bell, among many other commercial uses.

19.     The Center is a Buddhist religious organization.

20.     Plaintiffs Sivaporn Nimityongskul, Varin Nimityongskul, Serena Nimityongskul, and Prasit Nimityongskul are all Thai and all participate in the Center's religious exercise.

21.     Buddhism is a system of religious belief and practice that is approximately 2500 years old.

22.     Buddhism spread to Thailand in approximately the Fifth Century C.E.

23.     Buddhism is the religion of the great majority of Thais.

24.     The Center's religious practice consists of traditional Thai Buddhist practices.

25.     There are many different branches or schools of Buddhism. Each school of Buddhism uses somewhat different scriptures, rituals, ways of teaching and learning and systems of meditation.

26.     The Center is part of the *Dhammakaya* school of Buddhism.

27.     The *Dhammakaya* school of Buddhism is headquartered at the Wat Phra Dhammakaya in Pathum Thani, Thailand.

28.     Wat Phra Dhammakaya is the largest Buddhist temple in the world. It is comprised of one million golden Buddha statues.

29.     The Center's religious exercise involves prayer, meditation, various religious ceremonies, lectures, teaching and learning, which is most often led by monks and/or nuns and lay teachers trained in the particular Buddhist tradition of *Dhammakaya*.

30.     The Center was founded for the purpose of providing Buddhist teaching and Buddhist meditation practice.  The Center teaches only the specific meditation practices of the *Dhammakaya* school of Buddhism.

31.     There is no other meditation center that engages in the specific practices of the *Dhammakaya* school of Buddhism in Alabama.

32.     The Center's logo is the official logo of the *Dhammakaya*, or "Middle Way," meditation technique. The logo is a representation of the pagoda at the center of Wat Phra Dhammakaya.

33.     The specific meditation technique practiced within the *Dhammakaya* school was developed by Luang Pu Wat Paknam in the beginning of the 20th century and is practiced by thousands of temples in Thailand.

34.     Most of the Center's teachers were trained at monasteries in Thailand.

35.     The central religious practice of Buddhism is meditation.

36.     Plaintiffs believe that Shakyamuni Buddha, the founder of the Buddhist religion, achieved his great spiritual insights as a result of years of meditation, and he taught that meditation is central to following his teachings.

37.     Meditation is central to many Buddhist schools, including the *Dhammakaya* school.

38.     Many Buddhist schools have their own specific form of meditation and method of teaching and progressing in religious development, as does the *Dhammakaya* school.

39.     The *Dhammakaya* meditation technique is the only type of meditation taught at the Center.

7

40.    According to *Dhammakaya* Buddhist belief, meditation is an essential component of the Buddhist religion. The Plaintiffs share this belief.

41.    Buddhists, including the Plaintiffs, believe in the four noble truths taught by the Buddha, the fourth of which is the path of liberation, which is also known as the Noble Eightfold Path.

42.    The Noble Eightfold Path, the Plaintiffs believe, can be broken into three divisions: the path of cultivating wisdom or *prajna* (Right View, Right Intention), cultivating ethical conduct or *sila* (Right Speech, Right Action, Right Livelihood), and cultivating meditative concentration or *Samadhi* (Right Effort, Right Mindfulness, and Right Concentration).  These latter three components of the Eightfold Path are all meditative in nature with the last, "Right Concentration," involving explicit meditative absorption or *jhana*.

43.    Cultivating meditative concentration is central to the Buddhist religion.

44.    Buddhism teaches that cognition alone is not able to achieve the Buddhist goal of liberation from suffering, since the misconception of self which generates suffering is more subtle than cognition alone can identify.  Nor can this misconception be ended simply by withdrawing the mind from all conception; otherwise sleep or unconsciousness would remove it. This ability is cultivated through meditation practice, which generates the dual Buddhist virtues of serenity and insight.

45.    Various Buddhist sources attest to the centrality of meditation practice in the Buddhist religion.

46.    In the "Sutra Unraveling the Intended Meaning," the Buddha states:   "You should know that all mundane and supramundane virtuous qualities . . . are the result of

meditative serenity and insight."   The same source states:   "Know that serenity and insight include all the many aspects of the states of meditative concentration which I have taught."

47.     In the "Compendium of the Teachings Sutra," the Buddha states: "When your mind is in meditative equipoise, you will understand reality just as it is."

48.     Likewise, Kamalasila, a major Buddhist saint, states in his "Stages of Meditation" that: "Because your mind moves like a river, it does not rest without the foundation of meditative serenity; a mind that is not in meditative equipoise cannot understand reality just as it is."

49.     The Center offers four meditation classes with talks on Buddhist scriptures and morality each week.

50.     All classes practice the *Dhammakaya* meditation technique.

51.     The Center's classes include a Buddhist Sangha group, silent meditations, multiple opportunities for Dharma learning and *Dhammakaya* meditation guided by Buddhist monks or certified lay people, a weekly Buddhist meditation and chanting service which includes blessings by Buddhist monks,

52.     Each Monday, the Center holds a meditation service that includes viewing a recording of a teaching by the Zen Buddhist monk and scholar ThichNhatHanh.  The teaching highlights parts of Buddhist philosophy and may be drawn from the Four Noble Truths, the Eightfold path, the Five Precepts and the Three Jewels.

53.     The Monday meditation service then includes a reading of one of the Five Precepts of Buddhism, and a brief discussion of the teaching and the Precept.  The participants then meditate on the meaning of the teaching.

54.     The purpose of the Monday session is to gain greater knowledge and understanding of Buddhist religion and practices.

55.     The Center also provides *Dhammakaya* Buddhist meditation classes on Wednesday and Thursday nights, led by Buddhist monks and laypeople trained at the Dhammakaya Temple.   These classes consist of mindfulness exercises, a guided meditation session, a lecture on Buddhist principles and teachings, and concludes with a complimentary meet and greet dinner.

56.     Each Saturday, the Center holds a Buddhist chanting and meditation service including a blessing from Buddhist monks, and livestreams a Buddhist service from Wat Phra Dhammakaya in Pathum Thani, Thailand.

57.     The Center also hosts special activities, such as lectures by monks and lay people, as well as half day and three day retreats.  The retreats are meant to provide in depth experience into inner peace and stillness and feature experienced instructors and discourses on Buddhism.

58.     Alms offering ceremonies are regularly held with visiting monks.

59.     The Center frequently hosts visiting Buddhist clergymen for its meditation retreats.

60.     All of the Center's religious activities constitute worship within Plaintiffs' Buddhist beliefs.

61.     The Center never charges a fee to attend any religious classes or worship services. The Center subsists on donations.

62.     The Center has in the past suggested a small donation of ten dollars to attendees, but no donation is required to participate.  Most attendees do not contribute that much.

63.     The Center welcomes all who wish to participate in its services and who wish to learn to meditate.

64.     Plaintiffs do not seek to "convert" others to Buddhism, but instead believe that the principles of Buddhism apply to everyone.  Plaintiffs believe that the Buddha taught that inside each person exists a 'Buddha nature" and that conversion to a specific religion was not necessary to achieve enlightenment.

65.     In accordance with this belief, the Center welcomes people of all religions and does not seek to "convert" them.

66.     While the Center is a Buddhist place of worship, the Center believes that Buddhism can be practiced by people from all faiths and religions.  The Center believes that the Lord Buddha's teachings are beneficial to people from all faiths.  These beliefs are central to the Plaintiffs' religion.

67.     The following statement appears in the Preface of "The Sun of Peace," published by the Dhammakaya Foundation of Thailand:

> "All people are from one family.
> We breathe the same air,
> Drink water under a single sky,
> Behold the same sun, moon, and stars.
> We will live together in this world from our birth
> Until the last second of our lives."
>
> The Most Venerable Phrarajbhavanavisudh (Luang Phaw Dhammajayo)
> made these statements with his heart replete with goodwill for the people of
> the world.
> No matter what their nationalities, languages, religions, or ethnicities,
> he has great diligence in leading the people of the world
> to discover true inner happiness by meditation.
> When the human mind is full of happiness and compassion,
> world peace will truly arise.

11

> Throughout many years he has conducted his life in pursuit of
> these good intentions. Every word that he has taught, every virtuous action
> he has performed to present a good example, these inspire
> his students to follow his good intentions in order to reach the day we all
> await.

The Center is an expression and extension of this mission.

68.    Silent meditation practice, by its nature, requires a serene environment.  As the Buddhist scriptures quoted above indicate, serenity is an essential aspect of Buddhist practice.  It is for this reason that historically Buddhist religious training took place in monasteries.

69.    The Center's current location in busy commercial area on Airport Boulevard creates significant hardships for its religious exercise.

70.    The current location is on a busy road, where noise from the street can be heard in the meditation room.

71.    The current facility is also located next to restaurant, a travel agency, and near an auto parts store, a Taco Bell and a Panda Express.  Such a location creates significant hardship for the Center's religious activities.

72.    Additionally, the Center lacks space to house visiting teachers including visiting monks.

73.    Monks may not share a room with non-monks and may not be housed in the same building as women.

74.    In order to accommodate traveling monks, the Center requires its own housing.

75.    Due to the Center's location, attendees also lack sufficient parking.

76.    The current location interferes and obstructs the religious exercise of the Plaintiffs.

### The Center's Land Use and the Subject Property

77. In order to accommodate its religious exercise, the Center has been searching for a permanent place of worship and meditation for many years.

78. On July 27, 2007, Sivaporn Nimityongskul purchased a house located at 4567 Airport Boulevard in Mobile for use as the Center's meditation center.

79. The Venerable Wuttichai Phothachai, an ordained Buddhist monk who served as a Director and teacher for the Center, lived at that house.

80. The Center conducted Buddhist ceremonies and meditation classes for almost two years at that location.

81. The City of Mobile issued two warnings to the Center specifically to not conduct any religious activities on this property.

82. The City stated that the activities that took place at the 4567 Airport Boulevard location were "religious" in nature.

83. After the City's warnings to the Center, the Center became fearful to use the term "religious" in its public communications.

84. In 2009, the Center sought a permit to formally locate its meditation center at the home on Airport Boulevard.

85. The Center faced tremendous community opposition to its application. At the public hearing on the Center's application, many neighbors came to oppose the hearing.

86. Bert Hoffman, a planner in the City of Mobile's Planning Department, told the Center that he recommended denial of the application.

87.     Opposing residents cited religious reasons and fear of the Center "converting" others to Buddhism as reasons for their opposition.

88.     Comments against the Center's application included:

> We do not need a meditation center, since all we have to do to achieve that result is to walk out into a sunlit yard on a quiet Mobile afternoon. (While serving with the Air Force in Vietnam many years ago I had the occasion to visit Thailand, where there are countless temples, and the streets are filling with Buddhist priests, wearing their colorful, orange robes. It was a quaint sight, but I had no desire to bring one back to my neighborhood, and install him there.)

89.     At the Planning Commission hearing, the City Councilman for the district stood and spoke against the application.

90.     In the face of this community opposition, the Center withdrew its application.

91.     In 2010, the Center moved to its present temporary location in the shopping center at 3821 Airport Boulevard in Mobile.

92.     This is not a suitable location for the Center, as described above.

93.     The Center continued to search for a suitable property for its meditation center.

94.     On November 21, 2014, approximately 104 acres of land was donated to the Center for use as a meditation center (the "North University Property").

95.     In February 2015, a Center representative contacted Bert Hoffman, a planner in the City of Mobile's Planning Department, to inquire about the land use procedure necessary to locate the Center's meditation center on the site.

96.     Hoffman informed the Center's representative that the Center would need to file a Planning Approval application and a Subdivision application.

97.     He wrote: "Planning Approval because a meditation center can be interpreted as a

14

religious institution of sorts."

98.     After further investigation, the Center found that the North University Property was not suitable for construction.  The installation of drainage, grading the site and fire hydrants made development of the property impracticable.

99.     The Center continued to search for a suitable property for its meditation center.

100.    In or around April 2015, Plaintiffs identified the subject Property.

101.    The Property is 292,790 square feet, or approximately 6.7 acres, in area.

102.    The Property is uniquely suited for the Center's use.

103.    The Property is large and densely forested.  The Center's meditation buildings would be bordered by trees and have views of the Dog River.  Most importantly, the Property would provide a quiet, contemplative environment suitable for meditation.

104.    The importance of selecting a suitable site for Buddhist meditation is highlighted in Samyutta Nikaya, Sutta 10.8, a discourse from the Pali Canon, the earliest canon of Buddhist teachings.   The discourse discusses a wealthy merchant, Anathapindika, who seeks enlightenment, and provides the following:

> He then invited the Blessed One for a meal the next day at the home of his brother-in-law, and the Master accepted. After the meal, Anathapindika asked the Enlightened One if he might build a monastery for the Order in his hometown of Savatthi. The Buddha answered: "The Enlightened Ones love peaceful places." "I understand, O Master, I understand," answered Anathapindika, overjoyed with the acceptance of his offer.
>
> When Anathapindika returned to Savatthi, he encouraged the people along the route to receive the Buddha in a respectful manner. In this way he prepared the way along the Rajagaha-Savatthi road for the Buddha's journey. Once he arrived in Savatthi, he immediately searched for an appropriate location for the monastery. It had to be neither too close to the city, nor too far. The site should not be one

that would be overrun by people in the daytime, nor should there be noise at night. It should be suitable for access by devoted visitors and also fit for those bent on seclusion. At last, in the chain of hills surrounding the city, he found a beautiful forest glade, ideal for the purpose. The area belonged to Prince Jeta, a son of King Pasenadi.

105.   The Property meets these religious criteria.

106.   The Property is located within the "R-1" zoning district in the City of Mobile.

107.   The Property is located approximately 1,000 feet away from The Church of the Nazarene, located on Riverside Drive.

108.   The Property is located a couple blocks away from the "South Bay Congregation," on Gill Road.

109.   The Property is currently improved with a single-family residence and detached garage.

110.   Prior to purchasing the Property, representatives of the Center again contacted Hoffman in the City of Mobile's Planning and Zoning department.

111.   The proposed use of the Property was to be the same as that proposed with respect to the "North University Property."

112.   Mr. Hoffman responded with the Chart of Permitted Uses found in the Zoning Ordinance ("ZO") of the laws of the City of Mobile, and the definition of "Church" found in the ZO.

113.   In the same email, Mr. Hoffman stated:

> Even if meditation can be determined as a different non-religious use, it would probably fall into a category of something that would not be allowed three times a week with 30 people per session.

114.   With respect to the Center's proposal, Hoffman wrote: "Planning will treat this as

a place of worship, . . . ."

115.    The Center's representative replied, "I am not at all sure that I understand your response.  The N[orth] University [P]roperty we were told R-1 for a church And a meditation center is in that category.  Now this nicer property has 7 AC plenty of room for parking.  Two facilities already on site.  Seem ideal. . . .We need to have a way for this to work for This client that is so willing to play by the rules.  But the rules can't keep Changing."

116.    A Pre-Development Meeting was held with Planning Department staff members Bert Hoffman and Marie Cross on behalf of the Center on April 24, 2015.

117.    To prepare for the meeting, on April 23, 2015, Hoffman circulated a link to the real estate listing for the Property via e-mail.

118.    Richard Olsen, the Deputy Director of Planning and Zoning replied, "I could live there."

119.    Mr. Hoffman replied, "Laura thought so as well.  I think that she and Frost could probably get it with their combined assets.  Then it could be subdivided and lots sold.  Or maybe Planning division or UDD overall could buy it and do it."

120.    Although Planning Department staff did not support the Center, they did not inform that Center of the fact during the Pre-Development Meeting.

121.    Representatives of the Center attended the Pre-Development Meeting with Mr. Hoffman and Ms. Cross and discussed the nature of the Center's proposed use of the Property, including meditation sessions about three times per week with about 30 people.

122.    Planning Department staff informed the Center that its use was permitted on the Property.

17

123.    Planning Department staff gave the Center an application for planning approval.

124.    Planning Department staff told the Center that it did not need any zoning changes to develop the proposed meditation center.

125.    Following the meeting, Bert Hoffman sent an email to the Planning Department staff in which he wrote:

> Marie and I attended this predevelopment meeting on Friday, April 24, 2015.
>
> We told the potential applicant that the use of the house as a meditation center would require:
>
> 1)    Planning Approval for <u>worship related use</u>;
> 2)    PUD because of a second habitable structure on the Property;
> 3)    Subdivision; and
> 4)    Variance for non-paved parking and maneuvering.
>
> The scope is that the house will be used a residence, but will also have meditation sessions about 3 times a week, with about 30 people.  They want to make as few improvements as possible.
>
> In the future, they may add a dedicated meditation building, and a few cottages for transient Tibetian [sic] monks or similar.  It was suggested they show these items as future phases.

(Emphasis added).

126.    There were no negative comments from Planning Department staff regarding the proposed use of the Property as a meditation center, or otherwise suggesting that planning approval would not be forthcoming.

127.    Based on the permitted use (with planning approval) status of a "church or religious facility; including parish house, community house and educational buildings" on the Property, the positive reaction of Planning Department staff, and no indication that planning approval would not be forthcoming, the individual Plaintiffs purchased the Property on August

20, 2015, and have a lease agreement with the Center for the Center's use of the Property as a Buddhist meditation center.

## The City's Relevant Land Use Regulations

128.    The City regulates land use within its jurisdiction in part through its Zoning Ordinance.

129.    The ZO provides that, for R-1 districts: "These districts are composed of both developed and largely undeveloped areas.  The developed areas contain mainly one-family dwellings and small open areas . . . .  The district regulations are designed to protect the residential character of the developed areas by prohibiting all commercial activities; to encourage a suitable neighborhood environment for family life by including among the permitted uses such facilities as <u>schools and churches</u>; and to preserve the openness of the areas by requiring certain minimum yard and area standards to be met."  (Emphasis added.)

130.    In the R-1 zoning district, a "church or religious facility; including parish house, community house and educational buildings" is permitted with "Planning Approval."

131.    "Convents" and "Monasteries" are also permitted in the R-1 district.

132.    Other nonreligious assembly and institutional land uses are permitted in the R-1 zoning district, including "Community center, recreation center: including social services, activity centers, outreach programs," "Library, public," "Museum: public or semi-public; or art, natural history, science, technology, etc.," "Park and/or playground, public: need not be enclosed within structure," "Schools, elementary and secondary: meeting all requirements of the compulsory education laws of the State of Alabama; including boarding schools," "Sports and

recreation club, membership: such as country club, golf club, swimming club; facilities may include golf course, pro-shop, swimming pool, tennis court, etc.," and "Zoo, public: permitted only as an accessory use in a major public park; need not be enclosed within structure."

133.    Under the ZO, land uses within a zoning district identified as "Planning Approval" uses "are permitted in that particular district upon approval of their location and site plan by the planning commission as being appropriate with regard to transportation and access, water supply, waste disposal, fire and police protection, and other public facilities; as not causing undue traffic congestion or creating a traffic hazard; and as being in harmony with the orderly and appropriate development of the district in which the use is located. Such uses are also subject to any conditions and limitations imposed by the planning commission."

134.    Under Alabama law, planning approval is an opportunity for the Planning Commission to impose such reasonable conditions on an allowed use as will protect neighboring property owners and the public from negative impacts.

135.    The ZO defines a "Church" as: "A building, together with its accessory buildings and uses, where persons regularly assemble for religious worship, and which building, together with its accessory buildings and uses, is maintained and controlled by a religious body organized to sustain public worship."

136.    The ZO does not define a "religious facility."

137.    The ZO defines an "accessory structure" as "A detached subordinate, located on the same building site with the main structure, the use of which is incidental to that of the main structure."

138.    The ZO provides that a "Planned Unit Development" ("PUD") may be approved

20

in order to obviate the need for a separate building site for each building other than an accessory building.

139.   With respect to a planned unit development, "the requirement for a separate building site for each building is waived and the land occupied by the planned unit development is considered to be the building site for the group of buildings as a whole.

### The Plaintiffs' Applications to the Planning Commission

140.   On September 11, 2015, Sivaporn Nimityongskul filed a Subdivision Application with the Mobile City Planning Commission seeking Planning Approval (ZON2015-02190), PUD approval (ZON2015-02189), Subdivision (ZON2015-00114) and a Bulk/Site Variance to permit the gravel parking and maneuvering area (ZON2015-02118).

141.   In the application, Plaintiffs proposed to use the Property primarily as a residence, but also sought approval to construct the meditation center.

142.   The proposed meditation center use would be very limited in scope.

143.   Plaintiffs proposed to conduct meditation sessions approximately three times per week.

144.   Attendance at such sessions is, on average, about fifteen people with a maximum of approximately thirty people.

145.   Each meditation session would constitute religious exercise of the Plaintiffs.

146.   The Center proposed construction of two 2,000 square foot cottages with four bedrooms and a small common area in each, a 600 square foot restroom facility, a 2,400 square foot meditation center, and 42 gravel parking spaces.

147.   The proposed cottages would be used for visiting religious clergy.

148.   The proposed meditation center would include a large group meditation room, a small storage area, four private meditation rooms, and an exercise room.

149.   The Planning Commission held two meetings on the Plaintiffs' Application.

150.   The first meeting was held on October 15, 2015.

151.   Prior to the meeting, on October 14, 2015, Hoffman emailed an Internet website address to two colleagues in the Planning Department and wrote, "This link takes you to a bio about a person who founded a mindfulness based stress reduction program, based upon meditation, as a way to address health and mental issues.  Thus in this case, meditation is medical in nature rather than religious.  Thus the Inner Peace application may need to be a full set of variances rather than Planning Approval."

152.   Richard Olsen, Deputy Director of Planning and Zoning replied, "Did we tell them religious facility, or was that their take because of the visiting monks?"

153.   Hoffman replied, "I had brought it up during a predevelopment meeting.  They did not debate it."

154.   On October 15, 2015, Hoffman emailed documentation of the Center's 501(c)(3) non-profit status to his colleagues.

155.   Olsen wrote back, stating that he did not think that the Center's amendment to its articles of incorporation "is anywhere near enough."

156.   The Planning Department issued a Staff Report on Plaintiffs' applications dated October 15, 2015.

157.   The section for "Remarks" in the Staff Report states, in part: "The applicant is

22

requesting Planning Approval to allow a meditation center in an R-1, single-Family Residential District, Planned Unit Development approval to allow multiple buildings on a single building site, and subdivision approval to create one legal lot of record. <u>Religious facilities require Planning Approval when located in R-1 districts. . . . The applicant wishes to modify an existing residential property to accommodate a religious meditation center.</u> . . . the proposed two four-bedroom cottages which are in addition to retaining two existing dwellings on the site for a total of 4 dwelling units are to be used to house transient religious clergymen. <u>This is considered an accessory use to the primary function of the site as a religious meditation facility; . . . It should be noted that because of the religious nature of the proposed facility</u>, the parking requirement should be based on the occupancy of the structure. " (Emphases added.)

158.    The Agenda for the October 15, 2015 Planning Commission hearing includes a recommendation by the Planning Department staff for "Holdover" so that the Plaintiffs could meet certain listed requirements.

159.    The requirements included conditions related to traffic and access issues on Eloong Drive.

160.    Any impact to Eloong Drive would be minimal, as access to the Property is the first along Eloong Drive, after turning from Riverside Drive. The other residences along Eloong Drive are located further along that road.

161.    It has long been the common practice of the Planning Commission to impose such reasonable conditions for planning approval as will permit such a use, such as including conditions for street improvements.

162.    At the October 15, 2015 Planning Commission hearing, the Center once again

faced tremendous community opposition.

163.    A petition was presented to the Defendants opposing the Center's use with approximately 280 signatures, most of whom do not live anywhere near the Property.

164.    Upon information and belief, opponents went door to door in the area informing people that the Center was moving a "large Buddhist congregation" into the area.

165.    An attorney for objectors to the Plaintiffs' applications appeared and argued that the Center is not a religious organization and that the meditation center is a for-profit business and not a religious facility.  These statements were false.

166.    The attorney representing the neighbors stated "There has to be public worship involved.  Meditation is not limited to Buddhism religion."

167.    The Planning Commission's attorney, Doug Anderson, stated to the media that a meditation center is allowed in the R-1 district.

168.    However, at the end of the October 15, 2015 Planning Commission hearing, Anderson told the Center that they must prove that the meditation center is religious.

169.    Plaintiffs then submitted additional documentation of the Center's religious status to the Planning Commission.

170.    This documentation included a letter from the Director of the International Affairs Department of the Dhammakaya Foundation, in which he wrote in part: "this letter is to confirm that the Meditation Center of Alabama is affiliated with the Dhammakaya Foundation whose headquarters is located in Pathum Thani, Thailand.  The mission of the Dhammakaya Foundation is to foster world peace through inner peace by promoting the Buddha's method of meditation and teachings.  Monks and lay staff trained directly from the Dhammakaya Center have been

teaching meditation and Dhamma at the Meditation Center of AL for the past six years."

171.    The documentation also included a letter from the Venerable Phra Piya Piyawajako, a Buddhist monk ordained at the Dhammakaya Temple in Thailand in 2001.  He wrote, in part, "I have been teaching at the Meditation Center of AL for almost 3 years.  I guide live meditation sessions and give Dharma talks on the truths of life as discovered by the Lord Buddha.  In 2014 I visited the Meditation Center to teach live classes, give public talks and teach two half day meditation retreats.  During these retreats, traditional Buddhist ceremonies such as alms offering and food offering ceremonies were held."

172.    The documentation also included a letter from the Venerable Tashi Nyima, an ordained Buddhist monk and Preceptor for the New Jonang Buddhist Community, a "sister" Buddhist organization in Texas, in which he wrote, "The MEDITATION CENTER OF ALABAMA, 3821 Airport Boulevard, Mobile, AL 36608, is a legitimate Buddhist organization, serving both ethnic Thai and American Buddhists, providing instruction in ethical conduct and meditation, and promoting peace and goodwill throughout Mobile.  I recently had the opportunity to lead a three-day exploration of the Four Noble truths and the eightfold Noble Path at the Meditation Center, and found the participants to be extremely peaceful, calm, and devoted to the Buddhist principles of loving-kindness, non-harming, and compassion."

173.    The documentation also included a letter from the Venerable Anuchit Tikkhaviro, a Buddhist monk ordained at the Dhammakaya Temple in Thailand in 2000. He wrote, in part, "I have been teaching at the Meditation Center of AL for almost 3 years. Guide [sic] live meditation sessions and give Dharma talks on the truths of life as discovered by the Lord Buddha.  In 2013 I visited the Meditation Center to teach live classes, give public talks and teach

two half day meditation retreats.  During these retreats, traditional Buddhist ceremonies such as alms offering and food offering ceremonies were held."

174.    The documentation further included a letter from an Associate Dean at the College of Arts and Sciences at the University of South Alabama discussing the relationship between meditation and Buddhism.

175.    The documentation further included a letter from the IRS dating back to January 19, 2007 notifying the Center of its 501(c)(3) status as a charitable organization.

176.    On November 19, 2015, Hoffman emailed Planning Commission attorney Anderson and wrote:

> Doug -- Attached is the documentation (and some letters) provided regarding the 'religious' status of the Inner Peace Meditation proposal on Dog River.  They do not appear to have provided an opinion prepared by a legal professional.  If you could in your spare time, review the attachment and let us know your legal opinion by Nov 23 or 24, that would be appreciated.

177.    Upon information and belief, Hoffman's use of quotation marks around the word "religious" in his November 19, 2015 email indicated hostility towards the Center and its religious practices.

178.    On November 23, 2015, Hoffman again emailed Anderson and wrote, "Doug -- If you can give us a legal opinion as to whether the attached documentation is sufficient to determine if the proposed meditation center on Dog River is 'religious' or not, it would be appreciated."

179.    Anderson replied: "I do not think it is. This shows the IRS has given it tax exempt status as a charity or foundation -- there are tests a church has to go through with the IRS to be classified as a church/religious organization.  Just because meditation is part of a religion(my

26

preacher teaches contemplative prayer) does not make the building a church or the owner a religious organization.  Recommend denial."

180.   The Planning Commission attorney's recommendation to deny the Center's application was based on his view of Buddhist meditation practices as not "religious."

181.   Federal law, 26 U.S.C. § 501(c)(3), confers tax-exempt status on "Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, . . .  or educational purposes . . . ."

182.   Many religious organizations have the same tax exempt status as the Center.

183.   The Planning Commission's attorney thus advised the Planning Commission to deny based on his opinion of the Center's religious character, or lack thereof.

184.   Planning Department staff forwarded Anderson's email to Caldwell Whistler at the City of Mobile's Forestry (Tree) and Zoning (Land Use) Department, writing, "Response from Doug.  Note in staff report that proposed use will require a Use variance and multiple buildings on a single site variance application."

185.   Whistler replied, "Thanks.  That simplifies the process a bit."

186.   On November 30, 2015, representatives of the Center met with neighbors of the Property and City Councilman CJ Small.

187.   Following the November 30, 2015 meeting, Plaintiff Sivaporn Nimitgonskul submitted a revised site plan for the Property, in which the scope of the project was reduced, to include only one 2,000 square foot cottage and only 30 parking spaces.

188.   Prior to the December 3, 2015 Zoning Commission hearing, Planning Staff issued a revised Staff Report in which it stated in part: "Pertaining to the Planning Approval to allow

the meditation center, the applicant submitted documents indicating Internal Revenue service recognition as a 501(c)(3) tax exempt public charity organization.  However, the legal counsel of the Planning Commission and Board of Zoning adjustment has determined that there are other tests that a church must go through with the IRS to be classified as a church/religious organization and documentation supporting such has not been furnished to staff.  Simply because meditation is part of a religion does not make the building a church or the owner a religious organization.  The allowance of a meditation center within a residential district would, therefore, not be a determination to be made via Planning Approval, but rather, by a Use Variance through the Board of Zoning Adjustment.  The Planning Approval request should, therefore, be denied by the Planning Commission or withdrawn by the applicant."

189.    The Recommendations in the Staff Report stated were as follows:

*Subdivision:    Based on the preceding, this application is recommended for denial for the following reasons:*

1) *the Subdivision is structured for an institutional use which is not approvable via the Planning Approval process; and*

2) *the Engineering, Traffic Engineering and Fire Department comments are not applicable to a single-family residential site.*

*Planned Unit Development: based on the preceding, this application is recommended for denial for the following reasons:*

1) *Multiple buildings cannot be allowed for an unapproved use; and*

2) *A Use Variance to allow multiple buildings and multiple dwellings (beyond those already existing as legal nonconforming) in an R-1, Single-Family Residential District would be the appropriate application required.*

28

> **Planning Approval:** *Based on the preceding, this application is recommended for denial for the following reasons:*
>
> 1) *Legal counsel for the Planning Commission has determined that there are tests that a church must go through with the Internal Revenue Service (IRS) to be classified as a church/religious organization and documentation supporting such has not been furnished to staff; and*
>
> 2) *The allowance of a meditation center within a residential district would not be a determination to be made via Planning Approval, but rather, by a Use Variance through the Board of Zoning Adjustment.*

190.   The revised Staff Report also noted that Plaintiffs had addressed most of the revisions required by the previous "holdover" relating to legitimate land use issues.

191.   The Staff Report did not contain additional requirements related to Eloong Drive.

192.   Thus, the Staff Report's recommendation for denial was based solely on the Planning Department and counsel for the Planning Commission's belief that the Center was not a "church or religious facility; including parish house, community house and educational buildings."

193.   At the second Planning Commission meeting on the Center's applications, on December 3, 2015, the Planning Commission voted to deny the application for Planning Approval.

194.   The Planning Commission did not discuss the Center's application at its meeting.

195.   On December 4, 2015, the Center wrote to Hoffman, requesting the reasons for Planning Commission's denial.

196.   The response was sent to the Center by Hoffman, stating that planning approval

29

was denied because: "the proposed use is not compatible with the surrounding area;" "access to the site is not adequate for the proposed use;" and "the proposed use would increase traffic on a very substandard street."

197.  These justifications were drafted by Olsen, the Deputy Director of Planning.

198.  Anderson told Hoffman to use Olsen's drafted "findings" as the basis for the Planning Commission's denial.

199.  Anderson further told Olsen and Hoffman:  "Use what is in the email, not the Staff Report."  (Emphasis added.)

200.  The stated justifications for denial by the Planning Commission were pretextual.

201.  These findings were designed to cover the real motivation for the denial, which was hostility towards the Center's religious character and practices.

202.  The Planning Commission was also knowingly responsive to the various hostile residents who appeared in opposition to the Center's Applications, including an objectors' attorney who falsely stated that the Center is not a religious organization and that the meditation center is a for-profit business and not a religious facility.

203.  The Planning Commission could have imposed conditions as recommended by the Planning Department staff to address the stated issues concerning access, traffic and compatibility.

204.  The Planning Commission also voted to deny the application for Planned Unit Development, finding that, "denial of the Planning Approval and Subdivision make the PUD request unnecessary because multiple buildings cannot be allowed for an unapproved use."

205.  The Planning Commission voted to deny the application for Subdivision because,

30

"1) Denial of the PUD and Planning Approval make this request unnecessary; and 2) the Engineering, Traffic Engineering and Fire Department comments are not applicable to a single-family residential site."

206.    The Planning Commission notified Plaintiffs of its decisions in letters dated December 8, 2015.

207.    The letters were signed by Olsen.


<u>The Plaintiffs' Appeal to the Mobile City Council</u>

208.    On December 17, 2015, Plaintiff Sivaporn Nimityongskul appealed the Commission's denial to the Mobile City Council.

209.    On January 11, 2015, a supporter of the Center emailed City Councilman John Williams to request his support.

210.    Councilman Williams wrote back saying, "Can't help this time Barry--sorry, I committed to the longtime residents."

211.    Defendants continued to demonstrate hostility towards the Center during the pendency of the City Council appeal.

212.    Chief Assistant City Attorney Florence Kessler wrote on January 13, 2016: "Maybe traffic engineering can add some standards for certain traffic counts.  What do you think about placing a traffic counter on the road?"

213.    Jim Rossler, the City Council's independent legal counsel, wrote back "Not sure a traffic count will do anything.  I would expect the count to be extremely low because the road serves only 10 houses."

214.     Kessler responded: "I agree, but I think a traffic count shows the feds that the City cares about the data," referring to an investigation into this matter by the United States Department of Justice.

215.     Rossler responded: "it looks like the focus needs to be on the transportation/traffic aspect . . . . and the lack of 'harmony' that this development has with the surrounding residential neighborhood."

216.     The Appeal was set to be heard during the Mobile City Council Meeting on January 12, 2016, but was held over for one week.

217.     The Mobile City Council heard the Appeal during its Meeting on January 19, 2016..

218.     Again, the focus during the City Council proceedings on the Center's application was on its religious character, and not on legitimate land use concerns.

219.     Anderson made various statements at the City Council hearing indicating hostility toward, and discrimination against the religious exercise of the Plaintiffs, including:

   a.     "At that point in time, there was some concern whether or not this was a religious group," referring to the first Planning Commission hearing.

   b.     "Even if this was a religious facility . . . ."

   c.     "This is apples and oranges.  This is not a religious facility.  The application was mediation [sic] center of Alabama or whatever.  This is not the Baptist Church or the Episcopal Church."

220.     During the January 19, 2016 hearing, a City Council member drew parallels between the Center's application and a prior application made on behalf of the Islamic Center of

Mobile, in which the City of Mobile City Council had denied the Islamic Center's appeal from a denial of its application for expansion, and which denials resulted in an investigation by the United States Department of Justice Civil Rights Division.

221.   The City Council member noted that the Center's Articles of Incorporation stated that the Center was formed for religious purposes and wondered aloud if the U.S. Attorney's Office would investigate a denial of the Center's application.

222.   Mr. Anderson testified that, "I think the U.S. Attorney's Office first is going to make a determination, 'Is this a religious organization?'  The application was in her name individually.  Name of the subdivision was Inner Peace Subdivision.  So when it came to the Planning Commission, there were questions, not by the opposition, but by staff and some of the Planning Commission members,  'Is this a religious organization?' I asked [the Center's realtor] can you all prove that you're a religious organization.  So I can guess that the first issue, the threshold issue for your concern is, 'Is this a religious organization?' And that is what the U.S. Attorney's office would have to make a determination before they decide to do anything else."

223.   A City Council member asked, "Mr. Anderson, my recollection is that when you talk about the various types of tax-exempt status that organization can get, that there is a 501(c)(3) status, tax-exempt organization.  Now, this organization that we're dealing with today, they could have applied for a tax-exempt status that is applicable to a religious organization . . . . And it is also my understanding that they did not choose to do that.  They choose to seek a tax-exempt status that was not affiliated with a religious organization."

224.   Anderson replied, "The only evidence presented to the Planning Commission indicated, that was a letter from the I.R.S., indicates that they did not choose religious

organization status."

225.   Anderson's understanding of the tax status of charitable organizations was fundamentally flawed.

226.   The charitable status of the Center in no way indicates that it is not a religious organization.

227.   There was no discussion of any of the letters of support submitted by the Center.

228.   The City Council's discussion was limited to the organization's tax-exempt letter.

229.   Another City Council member then stated that she was not aware of any other religious organization having been required to submit its tax papers in the context of a land use application and that it appeared that the Center was being forced to meet different benchmarks.

230.   Olsen testified that he was "not a part of any meetings about this application. As, I think most of you know, I was had [sic] surgery back in August when all of this started. I was out from then until early October after the application had been submitted, so . . . I was not involved. As far as the predevelopment meeting, which is what we call those meetings, uh, we never assure an individual that the Planning Commission will approve an application. And from my conversations with Mr. Hoffman it is my understanding that the religious facility status came up during that predevelopment meeting and he stated that if they were a religious facility then they needed Planning Approval. If it was not a religious facility then it would have to have commercial zoning."

231.   A City Council member clarified, "He said he said 'if'"?

232.   Mr. Olsen replied, "That is my understanding. The application does state religious facility. It also does state that the attendance was anticipated at 30 people."

233. A City Council member asked Mr. Olsen if the Planning Department "ask[s] for tax documentation all the time."

234. He replied, "No, ma'am.  And, uh, I think that was done after some of the discussion at the meeting, for the Planning Commission meeting, when the question arose."

235. Councilman Small stated, "We have plenty of empty shopping centers.  Please find one of those and open a meditation center."

236. Another Councilman stated "It is not the role of this body to overturn the Planning Commission."

237. The Mobile City Council voted to deny the appeal on January 19, 2016 by a vote of 6-0, with one Council member abstaining.


The City of Mobile's Injunction Action

238. On March 5, 2016, the Center held a half-day meditation gathering at Mrs. Nimit's home, located on the Property.

239. The gathering was led by the Venerable Ruben Visalo, a Theravada Buddhist monk ordained at the Wat Phra Dhammakaya.

240. The gathering included hours of meditation and teaching of Dhamma, along with a vegetarian lunch and a "game" meant to teach mindfulness.

241. There were approximately 20 people that took part.

242. Homeowners in a residential district may, as part of the principal single family residential use, invite similar numbers of people to gatherings on their property for various purposes, including parties, meals, and other events.

243.   The Defendants were aware of the March 5, 2016 event in February of 2016.

244.   Anderson stated in an email, "Ricardo and I think it best if we wait and see if they are going to move forward with this week's event, and if they do, then give them a NOV [Notice of Violation] before the 2nd retreat."

245.   Anderson wrote: "I believe the neighbors are going to watch it close enough to give us info."

246.   On March 25, 2016, the Center held another meditation retreat at Mrs. Nimit's home, located on the Property.

247.   It is the City's practice to give a Notice of Violation for any land use permit violation prior to instituting any court action.

248.   The City never issued a Notice of Violation for the March 5 or March 25 meditation events.

249.   On May 26, 2016, the City of Mobile filed suit against the Center, Sivaporn Nimityongskul, Serena Nimityongskul, Varin Nimityongskul and Prasit Nimityongskul in the Circuit Court of Mobile County, Alabama (Case No. 02-CV-2016-901095), seeking preliminary and permanent injunctions to prevent the Center from holding additional meditation retreats on the Property.

250.   On July 11, 2016, the Circuit Court issued an order dismissing the action, based on the Center's stipulation that they would obtain any necessary permits or approvals prior to using their property as a meditation center.

Differential Treatment of the Center

36

251.    The City Defendants have treated other religious and nonreligious assembly and institutional land use applicants more favorably than the Center.

252.    The City Defendants have often approved land use applications for religious and nonreligious assembly and institutional entities that created negative land use impacts related to traffic, road access and "compatibility," imposing conditions related to such issues rather than denying them outright.

253.    The Planning Commission granted planning approval on March 11, 2014 to the Sweet Pilgrim Baptist Church to allow a church in an R-1 zoning district, subject to "compliance with Traffic Engineering comments (Driveway number, size, location and design to be approved by Traffic Engineering and conform to AASHTO standards. . . .)."

254.    The Planning Commission granted planning approval on July 6, 2009 to the First Baptist Church of Carver Homes to allow a church in the R-1 zoning district, subject to "provision of buffering, in compliance with Section 64-4. of the Zoning Ordinance, from residentially zoned properties adjacent to the site (church site and parking lot), along with appropriate screening along the street where the parking lot is across from residentially zoned properties . . . ."

255.    The Planning Commission granted planning approval on June 5, 2009 to the ICM Foundation to allow a church in the R-1 zoning district, subject to "compliance with Traffic Engineering comments (Driveway number, size, location, and design to be approved by Traffic Engineering and ALDOT and conform to AASHTO standards."

256.    The Planning Commission granted planning approval on September 18, 2014 to the Smith Memorial AME Church for expansion of a church in the R-1 zoning district, subject to

37

"Traffic Engineering comments: (Site is limited to the existing curb cuts on Felhorn Road N and Roslyn Drive W, with size, location and design to be approved by Traffic Engineering and conform to AASHTO standards. . . .)" and "revision of the site plan to locate the building to scale to match the Subdivision plat."

257.    The Planning Commission granted planning approval on April 9, 2013 to the Forest Hill Church of God for an expansion of church parking in an R-1 zoning district, subject to "Compliance with Traffic Engineering comments (Moffett Road is a state maintained roadway. Driveway number, size, location and design to be approved by ALDOT (Moffett Road) and Traffic Engineering and conform to AASHTO standards. No additional curb-cuts are illustrated on the site plan; however the existing driveways for the proposed lots should be closed. An ALDOT right-of-way permit, in addition to city permits, will be necessary."

258.    The Planning Commission granted planning approval on February 17, 2012 to allow expansion of an existing church in the R-1 zoning district, subject to "placement of appropriate directional arrows at the drive aisle both under the canopy and beside the canopy . . . ."

259.    The Planning Commission granted planning approval on December 1, 2011 to amend a previously approved planning approval for the St. Ignatius Parish in the R-1 zoning district, subject to "placement of a note on the site plan stating that a Traffic Impact Study will be required prior to the construction of any new buildings on the site, to be submitted to Traffic Engineering and Planning at least 2 months prior to the anticipated new construction . . . ."

260.    The Planning Commission granted planning approval on May 2, 2008 to the St. Dominic Catholic Church to allow the use of a single family residential dwelling for church

functions, and to allow parking lot improvements, subject to "provision of screening of parking as required by Section 64.6.A.3.i of the Zoning Ordinance . . . ."

261.    The Planning Commission granted planning approval on April 4, 2008 to the Nazaree Full Gospel Church for a private school, subject to "revision of the site plan to indicate the posting of a sign at the school's curb-cut onto the Interstate 65 Service Road restricting the curb-cut to exit-only during thirty minutes before and after school start and end hours, and removal of the entry/exit arrows at the school curb-cut entrance" and "revision of the site plan to indicate the posting of a sign on the eastern side of the school parking lot stating 'do not enter' so that traffic entering from the church site will not turn left into the one-way portion of the school parking lot."

262.    In cases of substandard right-of-way, the Planning Commission has typically required dedication to bring that up to standard.

263.    In 2006, the Planning Commission approved the Alba Hunting & Fishing Club's application to subdivide its land and expand within an R-1 residential district.

264.    The Planning Department's staff report on the Alba Hunting & Fishing Club's application noted that, "the site fronts onto River Forest Road, a minor street that does not meet the minimum right-of-way width of 60 feet for streets lacking curb and gutter, as required by Section V.B.14 of the Subdivision Regulations."

265.    The Planning Department recommended approval of the Alba Hunting & Fishing Club's application for subdivision and expansion.

266.    The Planning Commission approved the Alba Hunting & Fishing Club's application for expansion with the condition that the Alba Hunting & Fishing Club include a note

on the site plan and plat limiting the Alba Hunting & Fishing Club to the existing curb cut on River Forest Road.

267.    Upon information and belief, the Planning Commission never requested "proof" of religious status, or otherwise questioned the religious nature of the uses described above.

268.    While the Center proposed various conditions on its application, the Planning Commission suggested no measures that would have accommodated the proposed religious use of the Property while mitigating any perceived adverse effects on the surrounding community.

269.    The proposed religious use of the Center could have been substantially accommodated with an approval with conditions.

270.    Upon information and belief, the Planning Commission has accommodated other religious uses in this manner.

271.    Upon information and belief, the Planning Commission and City Council have approved religious and nonreligious assembly and institutional land uses which created far greater traffic and access issues than the Center's proposed use.

272.    The City Defendants' actions severely impede and prevent the Center's exercise of religion.

273.    The Planning Commission's actions targeting the Center took place within a system of formal procedures that permitted the City Defendants to make individualized assessments for the uses for the property involved.

274.    The City Council's actions targeting the Center took place within a system of formal procedures that permitted the City Defendants to make individualized assessments for the uses for the property involved.

40

275.    The Center has spent more than $30,000 in direct cash payments for lease payments, taxes, building insurance, legal, engineering and traffic expert fees during the last six months of holding the building(s) and pursuing this matter.

276.    The construction and use of the Property as a meditation center by the Center would affect interstate commerce by or through, amongst other things, serving as a site for ongoing fundraising; its receipt of charitable donations from persons working or living outside of the State of Alabama; the use of means of interstate communication to facilitate the Center's construction and ongoing operations; the use of interstate travel related to the Center's ongoing operations; and the purchase of goods and services related to the Center's ongoing operations, maintenance, and construction.

277.    The City Defendants' actions described above all took place under color of state law.

278.    The City Defendants were informed of the applicability of RLUIPA to their actions.

279.    Upon information and belief, the City Defendants knew or should have known that their actions were contrary to the Center's statutory or constitutional rights.

280.    Upon information and belief, the City Defendants have granted similar land use applications for other religious land use applicants.

281.    Given the *de minimis* impact of the Center's use, there is no legitimate "traffic" or "access" basis to deny planning approval for the Center's use.

282.    Upon information and belief, the City Defendants have permitted other "religious facilities" to locate on substandard streets in residential zones within the City of Mobile.

41

283.    Upon information and belief, the City Defendants have permitted other nonreligious assembly and institutional uses to locate on substandard streets in residential zones within the City of Mobile.

284.    Upon information and belief, the City Defendants have not required proof of religious status from other applicants.

285.    The City Defendants, through the imposition and application of their land use regulations, discriminate against Buddhist religious worship, which focuses on meditation activities, and in favor of traditional Christian forms of worship, primarily focused on weekly Sunday services.

286.    Upon information and belief, the City Defendants have not undertaken an investigation of the religious status of other applicants.

287.    The City Defendants' laws and actions treat the Center's religious assembly use on less than equal terms as nonreligious assembly and institutional land uses by imposing greater restrictions and stricter review on the Center's use.

288.    The City Defendants' laws treat the Center's religious use on less than equal terms as various other nonreligious assembly and institutional land use within the R-1 zoning district.

289.    The harm to the Center caused by the City Defendants' laws and actions, which prevent it from using the Property to accommodate religious needs, is immediate and severe.

290.    The City Defendants' laws and actions imminently threaten to substantially burden the Center's free exercise of religion.

291.    There is no legitimate or compelling traffic justification to prohibit the Center

from constructing its meditation center on the Property.

292.    The Defendants did not use the least restrictive means of achieving any governmental interest purportedly threatened by the Center's proposed use.

293.    There are no quick, reliable, and viable alternative options for the Center's operations.

294.    The Center has no adequate remedy at law for the harm and damage caused by the City Defendants' wrongful laws and actions.

295.    Plaintiffs have also suffered significant financial damages as a result of the City Defendants' laws and their application to the Center.

296.    The Center has been forced to pay various additional costs and legal fees related to the Property as a result of the City Defendants' laws and actions.

## COUNT I

### Violation of Religious Land Use and Institutionalized
### Persons Act of 2000 – "Substantial Burdens"
### 42 U.S.C. § 2000cc(a)

297.    Paragraphs 1 through 296 are incorporated by reference as if set forth fully herein.

298.    Defendants have deprived and continue to deprive the Plaintiffs of their right to the free exercise of religion, as secured by RLUIPA, by imposing and implementing land use regulations both on their face and as applied in a manner that places a substantial burden on the Plaintiffs' religious exercise without using the least restrictive means of achieving a compelling governmental interest.

43

**COUNT II**

**Violation of Religious Land Use and Institutionalized
Persons Act of 2000 – "Nondiscrimination"
42 U.S.C. § 2000cc(b)(2)**

299.    Paragraphs 1 through 298 are incorporated by reference as if set forth fully herein.

300.    Defendants have deprived and continue to deprive the Plaintiffs of their right to the free exercise of religion, as secured by RLUIPA, by imposing and implementing land use regulations both on their face and as applied in a manner that discriminates against them on the basis of religion and religious denomination.

**COUNT III**

**Violation of Religious Land Use and Institutionalized
Persons Act of 2000 — "Equal terms"
42 U.S.C. § 2000cc(b)(1)**

301.    Paragraphs 1 through 300 are incorporated by reference as if fully set forth herein.

302.    Defendants have deprived and continue to deprive the Plaintiffs of their right to the free exercise of religion, as secured by RLUIPA, by imposing and implementing land use regulations both on their face and as applied to religious land uses in a manner that treats them on terms that are less than equal to nonreligious assembly and institutional land uses.

**COUNT IV**

**United States Constitution
Violation of 42 U.S.C. § 1983: First Amendment
Free Exercise of Religion**

303.    Paragraphs 1 through 302 are incorporated by reference as if set forth fully herein.

44

304.    Defendants have deprived and continue to deprive the Plaintiffs of their right to free exercise of religion, as secured by the First Amendment to the United States Constitution and made applicable to the States by the Fourteenth Amendment, by substantially burdening their religious exercise without using the least restrictive means of achieving a compelling governmental interest, and by discriminating against them on the basis of religion in a manner that is not the least restrictive means of achieving a compelling governmental interest.

**COUNT V**

**United States Constitution**
**Violation of 42 U.S.C. § 1983: Fourteenth Amendment**
**Equal Protection**

305.    Paragraphs 1 through 304 are incorporated by reference as if set forth fully herein.

306.    Defendants have deprived and continue to deprive the Plaintiffs of their right to equal protection of the laws, as secured by the Fourteenth Amendment to the United States Constitution, by discriminating against them in the imposition and implementation of their land use regulations.

**COUNT VI**

**Alabama Constitution**
**Violation of Article I, section 3.01 (ARFA)**
**Free Exercise of Religion**

307.    Paragraphs 1 through 306 are incorporated by reference as if set forth fully herein.

308.    Defendants have deprived and continue to deprive the Plaintiffs of their right to freedom of religion, as secured by ARFA, by imposing and implementing land use regulations both on their face and as applied in a manner that places a burden on the Plaintiffs' freedom of

45

religion without using the least restrictive means of achieving a compelling governmental interest.

## COUNT VII

### Alabama State Law Claim for Negligent Misrepresentation relating to Zoning Classification of the Subject Property

309.    Paragraphs 1 through 308 are incorporated by reference as if fully set forth herein.

310.    The subject property was purchased by Plaintiffs for its specific use as a meditation center.  Prior to its purchase, Plaintiff Sivaporn Nimityongskul and realtor, Bill Youngblood, met with city zoning official Bert Hoffman and inquired as to whether the proposed meditation center would be allowed on the subject Property which is zoned single family residential.  They were advised by Mr. Hoffman that a meditation center was allowed in a single family residential zone with planning approval.  This was confirmed in an email from zoning official Bert Hoffman dated April 27, 2015 to the planning staff.  It was confirmed again on July 21, 2015 via email from Mr. Hoffman to Steve Fisher, an engineer employed by Plaintiffs to prepare a site plan for the meditation center which would meet the conditions suggested by Planning Commission Staff for planning approval.

311.    Having been assured that a meditation center was allowed on the Property with planning approval, Plaintiffs, on August 20, 2015, closed on their purchase of the property.

312.    On September 11, 2015, Plaintiff Sivaporn Nimityongskul, as directed by Mr. Hoffman, filed an application for planning approval and a planned unit development.  The application was set for hearing on October 15, 2015.  The Staff Report for this meeting of The

Planning Commission discussed in detail the requirements for planning approval.  However, nowhere in the report was any question raised about whether a meditation center was allowed in an R-1 single family zoning district.  The Staff Report noted that "religious facilities require planning approval when located in R-1 districts."  At the October 15th meeting of the Planning Commission to consider the application for planning approval and PUD, neighboring property owners appeared in opposition to the request.  Their objections were based mainly on the use and not on any planning issue.  They claimed that the proposed meditation center was not a church or religious facility.

313.    At this meeting, the Planning Commission's attorney, Douglas Anderson, advised Sivaporn Nimityongskul and Mr. Youngblood that to use the property for a meditation center they would have to prove that it was a church.  The application was held over to be heard on December 3, 2016.

314.    In the December 3rd Staff Report, it was suggested that since the proposed meditation center is not a church, that it would not be allowed in R-1 single family districts.  On Page 12 of the report, under recommendations, the Planning Commission's legal counsel attempts to reverse the earlier determination made by Mr. Hoffman.

> "**Planning Approval**:  *Based on the preceding, this application is recommended for denial for the following reasons:*
>
> *1)    legal counsel of the Planning Commission has determined that there are tests that a church must go through with the Internal Revenue Service (IRS) to be classified as a church/religion organization and documentation supporting such has not been furnished to staff; and*

47

> 3)      *the allowance of a mediation center within a residential district would not be a determination to be made via Planning Approval, but rather, by a Use Variance through the Board of Zoning Adjustment.*"

315.    The ZO does not authorize the Planning Commission or its attorney to change the determination of the use applied for that was made by the zoning official, Hoffman.  While an appeal from the decision of the zoning official can be made to the Board of Adjustment, it must be made in writing within thirty (30) days as provided by the by-laws of the Board.  This means anyone aggrieved by the decision (which could have included the City) could have appealed to the Board of Adjustment.  An appeal was not timely filed and the determination that the zoning official made is final. The Mobile City Planning Commission is bound to follow its own regulations. The City's conduct created a special duty of care and it is charged with the negligence of its agents named herein.

## PRAYER FOR RELIEF

WHEREFORE, THAI MEDITATION ASSOCIATION OF ALABAMA, INC., SIVAPORN NIMITYONGSKUL, VARIN NIMITYONGSKUL, SERENA NIMITYONGSKUL, and PRASIT NIMITYONGSKUL, respectfully request that this Court grant the following relief:

1.      A declaration that the City of Mobile's land use ordinances, to the extent that they substantially burden and discriminate against the Center's land use and religious land uses, are void, invalid, and unconstitutional on their face and as applied to the Plaintiffs on the ground that they violate the Free Exercise Clause of the First Amendment to the United States Constitution, the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, the Religious Land Use and Institutionalized Persons Act, and the Alabama State Constitution;

48

2.    A declaration that the denial of the Plaintiffs' land use applications by the Defendants is void, invalid, and unconstitutional on its face and as applied to the Plaintiff on the ground that it violates the Free Exercise Clause of the First Amendment to the United States Constitution, the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, the Religious Land Use and Institutionalized Persons Act, and the Alabama State Constitution;

3.    A monetary award of damages suffered as a proximate result of the City's negligent representation that a meditation center would be an allowed use on Plaintiffs' property zoned single family residential.  Plaintiffs have been injured and damaged and caused to incur attorney's fees, hire engineers, incur expenses for insurance, real estate commissions, interest on the mortgage, maintenance and renovation of the property.   Plaintiffs claim damages for mental anguish, emotional distress, defamation and loss of reputation.   Plaintiffs claim monetary damages in an amount to be determined Court.

4.    Preliminary and permanent orders enjoining the Defendants, their officers, employees, agents, successors, and all others acting in concert with them from applying their laws to the Center in a manner that violates the Free Exercise Clause of the First Amendment to the United States Constitution, the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, the Religious Land Use and Institutionalized Persons Act, and the Alabama State Constitution, or undertaking any and all action in furtherance of these acts;

5.    An award of compensatory damages against the Defendants in favor of the Plaintiffs, in an amount to be determined at trial for the loss of its rights under the First and Fourteenth Amendments to the United States Constitution, the Religious Land Use and Institutionalized Persons Act, and the Alabama State Constitution, incurred by the Plaintiffs and caused by the Defendants' laws and actions;

8.    An award to the Plaintiffs of full costs and attorneys' fees arising out of Defendants' actions and land use decisions and out of this litigation; and

9.    An order granting such other and further relief to the Plaintiffs as this Court may deem just and appropriate.

Respectfully submitted by the Plaintiffs this 26th day of July, 2016.

/s/John L. Lawler
JOHN L. LAWLER, ESQ.
Post Office Box 47
Mobile, Alabama 36601
Tel: 251-432-8861
Fax: 251-432-8864

**STORZER & ASSOCIATES, P.C.**
Roman P. Storzer, *application for admission
  pro hac vice pending*
Blair Lazarus Storzer, *application for admission
  pro hac vice pending*
1025 Connecticut Ave., N.W. Suite 1000
Washington, D.C. 20036
Tel: 202.857.9766
Fax: 202.315.3996

*Attorneys for Plaintiffs*

**PLEASE SERVE DEFENDANTS VIA CERTIFIED MAIL AS FOLLOWS:**

**City of Mobile, Alabama
c/o Mayor Sandy Stimpson
P.O. Box 1827
Mobile, AL 36633-1827**

**City of Mobile City Council
c/o Gina Gregory, President
P.O. Box 1827
9th Floor, South Tower Government Plaza
Mobile, AL. 36633-1827**

**City of Mobile Planning Commission
c/o Jay Watkins, President
Maynard Cooper & Gale
11 North Water Street
RSA Battle House Tower Suite 27000
Mobile, AL 36602**