# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

THAI MEDITATION ASSOCIATION : 
OF ALABAMA, INC., *et al.*, :

    Plaintiffs, :

vs. :     Civil Action No. 1:16-cv-00395-TM-MU

CITY OF MOBILE, ALABAMA, :

    Defendant. :

## ORDER

This matter is before the Court on the parties' cross motions for summary judgment. Defendant City of Mobile filed a Motion for Summary Judgment and Memorandum in Support, (Docs. 89 & 90), a reply brief in support, (Doc. 104), a response and supporting documents to Plaintiffs' motion for partial summary judgment, (Docs. 100 & 101), and a response in opposition to Plaintiffs' sur-reply, (Doc. 110). Plaintiffs Thai Meditation Association of Alabama, Inc., Sivaporn Nimityongskul, Varin Nimityongskul, Serena Nimityongskul, and Prasit Nimityongskul have filed a Motion for Partial Summary Judgment and Memorandum in Support, (Docs. 91 & 94), a reply brief in support (Doc. 106), a response and supporting documents to Defendant's motion for summary judgment, (Docs. 97 & 98), and a sur-Reply in opposition to Defendant's motion for summary judgment, (Doc. 112). For the reasons stated below, Defendant's motion for

summary judgment is due to be **GRANTED IN PART AND DENIED IN PART**, and Plaintiffs' motion for partial summary judgment is due to be **DENIED**.

## I. Procedural Background

This matter arises out of the Defendant's denial of Plaintiffs' zoning applications to construct a Buddhist meditation center in a residential district. The Complaint asserts seven counts: (1) Defendant imposed and implemented land use regulations, both on their face and as applied, in a manner that places a substantial burden on Plaintiffs' religious exercise in violation of 42 U.S.C. § 2000cc(a); (2) Defendant imposed and implemented land use regulations, both on their face and as applied, in a manner that discriminates against Plaintiffs on the basis of religion and religious denomination in violation of 42 U.S.C. § 2000cc(b)(2); (3) Defendant imposed and implemented land use regulations, both on their face and as applied, in a manner that treats Plaintiffs on terms that are less than equal to nonreligious assemblies in violation of 42 U.S.C. § 2000cc(b)(1); (4) Defendant has deprived Plaintiffs of their right to free exercise of religion under the First Amendment in violation of 42 U.S.C. § 1983; (5) Defendant has deprived Plaintiffs of their right to equal protection under the laws under the Fourteenth Amendment in violation of 42 U.S.C. § 1983; (6) Defendant imposed and implemented land use regulations, both on their face and as applied, in a manner that places a burden on Plaintiffs' religious exercise in violation of Article I, § 3.01 of the Alabama Constitution; and (7) Defendant has negligently misrepresented facts relating to Plaintiffs' zoning classification in violation of Alabama state law. (Doc. 1).

Defendant filed a motion to dismiss certain parts of the Complaint. (Doc. 18). The Court granted in part Defendant's motion to dismiss as to the facial components of Counts 1, 2, and 3. (Doc. 31). Defendant's motion to dismiss as to Count 7 was denied. *Id.* The parties subsequently filed cross motions for summary judgment—Defendant's motion on all counts, and Plaintiffs' motion on Counts 1 through 6. Each party briefed their position and provided evidentiary support thereof to the Court. This matter is now ripe for consideration.

## II. Factual Background

In 2015, Plaintiffs Sivaporn Nimityongskul ("Nimit"), Varin Nimityongskul ("V. Nimit"), Serena Nimityongskul ("S. Nimit"), and Prasit Nimityongskul ("P. Nimit") (collectively, "the Nimit Plaintiffs") purchased property located at 2354 and 2410 Eloong Drive ("the Eloong property") for the primary purpose of constructing a Buddhist meditation center on the site. (Doc. 92-4; Doc. 92-29; Doc. 92-30, p. 19 ¶¶ 12-22). Plaintiff Thai Meditation Association of Alabama, Inc., ("TMAA")[1] has a leasehold interest in the Eloong property. (Doc. 92-29).

In September 2015, Nimit submitted an application to the City of Mobile Planning Commission ("the Planning Commission") for Planning Approval, Planned Unit Development ("PUD"), and Subdivision Approval (collectively, the "Applications" or "Plaintiffs' Applications") to permit TMAA's development on the Eloong property. (Doc. 93-21). In the Applications, Plaintiffs sought construction of a 2,400-square foot meditation center building, a 2,000-square foot cottage for

---

[1] For purposes of this Order, the Nimit Plaintiffs and TMAA will collectively be referred to as "Plaintiffs."

visiting monks, a 600-square foot restroom facility, and associated parking. (Doc. 93-22). The Planning Commission ultimately denied Plaintiffs' Applications, and the Mobile City Council ("the City Council") denied Plaintiffs' appeal, upholding the Planning Commission's decision. (Doc. 92-20, p. 2).

## A. The Zoning Ordinance

Chapter 64 of the Code of the City of Mobile, Alabama ("the Zoning Ordinance") divides Mobile into fifteen zoning districts, identified in Section 64-3 of the Zoning Ordinance. (Doc. 92-12, pp. 20-53). Section 64-3 of the Zoning Ordinance sets forth the specific regulations governing the applicable districts and delineates uses permitted by right and uses requiring planning approval. *Id.* at p. 22-53, 137. If a requested use in a particular zone is not specifically listed, the City of Mobile's director of inspection services or his agent may determine in which district the use may be permitted by right or with planning approval. *Id.* at p. 137.

Under the Zoning Ordinance, a "church or religious facility" is permitted by right in all business districts, but it must receive planning approval to locate in any residential district. *Id.* at p. 146. Accordingly, before a church or religious facility may locate in a residential area, the Planning Commission must determine if the facility's location would be in harmony with, and appropriate for, the residential district. *Id.* at p. 137.

The Eloong Property is located in an R-1 Residential District ("R-1 District"). (Doc. 93-1). R-1 Districts are composed of primarily "one-family dwellings and small open areas . . . where residential development seems likely to occur." (Doc.

92-12, p.22). Churches and schools are permitted with Planning Approval in R-1 Districts because Defendant wishes to encourage suitable neighborhood environments for families. *Id.* Because Plaintiffs sought to build a religious facility in an R-1 District, they were required to apply for Planning Approval.

**B. Plaintiffs' Religious Beliefs**

TMAA is a Buddhist religious organization. (Doc. 93-24, p. 1). The organization's purpose is "[t]eaching and research into growth and development of mind and spirit through meditation and to expand the knowledge of Buddhism." *Id.* It is affiliated with the Dhammakaya school of Buddhism, a sect of Theravada Buddhism headquartered in Wat Phra Dhammakaya in Pathum Thani, Thailand. (Doc. 93-75 ¶¶ 14-16). TMAA's religious exercise includes "prayer, meditation, various religious ceremonies, lectures, teaching and learning." *Id.* at ¶ 17. While there are many different schools of Buddhism, TMAA engages in the meditation technique known as *Dhammakaya* meditation, which is practiced by thousands of temples in Thailand. *Id.* at ¶ 13, 17. Meditation sessions at TMAA are led by either monks or lay teachers trained in Dhammakaya meditation. *Id.* at 17. Plaintiffs believe "Shakyamuni Buddha, the founder of the Buddhist religion, achieved his great spiritual insights as a result of years of meditation, and he taught that mediation is central to following his teachings." *Id.* at ¶ 21. Every week, TMAA offers four meditation classes with talks on Buddhist scriptures and morality. *Id.* at ¶ 36.

Defendant, however, questions Plaintiffs' meditation practice as religious exercise. (Doc. 100, p. 3). Defendant bases its viewpoint on various public announcements, in which Plaintiffs explained why religion is not important for meditation. (*See, e.g.,* Doc. 92-16). For instance, in a 2010 article published by AL.com, Nimit explained, "[T]his meditation center was established in order to teach people how to find inner peace and happiness. My ultimate mission is to spread world peace through inner peace, and have people see that mediation is not to be associated with any one particular, race, culture, and religion . . . ." (Doc. 92-16, p. 7). TMAA also holds itself out to be a non-profit, non-religious organization on social media and other website directories. *Id.* at p. 10; 14-15. Furthermore, in her deposition, Nimit agreed:

> The great thing about meditation is that philosophy/religious belief is not important. Meditation is about consciousness. The beliefs of the mind become trivial. You dive deep into the heart of the matter to gain access to your soul – your inner reality. Therefore, meditation can be practiced by people of different religions or no religion at all.

(Doc. 101-2, pp. 6-7).

Plaintiffs assert they describe their meditation practices as "non-religious" because TMAA is open to all, and "following Buddhist teachings does not require rejection of the particular theistic concepts that are central to Judeo-Christian notions of what is meant by 'religion.'" (Doc. 94, p. 5). In fact, both the Planning Commission and City Council heard testimony to this effect at the hearings in front of each body. (*See* Doc. 92-19, p. 18 ("The meditation [center] has elicited itself on Facebook and other social media as non-religious to indicate that one does not have

to be Buddhist in order to come learn meditation."); Doc. 93-34, p. 12 ("Buddhist liberation is essentially tied to meditation and meditation practice."). Nevertheless, Plaintiffs' religious beliefs were questioned throughout the processing of the Applications. (*See* Doc. 92-19; Doc. 93-34).

## C. Plaintiffs' Location History

TMAA began in 2007 at a home located at 4567 Airport Boulevard, Mobile, Alabama. (Doc. 93-73 ¶ 23). The home provided housing for a Buddhist monk who taught meditation classes there. *Id.* In August 2007, a citizen complained to Defendant that Plaintiffs had posted a sign that advertised services that were provided inside of the home. (Doc. 93-10, p. 1). A City Inspector came to the home and informed Nimit the sign was not permitted and must be removed. *Id.* Nimit removed the sign, and the inspector issued a Notice of Violation. *Id.*, pp. 1-2. The Notice gave Plaintiffs ten days to either cease the violation or apply for Planning Approval. *Id.* at p. 2.

On September 14, 2007, Plaintiffs applied for Planning Approval to continue offering meditation services at the home. (Doc. 93-12). The application received tremendous community opposition, and many neighbors came to the Planning Commission hearing to oppose the application. (Doc. 1 ¶ 85; Doc. 32 ¶ 85). Similar to the Applications at issue in this case, opposition to Plaintiffs' application for the Airport Boulevard home targeted both legitimate community concerns as well as Plaintiffs' religious beliefs. For instance, one resident wrote a letter stating:

> There is no concern on their part for the welfare of children growing up
> in this quiet area, no thought given to the additional traffic and the

danger it represents, and no concern for the loss of property value that we will all suffer because of their unwanted intrusion . . . . While serving with the Air Force in Vietnam many years ago I had the occasion to visit Thailand, where there are countless temples, and the streets are filling with Buddhist priests, wearing their colorful, orange robes. It was a quaint sight, but I had no desire to bring one back to my neighborhood, and install him there . . . . We do not want a meditation center, a non-sectarian church, a dental clinic, a service station, a bingo palace, or anything that is alien to family life intruding upon the citizens of this area . . . .

(Doc. 93-14).

On November 1, 2007, the Planning Commission recommended denial of Plaintiffs' application based on concerns regarding the possibility for future rezoning or use variance requests, and the lack of compliance with the parking surface, maneuvering, tree and landscaping, and buffering requirements of the Zoning Ordinance. (Doc. 93-13, p. 3). The Planning Commission's Staff Report explained, "[T]he meditation center would likely be a relatively 'quiet' neighbor and might generally be conducive to location in a residential area. However, as parking improvements and, most likely, building code improvements would be required to accommodate the proposed use, the general compatibility appears to be less favorable." *Id.* Plaintiffs later withdrew their application. (Doc. 93-11).

In 2009, Plaintiffs relocated TMAA to its current site at 3821 Airport Boulevard, Mobile, Alabama. (Doc. 93-73 ¶ 6). The current site is located in a shopping center on a busy street. *Id.* at ¶ 7. Plaintiffs assert its current location creates significant hardships for their religious exercise because their meditation practice requires a serene environment, they lack sufficient space for visiting monks and overnight retreats, and participants have encountered safety issues while

attending classes. *Id.* at ¶¶ 10-16. Defendant, however, asserts Plaintiffs' proposed meditation center would not alleviate Plaintiffs' size concerns because it is only 200 square feet larger than its current location, and Plaintiffs own numerous homes throughout the city where they could host visiting monks. (Doc. 100, p. 7). Additionally, Defendant asserts Plaintiffs have received 100 acres of viable land where they could host their meditation activities. *Id.*

Plaintiffs aver they received approximately 100 acres of donated land in November 2014 for the purpose of building a meditation center. (Doc. 92-30, pp. 41-44; Doc. 93-73 ¶ 25). However, after investigating the property and consulting with their land use professional, Plaintiffs found the donated acreage was not a feasible location. (Doc. 93-73 ¶ 26). Thus, Plaintiffs began searching for other property suitable for their meditation practices, and they discovered the Eloong Property. *Id.* at ¶ 27.

## D. Procedural History of Plaintiffs' Applications

On April 24, 2015, Plaintiffs attended a predevelopment meeting with their attorney and realtor, Bill Youngblood ("Youngblood"), and two City of Mobile Planners, Bert Hoffman ("Hoffman") and Marie Cross York ("York") to discuss the possibility of relocating TMAA to the Eloong property. (Doc. 93-27; Doc. 93-25, p. 3). The purpose of a pre-development meeting is for Defendant to gather information from applicants or potential applicants about what they are proposing to do at a specific location. (Doc. 93-5, p. 3). Additionally, Defendant provides applicants information about the process they must go through in order to obtain approvals.

*Id.* Defendant reviews, *inter alia*, the district in which applicants wish to locate and whether the property is a legal lot of record. *Id.* Thus, if an applicant's proposed use is not permitted in the district, in which the property is zoned, Defendant would inform the applicant of such at the predevelopment meeting. *Id*. at p. 4.

At the predevelopment meeting for Plaintiffs' potential Applications, the discussion centered around concerns about construction as well as the religious nature of their proposed meditation. (Doc. 93-25, p. 9). Following the meeting, Defendant concluded Plaintiffs' Applications would need the following approvals: "(1) Planning Approval for worship related use; (2) PUD because of a second habitable structure on the property; (3) Subdivision; and (4) Variance for non-paved parking and maneuvering." (Doc. 93-27).

On September 11, 2015, Plaintiffs submitted the Applications to construct a meditation center on the Eloong property. (Doc. 93-21). The Applications were, then, assigned to York for review and preparation of a Staff Report. (Doc. 93-4, p. 5; Doc. 93-25, p. 7). The Planning Commission issued the first Staff Report for Plaintiffs' Applications on October 15, 2015, which noted:

> The applicant is requesting Planning Approval to allow a meditation center in an R-1, Single-Family Residential District, Planned Unit Development approval to all multiple buildings on a single building site, and Subdivision approval to create one legal lot of record. Religious facilities require Planning Approval when located in R-1 districts.

(Doc. 93-1, p. 4).

Furthermore, the Staff Report recommended the Applications be held over until the November 19, 2015, Planning Commission meeting so Plaintiffs could revise the

Applications to reflect compliance with Engineering, Traffic, and Landscaping requirements. (Doc. 93-1, pp. 6-11). However, their Applications were ultimately reviewed at the October Planning Commission meeting instead of the proposed November meeting.

At the October 15, 2015 Planning Commission meeting, Plaintiffs' Applications were met with strong community opposition. (*See* Doc. 93-43). Specifically, a nearby resident of the Eloong property, Tamela Esham ("Esham") explained every single neighbor in the community opposed the project. *Id.* Some residents opposed the Applications for environmental reasons, and other residents opposed them because of the "lack of information" regarding the proposed project. *Id.* at pp. 12-13.

Additionally, questions were raised regarding Plaintiffs' religious beliefs. *Id.* at p. 7. The Planning Commission's attorney, Doug Anderson ("Anderson"), stated:

> For this to be proper within the zoning ordinance, it has to be a religious use. We're going to need written documentation, more than just an application, that says this is a religious building or religious use. We're going to need documentation to show – to prove that this actually is more than just a yoga or a meditation facility but that it is a religious use[;] otherwise planning approval is not going to be the proper procedure but a Board of Adjustment variant would be proper . . . If you can just provide us whatever written documentation other than just saying that it's religious. We've got to have something that shows it's not a commercial use but it is a religious use.

*Id.* at pp. 7-8.

Hoffman, also, informed the Planning Commission his staff "separately did some research trying to determine if it was a religious or non-religious facility based on how it's handled in other cities [,] and [they] found mixed results." *Id.* at p. 19. The

Planning Commission recommended holding over Plaintiffs' Applications until the December Planning Commission meeting.  *Id.* at pp. 15-17.

During the time between the October 2015 Planning Commission meeting and the December 2015 holdover meeting, Plaintiffs provided Defendant documentation addressing their religious status.  The documentation included TMAA's articles of incorporation, tax documentation, letters from Buddhist monks, letters from the Dhammakaya Foundation, and a letter from Eric Loomis, an associate professor of Philosophy, explaining the centrality of meditation to the Buddhist religion.  (Doc. 93-29, pp. 3-5; Doc. 93-24; Doc. 93-34, pp. 10-12).  TMAA's articles of incorporation state, "The corporation has been organized for . . . teaching and research into growth and development of mind and spirit through meditation and to expand the knowledge of Buddhism."  (Doc. 93-24).  Upon receipt of the items, Hoffman consulted Anderson to further evaluate Plaintiffs' religious status.  (Doc. 93-45).  In a November 23, 2015, email to Anderson, Hoffman requested, "Doug – If you can give us a legal opinion as to whether the attached documentation is sufficient to determine if the proposed meditation center on Dog River is 'religious' or not, it would be appreciated."  *Id.* at p. 1.  In response, Anderson asserted:

> I do not think it is.  This shows the IRS has given it tax exempt status as a charity or foundation – there are tests a church has to go through with the IRS to be classified as a church/religious organization. Just because meditation is part of a religion (my preacher teaches contemplative prayer) does not make the building a church or the owner a religious organization.  Recommend denial.

*Id.*

At the December Planning Commission Meeting, the Planning Commission, once again, entertained viewpoints from those in favor of Plaintiffs' Applications as well as those in opposition to them. (Doc. 93-34). Similar to the October meeting, there was discussion regarding both Plaintiffs' religious status as well as residents' concerns regarding the compatibility of the meditation center in the Eloong neighborhood. *Id.* Following extensive discussion, the Planning Commission moved to deny Plaintiffs' Applications. (Doc. 93-34, p. 44-47).

On December 3, 2015, the Planning Commission issued the Staff Report recommending denial of Plaintiffs' Applications. (Doc. 93-22). In relevant part, the Staff Report recommended denial because Plaintiffs' proposed use was not "approvable via the Planning Approval process," "multiple buildings cannot be allowed for unapproved use," and "legal counsel of the Planning Commission" determined Plaintiffs had not provided sufficient IRS documentation to be classified as a church or religious facility under the Zoning Ordinance. *Id.* at p. 12. However, Defendant informed Plaintiffs their Applications were denied based on compatibility, site access, and traffic increase. (Doc. 92-17, p. 2). Plaintiffs filed a Notice of Appeal to the City Council seeking reversal of the Planning Commission's denial. (Doc. 92-18).

The week before the City Council reviewed Plaintiffs' appeal, Esham composed an email to City Councilman C.J. Small ("Councilman Small") expressing her concerns about Plaintiffs' proposed construction. (Doc. 93-35). In her first email to Councilman Small, Esham expressed her concerns that the meditation

center would increase traffic and noise, which would "fundamentally change the nature and character of our residential neighborhood." *Id.* at p. 2. A second email to Councilman Small, however, touched on the religious nature of Plaintiffs' meditation center. (Doc. 93-36, p. 1). In defending her position regarding TMAA's compatibility within the neighborhood, Esham wrote that Nimit's "version of events that this is a religious issue" is "inaccurate and misguided." *Id.*

Another resident of the Eloong neighborhood also reached out to members of the City Council prior to the January appeal meeting. Resident Greg Marshall ("Marshall") wrote Councilman John Williams ("Councilman Williams") regarding a rumor that TMAA would be a "NUDE yoga center." (Doc. 93-53). Marshall expressed, "It's just not compatible with the neighborhood, and it's just a business flying under the veil of religious use exemptions." *Id.* Councilman Williams responded to the email, "You just saying nude makes me certain NO is the answer. CJ [Councilman Small] is with us here as well[.]" *Id.*

The City Council reviewed Plaintiffs' appeal on January 19, 2016. (Doc. 92-19). After extensive discussion regarding TMAA's compatibility with the Eloong neighborhood as well as dialogue regarding Plaintiffs' religious beliefs, the City Council upheld the Planning Commission's decision. *Id.* at p. 91. Plaintiffs' appeal failed by a vote of six to one, with one council member abstaining. *Id.*

Plaintiffs' motion for partial summary judgment asserts Defendant's application of the Zoning Ordinance burdened their religious exercise and

discriminated against them on the basis of religion. Defendant's motion for summary judgment attempts to rebut Plaintiffs' assertions on all claims.

### III. Standard of Review for Summary Judgment

Summary judgment should be granted only if "there is no issue as to any material fact and the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c) ("Rule 56"). The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its responsibility, the burden shifts to the nonmoving party to show the existence of a genuine issue of material fact. *Id.* "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Id.* (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) (footnote omitted)). "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determination of the truth of the matter. Instead, evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted). The mere existence, however, of any factual dispute will not necessarily compel denial of a motion for summary judgment; rather, only material factual disputes preclude

entry of summary judgment. *Lofton v. Sec'y of Dep't of Children and Family Servs.*, 358 F.3d 804, 809 (11th Cir. 2004).

The applicable Rule 56 standard is not affected by the filing of cross motions for summary judgment. *See Gerling Global Reinsurance Corp. of America v. Gallagher*, 267 F.3d 1228, 1233 (11th Cir. 2001). Indeed, the Eleventh Circuit has explained that "[c]ross-motions for summary judgment will not, in themselves, warrant the court in granting summary judgment unless one of the parties is entitled to judgment as a matter of law on facts that are not genuinely disputed." *United States v. Oakley*, 744 F.2d 1553, 1555 (11th Cir. 1984) (citations omitted). However, it is, also, true cross motions may be probative of the absence of a factual dispute where they reflect general agreement by the parties as to the dispositive legal theories and material facts. *Id*. at 1555-56.

## IV. Analysis

### A. Standing

Before addressing the parties' substantive claims, the Court must first determine whether TMAA has standing to bring this action.

"The question of standing 'involves both constitutional limitations on federal court jurisdiction and prudential limitations on its exercise.'" *Bennett v. Spear*, 520 U.S. 154, 162 (1997) (citations omitted). "To satisfy the 'case' or 'controversy' requirement of Article III standing, which is the 'irreducible constitutional minimum' of standing," the plaintiff must demonstrate three elements. *Id*. (citations omitted). "First, the plaintiff must have suffered an 'injury in fact' – an

invasion of a legally protected interest which is (a) concrete and particularized . . . and (b) 'actual or imminent, not conjectural or hypothetical.'" *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992) (internal citations and citations omitted). "Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court." *Id.* (citations omitted). "Third, it must be 'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision." *Id.* (citations omitted).[2]

First, Defendant argues TMAA has not suffered an actual injury because it was not an applicant on the Applications submitted to Defendant and the Planning Commission. (Doc. 90, p. 46). Defendant maintains TMAA does not have standing to bring this lawsuit because it had no legal interest in the Eloong property from the day the Applications were submitted through the day the Applications were denied. *Id.* TMAA did, however, gain a leasehold interest in the Eloong property prior to the filing of this lawsuit. (Doc. 92-29, p. 2).

Standing under Article III is determined at the time that the complaint is filed. *Dillard v. Chilton Cty. Comm'n*, 495 F.3d 1324, 1339 (11th Cir. 2007). In this case, at the time Plaintiffs filed their Complaint, TMAA had a leasehold interest in

---

[2] Defendant only briefs the standing issue with regard to Plaintiffs' Religious Land Use and Institutionalized Persons Act ("RLUIPA") claims, and thus, the Court addresses Plaintiffs' standing only as to those claims. Defendant does not contest Plaintiffs' standing to seek review of Plaintiffs' claims under the First Amendment, Fourteenth Amendment, Alabama Religious Freedom Amendment, or Negligent Misrepresentation.

the Eloong property. (*See* Doc. 1; Doc. 92-29). Additionally, TMAA was referred to as an interested party throughout the paperwork and proceedings before the Planning Commission and City Council, and Plaintiffs' Applications specifically requested using the property as a meditation center. (*See* Doc. 92-7). Defendant's assessment of TMAA's ability to bring suit is contrary to the purpose of the doctrine of standing: it "is not a technical rule intended to keep aggrieved parties out of court." 59 AM. JUR. 2D Parties § 29 (2018). All of the Plaintiffs in this case have a legally protected interest in the Eloong property, they were all injured by Defendant's denial of planning approval, and a favorable decision by this Court will redress their harm. Thus, TMAA has standing under Article III to bring suit against Defendant. Furthermore, based on the foregoing reasons, TMAA, also, meets the requirements of standing for purposes of the Religious Land Use and Institutionalized Persons Act ("RLUIPA").

## B. Religious Land Use and Institutionalized Persons Act ("RLUIPA")

Both parties seek summary judgment with respect to Plaintiffs' RLUIPA claims (Counts 1, 2, and 3). Plaintiffs argue Defendant's decision denying their Applications to construct a Buddhist meditation center violates RLUIPA and their free exercise of religion. The Complaint alleges Defendant violated RLUIPA in the following ways: (1) by imposing and implementing land use regulations in a way that substantially burdens religious exercise (Count 1); (2) by implementing a land use regulation that discriminates on the basis of religion (Count 2); and (3) by

applying the Zoning Ordinance in a way that treats Plaintiffs on less than equal terms with other religious and nonreligious assemblies (Count 3).

### 1. RLUIPA – Substantial Burden Provision (Count 1)

Congress enacted RLUIPA "'in order to provide a very broad protection for religious liberty.'" *Holt v. Hobbs*, 135 S. Ct. 853, 859 (2015) (citation omitted). RLUIPA concerns two areas of government activity: land use regulation—the provision at issue in this case—and religious exercise by institutionalized persons. 42 U.S.C. § 2000cc; 42 U.S.C. § 2000cc-1. The Court's analysis of Plaintiffs' substantial burden claim involves three considerations: (1) whether Plaintiffs have jurisdiction to bring a claim under RLUIPA; (2) whether Plaintiffs have established a prima facie case that Defendant imposed a substantial burden on their religious exercise; and (3) if Plaintiffs established a prima facie case, whether Defendant can justify the burden imposed by demonstrating a compelling interest achieved by the lease restrictive means. *See Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1225 (11th Cir. 2004).

### a. Jurisdiction is Appropriate Under RLUIPA

RLUIPA's land use regulation provision only applies . . . where one of three jurisdictional perquisites is met: (1) the land use regulation that allegedly imposes a substantial burden is implemented as part of a plan or activity that receives federal funding; (2) the substantial burden affects, or its removal would affect, interstate commerce; or (3) the substantial burden arises from the state or local government's procedures for making individualized assessments of proposed property use.

*Martin v. Houston*, 176 F. Supp. 3d 1286, 1295-96 (M.D. Ala. 2016) (citing 42 U.S.C. § 2000cc(a)(2)). Plaintiffs allege they were substantially burdened by Defendant's

actions, which "took place within a system of formal procedures that permitted the City Defendants to make individualized assessments for the uses for the property involved." (Doc. 1, p. 40 ¶¶ 273-74).

Jurisdiction in this case is appropriate under RLUIPA's "individualized assessment" test. Defendant regulates land use within its jurisdiction, in part, through its Zoning Ordinance. (Doc. 92-12, p. 6). The Zoning Ordinance states a "church or religious facility: including parish house, community house and educational buildings" is "allowed by right" in business districts but requires "Planning Approval" to locate in R-1 residential districts. (Doc. 92-12, p. 146). Planning Approval is a process by which Defendant determines "uses that may be appropriate in certain districts at certain locations, but not in all locations." (Doc. 93-3, p. 3 ¶¶ 20-23). "The review required for Planning Approval examines the applicant's location and site plan with regard to transportation, parking and access, public utilities and facilities, traffic congestion and hazard, and to determine if the proposal is in harmony with the orderly and appropriate development of the district." (Doc. 92-13, p. 5).

Defendant's assessment procedures for Planning Approval ultimately result in a case-by-case evaluation for the proposed activity for each church or religious facility. *Midrash*, 366 F.3d at 1225. The mere fact that the Zoning Ordinance distinguishes "uses allowed by right" from "uses requiring planning approval" is evidence that each proposed activity is individually assessed against an existing land use regulation. (*See* Doc. 92-12, p. 137). Defendant's officials "may use their

authority to individually evaluate and either approve or disapprove of churches [or religious facilities] in potentially discriminatory ways." *Midrash*, 366 F.3d at 1225. Thus, the Zoning Ordinance is essentially an "individualized assessment" for churches and religious facilities located in R-1 Districts.

### b. Defendant Has Not Imposed a Substantial Burden on Plaintiffs' Religious Exercise

In pertinent part, RLUIPA's "substantial burden" provision provides:

> No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution – (A) is in furtherance of a compelling governmental interest; and (B) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc(a)(1). The question of "substantial burden" is a "question of law for courts to decide." *Eternal World Television Network, Inc. v. Sec'y of U.S. Dept. of Health and Human Servs.*, 818 F.3d 1122, 1144 (11th Cir. 2016). Because the alleged burden in this case results from the application of the Zoning Ordinance, the Court must determine whether the Zoning Ordinance, or its implementation, involves "religious exercise."

Under RLUIPA, "the term 'religious exercise' includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). Additionally, "[t]he use, building, or conversion of real property for the purpose of religious exercise shall be considered to be religious exercise of the person or entity that uses or intends to use the property for that purpose." 42 U.S.C. § 2000cc-5(7)(A). "In passing RLUIPA, Congress recognized

that places of assembly are needed to facilitate religious practice, as well as the possibility that local governments may use zoning regulations to prevent religious groups from using land for such purposes." *Midrash*, 366 F.3d at 1226. Thus, the Court's initial inquiry into a substantial burden claim under RLUIPA is whether Plaintiffs are engaged in the exercise of religion.

Plaintiffs contend the proposed use for the Eloong property is "primarily as a residence, but it will also be used as a meditation center with meditation sessions approximately 3 times a week and an estimated attendance of about 25 people per session." (Doc. 92-9, p. 5). The meditation center's mission is "to help spread Dhammakaya meditation," (Doc. 92-30, p. 63 ¶¶ 5-6), which is "the biggest Buddhist sect in Thailand." (Doc. 92-30, p. 88 ¶¶ 18-19). Additionally, Plaintiffs propose constructing a cottage on the property for "visiting religious clergymen." (Doc. 92-9).

Defendant, however, contends Plaintiffs' meditation practice is not religious exercise. (*See, e.g.,* Doc. 100, p. 3 ¶ 5). In support of its argument, Defendant provides evidence of Nimit conveying, "[M]editation is not to be associated with any one particular race, culture, and religion," and TMAA "does not promote any religion." (Doc. 92-16, p. 7). Nimit, also, agrees:

> The great thing about meditation is that philosophy/religious belief is not important. Meditation is about consciousness. The beliefs of the mind become trivial. You dive deep into the heart of the matter to gain access to your soul – your inner reality. Therefore, meditation can be practiced by people of different religions or no religion at all.

(Doc. 101-2, pp. 6-7). Additionally, Defendant references individuals (specifically neighbors of the Eloong property) who dispute TMAA as a religious facility. (*See, e.g.,* Doc. 90, pp. 12-13; *see also* Doc. 93-33 (referencing an email from resident Esham to City Councilman C.J. Small in which Esham begins by stating, "In keeping you apprised of the Meditation Center's business activities . . . .")).

Plaintiffs assert they have described their meditation activity as "non-religious" because TMAA "is open to all and that following Buddhist teachings does not require rejection of the particular theistic concepts that are central to Judeo-Christian notions of what is meant by 'religion.'" (Doc. 94, p. 5).

The key language in RLUIPA's broad interpretation of religious exercise is Plaintiffs' exercise does not have to be "compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc-5(7)(A). It is clear that building a center with the alleged purpose of teaching Dhammakaya meditation falls squarely within RLUIPA's definition of "religious exercise." Accordingly, the Court's inquiry turns to whether or not Defendant has imposed a substantial burden upon Plaintiffs' free exercise of religion.

"[T]he plaintiff shall bear the burden of persuasion on whether the law (including a regulation) . . . substantially burdens the plaintiff's exercise of religion." 42 U.S.C. § 2000cc-2(b). The Supreme Court's line of Free Exercise cases has been instructive in defining the term "substantial burden" under RLUIPA. *See, e.g., Lyng v. Nw. Indian Cemetery Protective Ass'n.*, 485 U.S. 439, 350 (1988) (specifying no substantial burden exists where a regulation does not have "a tendency to coerce

individuals into acting contrary to their religious beliefs"); *Sherbert v. Verner*, 374 U.S. 398, 404 (1963) (determining a substantial burden existed where an individual was required to "choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion . . . on the other"); *but see Bowen v. Roy*, 476 U.S. 693, 707-08 (1986) (no substantial burden existed where government action simply interfered, but did not coerce, the individual's religious beliefs).

Based on the Supreme Court's combined articulations of substantial burdens under the Free Exercise Clause, the Eleventh Circuit has held "an individual's exercise of religion is 'substantially burdened' if a regulation completely prevents the individual from engaging in religiously mandated activity, or if the regulation requires participation in an activity prohibited by religion." *Midrash*, 366 F.3d at 1227 (citations omitted). Accordingly, a "'[s]ubstantial burden' requires something more than an incidental effect on religious exercise." *Id.* Such burdens "must place more than inconvenience on religious exercise; [it] is akin to significant pressure which directly coerces the religious adherent to conform his or her behavior accordingly." *Id.* "Thus, a substantial burden can result from pressure that tends to force adherents to forego religious precepts or from pressure that mandates religious conduct." *Id.* Though the Eleventh Circuit has held the question of substantial burden is a question of law for courts to decide, the Supreme Court's line of Free Exercise cases "has made clear that the substantial burden hurdle is high and that determining its existence is fact intensive." *Church of Scientology of*

*Ga., Inc. v. City of Sandy Springs, Ga.*, 843 F. Supp. 2d 1328, 1354-55 (N.D. Ga. 2013) (citations omitted).

In *Midrash*, the Eleventh Circuit focused on many key facts in concluding the Town of Surfside had not imposed a substantial burden on the plaintiff congregations. *Midrash*, 366 F.3d 1214. In *Midrash*, two Orthodox Jewish Congregations challenged the Town of Surfside's zoning ordinance because it excluded churches and synagogues from business districts. *Id.* at 1219. However, the zoning ordinance allowed clubs, lodges, theatres, and restaurants to operate in the business districts. *Id.* at 1220. Churches and synagogues were permitted in residential districts, once they obtained a conditional use permit from the Surfside Town Commission. *Id.* at 1219. Because Orthodox Judaism forbade the Congregations to use cars or other transportation during the weekly Sabbath and religious holidays, the Congregations preferred to gather for worship in districts closest to their homes. *Id.* at 1221. The majority of the members, especially elderly members, resided near business districts. *Id.* Additionally, members of both Congregations argued suitable land was not available in residential districts. *Id.* Thus, the Congregations contended requiring them to locate in a residential district substantially burdened their religious exercise. *Id.* at 1228.

The Eleventh Circuit held the Town of Surfside's zoning ordinance did not violate the Substantial Burden provision of RLUIPA. *Id.* at 1228. The Court, first, found the Congregations' inability to find suitable alternative space did not create a substantial burden. *Id.* at 1227 n.11 (citation omitted) ("The harsh reality of the

marketplace sometimes dictates that certain facilities are not available to those who desire them."). Next, the Court found requiring the Congregations to apply for a conditional use permit did not impose a substantial burden because it allowed "the zoning commission to consider factors such as size, congruity with existing uses, and availability of parking." *Id.* (citation omitted). The Court explained, "We have found that such reasonable 'run of the mill' zoning considerations do not constitute substantial burdens on religious exercise." *Id.* The Court, also, concluded requiring the Congregations to relocate, which forced its members to walk a few additional blocks, did not create a substantial burden. *Id.* at 1228. Ultimately, the most significant facts the Court noted were the Congregations' failure to claim the religious significance of the particular site, the Congregations' ability to apply for a permit to operate a few blocks away from its current location, and the Town of Surfside would find it virtually impossible to ensure no individual would be burdened by walking to their temple of choice. *Id.*

Plaintiffs argue they have been pressured into foregoing their religious precepts because Defendant is denying them an adequate location for their Buddhist meditation practices as well as other religious exercise. (Doc. 94, pp. 32-41). Plaintiffs contend:

> The current location is so noisy that sirens, other road noise, and noise from passersby can be heard in the mediation room and interrupts the concentration of those attempting to meditate. The Center cannot host monks because there is not sufficient space for them, given their particular religious needs, which limits their religious practices. The current location has also posed safety concerns, as the donation box has been stolen twice, and attendees have had their cars broken into.

26

(Doc. 94, p. 33). Plaintiffs, also, note churches and religious facilities are only "permitted by right" in business districts, which create the same issues as their current location. (Doc. 106, p. 15). Unlike the congregations in *Midrash*, Plaintiffs claim the Eloong property has religious significance because they "need a quiet, serene environment" to practice meditation. (Doc. 94, p. 37). Additionally, Plaintiffs contend an alternate location is unavailable because the 106-acre donated property is not a "ready alternative," according to their land development professional. (Doc. 106, p. 16). Moreover, because the donated property is, also, zoned in an R-1 district and surrounded by residential uses, Plaintiffs argue they "need not waste further resources attempting to use an inadequate property which will likely be denied, and where there will again be a substantial likelihood of neighborhood opposition, even if there is some remote possibility of being approved." (Doc. 106, p. 17). Furthermore, in 2007, Defendant took issue with the Center's location on a major road but now suggests the Center would not be suitable on a minor road. (Doc. 94, p. 38). "The City's actions have 'to a significantly great extent lessened the prospect of [Plaintiffs] being able to construct a [meditation center] in the future . . . .'" (Doc. 94, p. 38).

Defendant, however, asserts it has not exerted pressure that has forced Plaintiffs to forego their religious precepts. (Doc. 90, p. 27). It contends complaints of outside noise distracting members "are insufficient to constitute a Substantial Burden as such distraction cannot be said to violate Plaintiffs' religious precepts." (Doc. 104, p. 7). Additionally, Defendant asserts lack of housing for visiting monks

does not rise to such a level because "there is no pressure on Plaintiffs to violate religious precepts and, as shown by their deposition testimony, Plaintiffs own several different homes in the city which could serve such housing needs." (Doc. 104, p. 7). Defendant, also, contests Plaintiffs' assertion of inadequate space: "Plaintiffs practice meditation in such a location at 3821 Airport Boulevard which consists of roughly 2,200 square feet – nearly the same size as the 2,400 square foot meditation center building proposed for the Eloong property," (Doc. 90, p. 28). Defendant argues Plaintiffs continue practicing meditation in the same manner they were practicing before they submitted their Applications for the Eloong property. (Doc. 90, p. 28). Defendant, also, notes Plaintiffs hold meditation events at their current location and at other locations within the City of Mobile. (Doc. 90, p. 28). Furthermore, Defendant argues denying Plaintiffs' application to locate on a major road in 2007 and a minor road in 2015 "shows uniform reluctance to grant planning approval to non-residential uses in an established, single-family neighborhood." (Doc. 104, p. 9).

While Plaintiffs have presented substantial arguments detailing the inadequacies of their current location against the suitability of the Eloong property, the Court is not merely concerned in comparing the shortfalls of one property to the sufficiency of the other. The Court must determine whether Defendant's application of the Zoning Ordinance has imposed significant pressure that has required Plaintiffs to forego their religious beliefs.

Unlike the Plaintiff Congregations in *Midrash*, Plaintiffs argue the Eloong property has religious significance. However, the Eleventh Circuit explained the religious significance of the property must be "such that their faith requires a [center] at *this particular* site." *Midrash*, 366 F.3d at 1228. Plaintiffs have failed to demonstrate this. Plaintiffs allege their religious exercise requires them to locate in a quiet and serene area. Such qualities, however, are also attributable to various properties, especially those located in residential areas. Because Plaintiffs' religious significance argument is intertwined with overly common general characteristics of land, they must present evidence of land use characteristics specifically unique to *this particular* site. For instance, Plaintiffs do not argue they are unable to locate on the 106-acre donated property because it does not possess religiously significant qualities of serenity and quietness. They simply argue it is not a ready alternative. Thus, Plaintiffs' religion could require them to locate at either site. Similarly, Plaintiffs' reasoning for the religious significance of the Eloong property may, also, be used to claim religious significance of other properties, especially those in R-1 districts. Accordingly, Plaintiffs' ability to flexibly argue such a requirement is not proof that their religion *requires* them to locate at *this particular* site. While RLUIPA offers broad protection to religious exercise, it does not entitle Plaintiffs to establish a meditation center anywhere they want.

Plaintiffs, also, argue they lack sufficient space to host monks at their current location. (Doc. 94, p. 34). They assert monks live by a strict code of

conduct, so they cannot share a room with non-monks or be housed in the same building as women. (Doc. 93-75 ¶¶ 44; 65). Because there is not adequate space at TMAA's current location for separate housing, Plaintiffs argue they are unable to host traveling monks for their overnight retreats or keep resident monks for meditation classes. (Doc. 93-73 ¶ 16). Defendant, however, maintains Plaintiffs own several single-family homes within the City of Mobile that could provide housing for the monks. (Doc. 100, p. 45). Yet, Plaintiffs contend requiring participants to leave the retreats breaks the meditative atmosphere, further inhibiting their religious exercise. (Doc. 93-73 ¶ 15).

Though Defendant does not attempt to respond to the fact that breaking the meditative atmosphere of retreats inhibits Plaintiffs' religious exercise, the Court, nevertheless, finds Plaintiffs' inability to host monks does not amount to a substantial burden. While TMAA holds meditation classes multiple times a week, overnight retreats are occasional, two to three times a year. (Doc. 92-30, p. 11 ¶¶ 15-22). Accordingly, TMAA refers to retreats as "special activities" that "feature experienced instructors and discourses on Buddhism." (Doc. 93-78, p. 4). While the Court rejects Defendant's "anywhere but here" argument regarding Plaintiffs' ability to house monks in a different location, it is, nevertheless, evident Plaintiffs' inability to host monks is, at most, an inconvenience.

Plaintiffs, also, assert the current location has presented safety issues. (Doc. 94, p. 34). While sympathetic to Plaintiffs' concerns, safety is not a matter that

implicates religious exercise.  In sum, Plaintiffs' arguments are not consistent with the Supreme Court and Eleventh Circuit precedent previously discussed.

In addition to Eleventh Circuit precedent, Plaintiffs present persuasive authority from other Circuits' interpretation of the Substantial Burden provision. (Doc. 94, p. 35).  The Fourth Circuit has concluded, "When a religious organization buys property reasonably expecting to build a church, governmental action impeding the building of that church may impose a substantial burden."  *Bethel World Outreach Ministries v. Montgomery Cnty. Council*, 706 F.3d 548, 557 (4th Cir. 2013).  Plaintiffs argue a strong comparison can be made between the facts of this case to the facts of the *Bethel* case.  (Doc. 98, p. 14).

In *Bethel*, a large religious institution, Bethel World Outreach Ministries, held multiple worship services at two different locations.  706 F.3d at 552.  The church sought to build a new location because the size of their current facilities restricted the lengths of their services, which did not allow Communion to be held until after the services; limited their ability to have "Alter Calls," which allowed attendees to dedicate their lives to Christ, join the church, or make prayer requests; caused the church to face overcrowding, which sometimes prevented worshippers from entering; and lacked the facilities to host other religious, educational, and counseling programs.  *Bethel*, 706 F.3d at 552.  To alleviate their problems, the church applied to construct an 800-seat church on a 119-acre agricultural reserve. *Id.* at 553-54.  The county denied the application, noting "[t]here were no guarantees that Bethel would get all the necessary approvals to build what it

wanted." *Id.* at 558. However, the county did not contest the fact that other churches were permitted in the same zone where Bethel's proposed property was located. *Id.* The Fourth Circuit concluded a reasonable fact finder could find the county's actions imposed a substantial burden on the church's exercise. *Id.* The court, also, found it significant the county completely prevented the Plaintiffs from constructing any church on the property, rather than imposing limitations on the property. *Id.*

Plaintiffs contend, similar to *Bethel*, they reasonably expected to use the Eloong property because: (1) the Zoning Ordinance encourages religious uses in R-1 districts; (2) the property could easily accommodate their use; and (3) there were no land use impacts that would justify denial. (Doc. 94, p. 36). However, Defendant argues, "Nimit also knew from her past experience that such approval was not assured, having been recommended for denial the last time she sought planning approval to convert a single-family home in a neighborhood to a meditation center." (Doc. 100, p. 48).

This Court is cautious to concur with Plaintiffs' reasoning under their "reasonable expectation" argument. Under their line of reasoning, concluding Defendant imposed a substantial burden would be to essentially grant an automatic exemption to religious organizations from discretionary land use regulations. A fundamental role of local governments in zoning matters is to evaluate whether a religious organization's use can be accommodated in the area in which it seeks to locate. To strip a municipality of that determinative power would be to usurp a

central function of local government and, in effect, impermissibly favors religious uses over secular uses. RLUIPA should not be interpreted in a way that undermines the legitimate responsibility of local governments in implementing land use regulations. Thus, the Court does not agree with Plaintiffs' "reasonable expectation" argument.

Additionally, Plaintiffs argue, based on the Ninth Circuit's line of reasoning, "(1) that [Defendant's] broad reasons given for its tandem denials could easily apply to all future applications by [Plaintiffs]; and (2) that [Plaintiffs] readily agreed to every mitigation measure suggested by the Planning Division . . . ." (Doc. 94, p. 37 (citing *Guru Nanak Sick Soc'y of Yuba City v. County of Sutter*, 456 F.3d 978, 989 (9th Cir. 2006)).

Defendant contends the facts of *Guru Nanak* are distinguishable from this case. (Doc. 100, p. 49). In *Guru Nanak*, a Sikh non-profit organization was denied a conditional use permit ("CUP") to construct a temple in a residential area. *Guru Nanak*, 456 F.3d 978. "The denial was based on citizens' voiced fears that the resulting noise and traffic would interfere with the existing neighborhood." *Id.* at 982. One year later, the organization was again denied a CUP to construct a temple in a large, agricultural district. *Id.* at 983-84. The Ninth Circuit determined the Planning Division had imposed a substantial burden because "[t]he net effect of the County's two denials . . . is to shrink the large amount of land theoretically available to Guru Nanak." *Id.* at 991-92.

Defendant differentiates this case based on the following facts: (1) Plaintiffs' Applications for planning approval were submitted eight years apart for two separate properties (Airport Boulevard in 2007 and the Eloong property in 2015); (2) both of the properties in this case were zoned R-1; (3) both of the properties were historically used as single-family residences; (4) both of the properties are in the middle of established single-family residential neighborhoods; and (5) both applications attempted to convert the properties to the assembly-type use of a meditation center. (Doc. 100, p. 49). Moreover, Defendant contends it has never discouraged Plaintiffs' practices at their current, established location. (Doc. 100, p. 49).

Before Plaintiffs moved to their current location, they provided meditation services at a home on Airport Boulevard. (Doc. 94, p. 6). Because Plaintiffs used signage to advertise their meditation services at the home, Defendant issued a notice of violation on August 30, 2007, ordering Plaintiffs to take the sign down within ten days or apply for planning approval. (Doc. 93-10, pp. 1-2). Plaintiffs removed the sign and subsequently applied for Planning Approval on September 14, 2007. (Doc. 93-12). On November 1, 2007, the Planning Commission recommended denial of Plaintiffs' application because the proposed use and modifications could preclude future single-family residential use to the site, and set the stage for future zoning and variance requests, and Plaintiffs' site plan did not reflect compliance with parking surface and maneuvering requirements, tree and landscaping requirements, and buffering requirements. (Doc. 93-13, p. 3). While the Staff

Report noted Plaintiffs would likely be a relatively "quiet" neighbor, the report stated parking improvements and building code improvements made TMAA's compatibility less favorable. *Id.* at p. 3. Furthermore, Plaintiffs' initial application was met with community opposition, including complaints about increased traffic and child safety. (*See* Doc. 93-14). Predictably, Plaintiffs moved TMAA to its current location in a shopping center on Airport Boulevard.

Plaintiffs, now, attempt to relocate TMAA to a different residential district. However, Defendant's considerations and stated reasons for denying Plaintiffs' first application should have implied to Plaintiffs there was a possibility those same concerns would arise in their applications for the Eloong property. Plaintiffs should have been on notice compatibility would be an issue, especially since their proposed site on the Eloong property is much larger than its initial location on Airport Boulevard and their proposed construction for their Applications is on a much larger scale than the proposal on their first application. Accordingly, Plaintiffs should have known proposed parking improvements and building code improvements, especially those on a larger scale, may be unfavorable in the same zoning district for which TMAA was first deemed incompatible.

Moreover, unlike the plaintiffs in *Guru Nanak*, Plaintiffs have not been denied the opportunity to locate in distinctly separate districts. In order for Plaintiffs to make a comparable case to *Guru Nanak*, Defendant would have had to deny their initial location in an R-1 district and subsequently deny their attempt to relocate in a differently zoned area (i.e. a business district). *See* 456 F.3d at 989-90

("The County's stated reasons for denying Guru Nanak's first application implied to Guru Nanak that it should not attempt to locate in higher density districts (two-family residence, neighborhood apartment, general apartment, and the combining district) where nearby neighbors would be similarly bothered. Accordingly, Guru Nanak proposed a smaller temple, with the same seventy-five person capacity, on a much larger parcel of agricultural land.").

In light of the aforementioned standards and based on the facts presented by both parties, as a matter of law, the Court cannot conclude Plaintiffs have been substantially burdened by Defendant's denial of their Applications. Plaintiffs present persuasive authority from numerous Circuits, but the binding Eleventh Circuit's standard is whether Defendant has imposed pressure so significant as to require Plaintiffs to forego their religious beliefs. *Midrash*, 366 F.3d at 1227. While Plaintiffs' current location on Airport Boulevard may be less than ideal, Plaintiffs have not met the standard set in place by this Circuit.

This Court is not insensitive to Plaintiffs' concerns that Defendant may use technicalities in the Zoning Ordinance to reject applications it deems unwanted. It is undeniable the Zoning Ordinance makes it more difficult for Plaintiffs to operate its meditation center on the property of its choice. However, the fact that a local regulation limits the geographical options of churches and religious facilities does not prove Plaintiffs have been substantially burdened in their religious exercise. *See Midrash*, 366 F.3d at 1227 n.11. The inconveniences imposed on Plaintiffs do not preclude them from ultimately fulfilling their religious mission through

meditation as a whole or through its other various activities. Accordingly, Plaintiffs have failed to establish a prima facie case under RLUIPA's Substantial Burden provision. Therefore, this Court is not required to reach the question of whether Defendant can justify the burden created by articulating a compelling governmental interest.

## 2. RLUIPA – Nondiscrimination (Count 2)

In Count 2, Plaintiffs allege Defendant's application of the Zoning Ordinance violated their rights under RLUIPA's Nondiscrimination provision. Both parties seek summary judgment with respect to this claim.

RLUIPA's nondiscrimination provision provides, "No government shall impose or implement a land use regulation that discriminates against any assembly or institution on the basis of religion or religious denomination." 42 U.S.C. § 2000cc(b)(2). The Substantial Burden and Nondiscrimination provisions are "operatively independent of one another." *Midrash*, 366 F.3d at 1229 (citation omitted). First, the Nondiscrimination provision "does not require the plaintiff to meet a threshold jurisdictional test similar to that articulated in" the substantial burden analysis. *Id.* Additionally, unlike the substantial burden inquiry, a municipality will be "strictly liable for its violation" under the Nondiscrimination provision. *Id.* Thus, a "discriminatory land use regulation [is] per se unlawful without regard to any justifications supplied by the zoning authority." *Id.*

The Supreme Court's decision in *Village of Arlington Heights v. Metropolitan Housing Development Corporation* ("*Arlington Heights*"), which dealt with

protected-class discrimination, is also applicable to discrimination cases, such as this one, involving land use decisions. *See* 429 U.S. 252 (1977). Under *Arlington Heights*, courts perform "a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id*. at 266. *Arlington Heights* provided a list of relevant factors tending to show discrimination, including whether the official action "'bears more heavily on one [religion] than another;'" *id*. (citation omitted), the historical background of the decision, "particularly if it reveals a series of official actions taken for invidious purposes;" *id*. (citation omitted), "the specific sequence of events leading up [to] the challenged decision;" *id*. at 267 (citation omitted), "departures from the normal procedural sequence;" *id.*, "substantive departures . . . if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached;" *id*. (footnote omitted), and "the legislative or administrative history . . . especially where there are contemporary statements by members of the decision-making body, minutes of its meetings, or reports," *id*. at 268. The Eleventh Circuit has, also, found the "relevant evidentiary factors include substantial disparate impact, a history of discriminatory official actions, procedural and substantive departures from the norms generally followed by the decision-maker, and the legislative and administrative history of the decision." *Burton v. City of Belle Glade*, 178 F.3d 1175, 1189 (11th Cir. 1999) (citation omitted).

As a preliminary matter, the "relevant 'natural perimeter' for consideration with respect to RLUIPA's [nondiscrimination provision] is the category of 'assemblies and institutions.'" *Midrash*, 366 F.3d at 1230. Defendant argues the

Nimit Plaintiffs are not "assemblies or institutions." (Doc. 104, p. 12). RLUIPA does not define either term, and, thus, they are construed in accordance with their ordinary and natural meanings. *Midrash*, 366 F.3d at 1230. As explained in *Midrash*:

> An "assembly" is a "company of persons collected together in one place [usually] and usually for some common purpose (as deliberation and legislation, worship, or social entertainment)," WEBSTER'S 3D NEW INT'L UNABRIDGED DICTIONARY 131 (1993); or "[a] group of persons organized and united for some common purpose." BLACK'S LAW DICTIONARY 111 (7th ed. 1999). An institution is "an established society or corporation: an establishment or foundation esp. of a public character," WEBSTER'S 3D NEW INT'L UNABRIDGED DICTIONARY 1171 (1993); or "[a]n established organization, esp. one of a public character . . . ." BLACK'S LAW DICTIONARY 801 (7th ed. 1999).

*Midrash*, 366 F.3d at 1230.

The Nimit Plaintiffs practice Buddhist meditation at TMAA, and each individual assists in the daily operations of the center. (Doc. 92-16, p. 6-7). Additionally, each of the Nimit Plaintiffs co-owns a portion of the Eloong property where TMAA wishes to locate. (*See, e.g.,* Doc. 93-73 ¶ 35). Furthermore, TMAA is affiliated with the Dhammakaya school of Buddhism, the most predominant religion of Southeast Asia. (Doc. 93-74 ¶ 4). Thus, the Plaintiffs fall within the confines of "assemblies or institutions" because they are a company of persons collected together to practice meditation, and they are members of an established organization. The Court's inquiry, thus, turns to whether Defendant's denial of Plaintiffs' Applications was on the basis of religion.

Defendant's primary assertion is their Planning Approval decision was based on the poor compatibility of Plaintiffs' proposed meditation complex within a single-family neighborhood, not bias towards Plaintiffs' religion or practice of meditation. (Doc. 90, p. 3).  While this argument supports the level of discretion Defendant claims to possess, Defendant's evaluation of Plaintiffs' Applications is riddled with inclinations of discrimination.  (*See, e.g.,* Doc. 92-19, p. 44 ¶¶ 9-14) ("[I]n summary, even if this was a religious facility and they're threatening us now according to the deal with this federal religious land act, the Planning Commission still has the right and the obligation to review for planning approval to see if it is harmonious.").

Defendant asserts the questioning of Plaintiffs' religious status stemmed from advertisements that indicated TMAA held itself out to be "non-religious." (Doc. 90, p. 2).  Yet, at the City Council meeting that was held on January 19, 2016, supporters of TMAA, including Nimit, explained why TMAA is considered "non-religious," despite its affiliation with the Dhammakaya school of Buddhism.  (*See* Doc. 92-19).  For instance, one TMAA attendee, Kent Welsh, stated, "The meditation [center] has elicited itself on Facebook and other social media as non-religious in order to indicate that one does not have to be Buddhist in order to come learn meditation."  (Doc. 92-19, p. 18 ¶¶ 6-9).  Another attendee, Wilburn Jones, stated TMAA is open to "people of various religious faiths," noting that he practices meditation even though he is of Roman Catholic faith.  *Id.* at p. 22 ¶¶ 9-16.  Even one of the City Council members, Bess Rich, commented on Defendant's questioning of Plaintiffs' religious status:  "But we have religious facilities all over R-1s that get

expanded. I've sat on many applications and listened to them . . . . It just seems to me there's a double standard here because the incorporation papers clearly state it was for religious purpose." *Id.* at p. 47 ¶¶ 3-9. Despite hearing this testimony, as well as similar testimony at the December 2015 meeting, (*see* Doc. 92-15), Defendant decided Plaintiffs did not deserve to be classified as a church or religious facility because they did not pass certain "tests" with the IRS. (Doc. 93-22, p. 12).

The record, also, reveals other contemporary statements made at the January 2016 City Council meeting that suggest discrimination towards Plaintiffs' religion:

> Doug Anderson (City of Mobile Planning Department Attorney): As discussed in pre-council this morning and I think it was Councilman Small said this is apples and oranges. This is not a religious facility. The application was Meditation Center of Alabama or whatever. This is not the Baptist Church or the Episcopal Church. There were questions raised whether or not they actually qualified for that particular chart of permitted uses. That's why the issue came up.

(Doc. 92-19, pp. 47-48).

> Bess Rich (Councilwoman): Again, traffic safety, drainage, parking on a very small footprint were arguments that opponents to the mosque's expansion raised were trumped by the threat of a religious discrimination suit. I can only draw a similar parallel to the meditation center site. The meditation center application has stated that it will be used as a religious site. The road, drainage and utility access to this meditation site may be valid concerns similar to the parking and traffic concerns of the mosque site, but the Planning Commission and this council established a precedent by not considering zoning as a criteria to approve the application of the mosque. The fear of a religious discrimination and the threat of a Justice Department lawsuit were the sole reasons the mosque expansion was approved. How can the City allow one religion and expansion and stop another religion?

(Doc. 92-19, pp. 73-74).

Bess Rich:  I don't know where to begin with what tax papers. I don't believe the mosque was asked to present their tax papers or any other religious facility that I've witnessed expansion planning approval was ever asked.  So it is a different treatment that is being presented, different benchmarks, and at all times we should be as fair and even-handed as possible.

(Doc. 92-19, p. 92 ¶¶ 13-20).

John Lawler (Plaintiffs' Attorney representing their Applications): They may have said traffic but that is an effort to shield or cover the real reasons that they're opposed to it.  That's what they're doing.  I mean, ask yourself, you've seen many cases come before you where traffic was (inaudible) problem, much worse that this and it was worked out.  This facility is okay in this district.

(Doc. 92-19, p. 66 ¶¶ 16-22).

John Lawler:  And we all know – I think we all know in our heart of hearts if this was the little church up on Riverside that had decided to build a little retreat for prayer, we wouldn't be here today.

(Doc. 92-19, p. 70 ¶¶ 9-13).

Furthermore, the specific sequence of events leading up to the challenged decision include various emails that tend to reveal a series of official actions taken for invidious purposes.  For instance, a November 23, 2015, email from Anderson to Hoffman read:

I do not think it is [religious].  This shows the IRS has given it tax exempt status as a charity or foundation – there are tests a church has to go through with the IRS to be classified as a church/religious organization.  Just because meditation is part of a religion (my preacher teaches contemplative prayer) does not make the building a church or the owner a religious organization.  Recommend denial.

(Doc. 93-45, p. 1).

Another email exchange between Deputy Director of Planning, Richard Olsen, and Anderson and Hoffman conveyed the following:

Since there was discussion about regardless of determination of religious facility or not, and comparing to the Community center, recreation center: including social services, activity centers, outreach programs use, do we need to change the reasons for denial? Maybe something like below since those were the points made by the opposition that led to the decision – even though there was not really any PC discussion? Or, just leave it like it was on the agenda? Or combine the two?

(Doc. 93-49).

Deposition testimony, also, revealed Defendant may have substantially departed from its normal sequence of procedure. For example, Hoffman conveyed the following:

Q: Okay. Do you know of anyone else in the City government that's questioned whether a use is a church or religious facility?

A: Not to my knowledge.

Q: How does the planning staff determine whether an activity constitutes religious worship?

A: It's primarily based on the application, on the applicant's statement.

Q: You said primarily. Is there any secondary consideration?

A: I don't really think that there would be. You know, the only information we'll have available is that being provided by the applicant.

(Doc. 93-5, p. 16).

As discussed, *supra*, the information provided by the applicants in this case stated the Eloong property would be used as a religious site. (Doc. 92-19, pp. 73-74).

Plaintiffs, also, assert Defendant normally works with applicants to mitigate impacts and allow approval, but such was not the case with their application. (Doc.

94, pp. 49-50). Defendant admits it "usually attempts to work with applicants, religious and non-religious" and may impose "conditions on expansions of a non-residential use in a residential neighborhood [including] limiting hours of operation and access, requiring road improvements, buffering, and building scale." (Doc. 100, p. 24 ¶ 43). However, Defendant asserts it would have imposed conditions only if the Planning Commission felt the use was appropriate for the location. *Id.*, p. 27 ¶ 46.

Further, Plaintiffs argue Defendant has approved many Christian churches and other uses even where there had been community opposition, the use was not necessarily in harmony with the residential area, there were land use impacts and traffic issues, and the use was out of scale with the surrounding homes. (Doc. 94, p. 50). Defendant argues, however, Plaintiffs' proposed site is not similarly situated to the various church uses that have been approved with planning approval in the R-1 Districts. (*See* Doc. 100, pp. 25-35).

By Defendant arguing its application of the Zoning Ordinance is legitimate, it analyzes Plaintiffs' proffered comparators, which consists of other churches located in R-1 Districts. *See id.* Notably, Defendant contends some of the comparator churches' applications were approved because the existing structure was located on a small parcel of land, had previously been used as a church, and no proposal for constructing new buildings was presented. (Doc. 100, p. 27 ¶ 47) (referring to New Home Baptist Church's 2002 application). Moreover, Defendant asserts other churches were approved in the midst of community opposition, which "pales in

comparison" to the opposition of Plaintiffs' proposed center.  *Id.*, p. 25 ¶ 45 (referring to opposition received by Port City Church of Christ's 2005 parking lot expansion and Ashland Place UMC's amended planning approval application where each church received community opposition from only two people).

The record, also, reveals contemporary statements rebutting Plaintiffs' assertion of discrimination:

> Richard Olsen (Deputy Director of Planning):  The recommendation for denial was largely based on the insufficient access.  The Eloong Drive is, as Mr. Small stated, 16 feet.  It's recently, within the last two years, paved by not a city standard paving.  It's not in real good condition.  We would not recommend approval – planning [approval] for any type of facility in or on this property.

(Doc. 92-12, p 85).

> Dwayne Graham (Attorney for Various Landowners in Opposition):  I can tell you that my owners are not afraid of anything and they don't misunderstand anything.  They are angry about one thing and that is these false allegations of being religiously prejudiced that have been published against my people in the media and have been fostered by some people in support of this.  They are angry about that because that is totally utterly false.  Religion has never had anything to do with the basis of my clients and the neighborhood's opposition.  We have nothing against Buddhists.  We have nothing against meditation.  Meditation sounds like it's perfectly fine although I would comment that this project has certainly not brought peace and tranquility to this neighborhood.

(Doc. 92-19, pp. 50-51).

> Clark Kelly (Resident of Eloong Drive):  So, you know, we would oppose this project regardless whether it were religious in nature, secular in nature, if it were a corporate retreat center or a Girl Scout camp.

(Doc. 92-19, p. 54).

The Court recognizes the parties' competing evidence includes statements and actions taken by citizens and subordinate public officials whose liability might not ordinarily attach to a municipality. However, municipalities may be held liable "on the basis of ratification when a subordinate public official makes an unconstitutional decision and when that decision is then adopted by someone who does have final policymaking authority." *Matthews v. Columbia Cty.*, 294 F.3d 1294, 1297 (11th Cir. 2002) (citation omitted). Moreover, "'[i]f . . . a zoning board's response to political pressure amounts to implementation of local residents' discriminatory impulses, then the board's actions may give rise to a cause of action for intentional discrimination.'" *Jackson v. City of Auburn*, 41 F. Supp. 2d 1300, 1311 (M.D. Ala. 1990) (alteration in original) (citation omitted); *see also Hallmark Developers, Inc. v. Fulton Cty., Ga.*, 466 F.3d 1276, 1284 (2006) ("[A] plaintiff may demonstrate intentional discrimination if the 'decision-making body acted for the sole purpose of effectuating the desires of private citizens . . . and [the] members of the decision-making body were aware of the motivations of private citizens.'") (citation omitted)).[3] Thus, in light of the aforementioned standards, Defendant may be held liable for discriminating against Plaintiffs on the basis of their religion.

In light of the parties' competing motions for summary judgment, the record evidence has created a triable issue of fact on whether Defendant has acted with discriminatory purpose in denying Plaintiffs' Applications. A reasonable fact finder could find contemporary statements made by the Planning Commission's Attorney,

_____

[3] In light of these findings, it is unnecessary to address Defendant's arguments under Count 4 (Free Exercise Clause) and Count 5 (Equal Protection Clause) that Plaintiffs are unable to show municipal liability under 42 U.S.C. § 1983.

the City of Mobile's Deputy Director of Planning, or City Council members reflect a course of discriminatory conduct on the part of Defendant. Alternatively, a reasonable fact finder may conclude Defendant presented legitimate, non-discriminatory land use and policy reasons for its decision. At this stage of the litigation, it is not the Court's function to weigh the evidence. *Tipton*, 965 F.2d at 999. Accordingly, the parties' motions for summary judgment on Count 2 are denied.

### 3. RLUIPA – Equal Terms (Count 3)

In Count 3, Plaintiffs allege Defendant's application of the Zoning Ordinance violated their rights under RLUIPA's Equal Terms provision. Both parties seek summary judgment with respect to this claim.

RLUIPA's Equal Terms provision provides, "No government shall impose or implement a land use regulation in a manner that treats a religious assembly or institution on less than equal terms with a nonreligious assembly or institution." 42 U.S.C. § 2000cc(b)(1). "Under the statute, the plaintiff bears the initial burden of 'produc[ing] prima facie evidence to support a claim alleging a[n Equal Terms] violation.'" *Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward Cty.*, 450 F.3d 1295, 1308 (11th Cir. 2006) (quoting 42 U.S.C. § 2000cc-2(b)) (alterations in original). "If the plaintiff meets its initial burden, 'the government . . . bear[s] the burden of persuasion on any element of the claim.'" *Id.* (citing 42 U.S.C. § 2000cc-2(b)) (alterations in original). A defendant's violation of the Equal Terms provision may be upheld if it "establishes that the conduct employs a *narrowly* tailored means

of achieving a *compelling* government interest," i.e., strict scrutiny.  *Id.* (citing *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532 (1993)) (emphasis in original).

The Equal Terms provision may be violated by: "(1) a statute that facially differentiates between religious and nonreligious assemblies or institutions; (2) a facially neutral statute that is nevertheless 'gerrymandered' to place a burden solely on religious institutions; or (3) a truly neutral statute that is selectively enforced against religious, as opposed to nonreligious, assemblies or institutions." *Primera Iglesia*, 450 F.3d at 1308.  Plaintiffs argue Defendant has violated the third Equal Terms provision, discriminatory application of a facially neutral, generally applicable statute.  (Doc. 98, p. 32).

 "A plaintiff bringing an as-applied Equal Terms challenge must present evidence that a similarly situated nonreligious comparator received differential treatment under the challenged regulation." *Primera Iglesia*, 450 F.3d at 1311.  "If a plaintiff offers no similarly situated comparator, then there can be no cognizable evidence of less than equal treatment, and the plaintiff has failed to meet its initial burden of proof."  *Id.* (citing 42 U.S.C. § 2000cc-2(b)).  "In order for comparator properties to be considered similarly situated, a plaintiff must make a specific showing that the two properties are 'prima facie identical in all relevant aspects.'" *Scopellitti v. City of Tampa*, 677 F. App'x 503, 508 (11th Cir. 2017) (quoting *Campbell v. Rainbow City, Ala.,* 434 F.3d 1306, 1315 (11th Cir. 2006)).  The Eleventh Circuit has emphasized that "plaintiffs are not permitted simply to 'rely

on broad generalities in identifying a comparator.'" *Leib v. Hillsborough Cty. Transp. Comm'n*, 558 F.3d 1301, 1307 (11th Cir. 2009) (citing *Griffin Indus. v. Irvin*, 496 F.3d 1189, 1204 (11th Cir. 2007)). An equal terms inquiry requires a thorough review of the record, examining the evidence considered by Defendant when it denied Plaintiffs' Applications. *See Konikov v. Orange Cty., Fla.*, 410 F.3d 1317, 1327 (11th Cir. 2005).

In this case, the parties disagree whether TMAA is similarly situated with the Alba Fishing and Hunting Club ("the Club"). (Doc. 94, p. 24). The parties' arguments with respect to the "similarly situated" requirement have different focuses. Because these are competing motions for summary judgment, the Court necessarily applies the appropriate assumptions to each side of the contest. Ultimately, no genuine issue of material fact exists, and summary judgment is appropriate for Defendant on the similarly situated question.

The Alba Fishing and Hunting Club is located on Dog River at 2530 River Forest Road, approximately two miles away from the Eloong property. (Doc. 97-11, p. 1; Doc. 93-3, p. 51). It has been associated with the location since 1921, before the area was incorporated into the City of Mobile. (Doc. 97-11, p. 5). In 2006, the Club filed an application "requesting Planning Approval, Planned Unit Development, and Subdivision Approvals to allow the expansion of an existing recreation club in an R-1, Single Family Residential district." (Doc. 97-11, p. 4). The application allowed the Club to replace a portion of its clubhouse damaged by Hurricane Katrina and add a membership meeting hall to the site. *Id*. at pp. 3-4.

The clubhouse expansion would result in 3,334-square feet of clubhouse space and the proposed meeting hall would be 2,000-square feet. *Id*. at pp. 5 & 7. Additionally, the existing caretaker's residence on the site was approximately 1,200 square feet. *Id*. In sum, the proposed site plan included three separate buildings that would total roughly 6,400-square feet. *Id*. The buildings would expand across two lots totaling approximately 8.5 acres. *Id*. at pp. 3-5.

Plaintiffs' Eloong property is also located in an R-1, Single Family Residential District along the Dog River. (Doc. 93-22, p. 1). Plaintiffs' Applications were for Planning Approval, Planned Unit Development, and Subdivision Approval to allow them to build a meditation center, cottage, and restroom facility on the site. *Id*. at 15. The three buildings would total 5,000-square feet. (Doc. 94, pp. 8-9). Additionally, the existing structures on the property included a 5,000-square foot home and a separate garage apartment. (Doc. 92-30, p. 20). In sum, the proposed site plan included five separate buildings that would approximately total 10,000-square feet and the buildings would expand across two lots approximately totaling 6.72 acres. (*See* Doc. 93-22).

Defendant contends the Club is not a similarly situated comparator. Defendant takes issue with the Club's age of existence and its purpose for seeking planning approval. (Doc. 104, p. 21). "Such an application to repair and restore a nearly century-old part of the community which predates most of the community is hardly similarly situated to an application to build a new meditation center complex on a site historically used as a single-family residence within a single-family

residential neighborhood." *Id.* Defendant, also, notes the Club was "approved without opposition" at its Planning Commission meeting. *Id.*

Plaintiffs, however, argue the Club is similarly situated to the Eloong property because "it was located on the Dog River, could impact community character, was located on substandard narrow roads, and was surrounded by single family residential uses." (Doc. 94, p. 50). Plaintiffs, also, contend, "It is irrelevant that [the Club]—near the subject property—was 'damaged by Hurricane Katrina' and that the 'application was approved without opposition.'" (Doc. 106, p. 29).

As Plaintiffs argue, the Club and TMAA are similarly situated to the extent that they sought the same form of zoning relief from the same decision-making body under the same provisions for Planning Approval. *Cf. Primera Iglesia*, 450 F.3d at 1311 ("Primera and the School are not similarly situated because, notably, they sought markedly different forms of zoning relief, from different decision-making bodies, under sharply different provisions of local law."). However, the Court's analysis must not stop short of comparing only those characteristics. Plaintiffs must present evidence of "*all relevant* aspects." *Campbell*, 434 F.3d at 1315 (emphasis added).

This Court would be hard pressed to find the Club's age of existence irrelevant. When an organization's use of a property predates a zoning ordinance, the organization has an expectation that it will be able to reasonably expand that use. If such an expectation is thwarted, the organization may suffer a deprivation of property without due process of law. *See* U.S. CONST. amend. V. In contrast,

when a use does not predate the ordinance, an organization would not be afforded that same reasonable expectation of expansion. The Club fits within the former situation. TMAA does not. Furthermore, unlike Plaintiffs' use of the Eloong property, the Club was not seeking to put its property to a *new* use. The Club has operated as a fishing and hunting organization at its site since 1921, and its expansion in 2006 aligned with its established use of the property. It is undeniable Plaintiffs have shown a potential comparator was treated differently in *some* respects, but Plaintiff cannot show the Club is sufficiently similarly situated to support its Equal Terms claim.

Because Plaintiffs failed to produce prima facie evidence of a similarly situated comparator, Plaintiffs have not met their initial burden of proof. Therefore, there is no cognizable evidence of less than equal treatment, and summary judgment is due to be granted for Defendant on Count 3.

## C. Federal and State Law Claims

In addition to the claims under RLUIPA, both parties contend summary judgment is due on the following federal and state law claims: the Free Exercise Clause of the First Amendment (Count 4), the Equal Protection Clause of the Fourteenth Amendment (Count 5), and the Alabama Religious Freedom Amendment (Count 6). Defendant, also, contends summary judgment is due on Plaintiffs' state law claim of negligent misrepresentation (Count 7).

### 1. First Amendment – Free Exercise (Count 4)

As to Count 4, both parties move for summary judgment on Plaintiffs' claim that Defendant violated their rights under the First Amendment to freely exercise their religion. The First Amendment to the United States Constitution, which applies to the states through the Fourteenth Amendment, provides "Congress shall make no law . . . prohibiting the free exercise of religion." U.S. CONST. amend. I. "At a minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons." *Lukumi*, 508 U.S. at 532 (citations omitted).

> In addressing the constitutional protection for free exercise of religion, [the Supreme Court's] cases establish the general proposition that a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice.

*Id.* at 531 (citation omitted).

"Neutrality and general applicability are interrelated, and . . . failure to satisfy one requirement is a likely indication that the other has not been satisfied." *Id.* "The neutrality inquiry asks whether 'the object of a law is to infringe upon or restrict practices because of their religious motivation.'" *Keeton v. Anderson-Wiley*, 664 F.3d 865, 879 (11th Cir. 2011) (quoting *Lukumi*, 508 U.S. at 533). "The general applicability prong asks whether the government has 'in a selective manner impose[d] burdens only on conduct motivated by religious belief.'" *Id.* (quoting *Lukumi*, 508 U.S. at 543) (alteration in original). Thus, even if a law is facially neutral, the Court must evaluate whether the law is neutral in operation. *See*

*Lukumi*, 508 U.S. at 534 ("The Free Exercise Clause protects against governmental hostility which is masked, as well as overt."). "Official action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality." *Id.* A law that is not neutral and generally applicable must be "justified by a compelling government interest and must be narrowly tailored to advance that interest." *Id.* at 531-32. However, a law that is neutral and generally applicable "need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice." *Id.* at 531 (citation omitted).

Similar to the Substantial Burden prong under RLUIPA, the determination of the "general applicability" of a law under the Free Exercise Clause is a question of governmental burden upon religious conduct. *Compare id.* at 543 *with* U.S.C. § 2000cc(a)(1). Accordingly, as asserted in Plaintiffs' RLUIPA Substantial Burden argument, *supra*, Plaintiffs contend Defendant has burdened their right to freely exercise their religion. (Doc. 94, p. 32). However, Plaintiffs argue they are not required to demonstrate the burden imposed on their religious exercise is "substantial" (as required under RLUIPA) to prove a violation of the Free Exercise Clause. (Doc. 94, p. 32) (citing *Brown v. Borough of Mahaffey, Pennsylvania*, 35 F.3d 846, 849 (3rd Cir. 1994), and *World Outreach Conference Center v. City of Chicago*, 591 F.3d 531, 534 (7th Cir. 2009)). Furthermore, Plaintiffs claim Defendant's denial of their Applications is subject to strict scrutiny because the

denial was an individualized assessment and was not applied in a neutral and general manner to their religious group. (Doc. 98, p. 28).

Defendant, however, argues the Zoning Ordinance is a neutral and generally applicable law, which is subject to only rational basis scrutiny. (Doc. 104, p. 29). Defendant asserts, "There is no evidence that any provision of the Zoning Ordinance was enacted to target Plaintiffs or as a reaction to the subject application, or applied in any manner that would violate Plaintiffs' rights under the Free Exercise Clause." (Doc. 90, p. 36). Defendant contends Plaintiffs have misapprehended Free Exercise jurisprudence because the "Free Exercise Clause does not inhibit enforcement of otherwise valid regulations of general application that incidentally burden religious conduct." (Doc. 104, p. 28) (citing *Emp't Div. v. Smith*, 494 U.S. 872, 878-82 (1990)).

The Court cannot conclude Defendant's denial of Plaintiffs' Applications constitutes a violation of the Free Exercise Clause of the First Amendment. As demonstrated in the Court's findings under RLUIPA's Substantial Burden provision, the burdens Plaintiffs experience are nothing more than inconveniences incidental to Defendant's denial of their Applications. Defendant's denial does not restrict Plaintiffs' current religious practice but, rather, prevents a change in their religious practice. Furthermore, the Free Exercise Clause is not blanket authorization for a religious organization to build a place of worship on any property it deems ideal. Accordingly, Plaintiffs' inconveniences do not rise to a constitutionally impermissible infringement on free exercise, and summary judgment is due to be granted for Defendant on Count 4.

### 2. Fourteenth Amendment – Equal Protection (Count 5)

In Count 5, both parties move for summary judgment on Plaintiffs' claim that Defendant has violated their rights under the Equal Protection Clause.

The Equal Protection Clause of the Fourteenth Amendment provides, "No State shall . . . deny any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. To establish an equal protection violation, Plaintiffs must allege they were treated differently because of their race, religion, or another constitutionally protected interest. *Kirby v. Siegelman*, 195 F.3d 1285, 1289 (11th Cir. 1999).

Plaintiffs assert Defendant has treated them "differently and worse" on the basis of religion. (Doc. 94, p. 45). As alleged in their RLUIPA Nondiscrimination argument, *supra*, Plaintiffs contend Defendant has selectively enforced a truly neutral statute against their religious denomination as opposed to other religious denominations. (Doc. 98, p. 31).

"Unequal administration of facially neutral legislation can result from either misapplication (i.e., departure from or distortion of the law) or selective enforcement (i.e., correct enforcement in only a fraction of case). In either case, a showing of intentional discrimination is required." *E & T Realty v. Strickland*, 830 F.2d 1107, 1113 (11th Cir. 1987) (citations omitted). "Even arbitrary administration of a statute, without purposeful discrimination, does not violate the equal protection clause." *Id*. at 1114 (citations omitted). Thus, Plaintiffs must show evidence of Defendant's intentional discrimination to prevail on its equal protection challenge.

Specifically, "plaintiffs challenging an action as discriminatory must go further than identifying a disparate impact and prove the challenged action was the product of discriminatory intent." *Jean v. Nelson*, 711 F.2d 1455, 1485 (11th Cir. 1983) (citations omitted). "Recognizing that legislative and administrative actions are rarely motivated by one purpose only . . . plaintiffs must establish that the challenged provision was at least motivated in part by a discriminatory purpose." *Id*. (citations omitted). Accordingly, Plaintiffs need only show "the action taken was, at least in part, 'because of,' and not merely 'in spite of,' its adverse effects upon an identifiable group." *Id*. (citations omitted).

As discussed above in the parties' arguments under RLUIPA's Nondiscrimination provision, which codifies the Equal Protection Clause, the evidence has created a triable issue of fact on whether Defendant has acted with discriminatory purpose in denying Plaintiffs' Applications. Thus, the parties' motions for summary judgment on Count 5 are denied.

### 3. Alabama Religious Freedom Amendment (Count 6)

Count 6 of Plaintiffs' Complaint asserts a claim under Section V of the Alabama Religious Freedom Amendment ("ARFA"), ALA. CONST. art. I, § 3.01. Both parties move for summary judgment with respect to this claim.

ARFA provides in relevant part, "(b) Government may burden a person's freedom of religion only if it demonstrates that application of the burden to the person: (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling interest." Similar to their Free

Exercise argument, *supra*, Plaintiffs assert the Alabama Constitution requires strict scrutiny of any burden on religious exercise, regardless if such a burden is substantial or not. (Doc. 93, p. 31 (citing *Ex parte Snider*, 929 So. 2d 447, 466 n.15 (Ala. 2005) (Parker, J., dissenting)). Accordingly, Plaintiffs contend ARFA is an even stronger protection than RLUIPA. *Id.* Defendant, however, asserts Alabama courts applying ARFA follow "an RLUIPA-inspired analysis, applying the same substantial burden standard." (Doc. 100, p. 69 (citing *Presley v. Scott*, 2014 WL 7146837, *24 (N.D. Ala. 2017)).

The Court has determined Defendant has not imposed a substantial burden on Plaintiffs' religious exercise under RLUIPA. Additionally, the Court concluded under the Free Exercise Clause Defendant's actions constitute, at most, an incidental burden on their religious exercise, and thus, Plaintiffs could not demonstrate a violation of their constitutional rights under the First Amendment.

The provisions of ARFA, however, are not as clearly defined as RLUIPA's terms or Free Exercise jurisprudence. While the language of the statute essentially reflects the language of RLUIPA's Substantial Burden provision, Plaintiffs argue against interpreting ARFA in light of the case law decided under RLUIPA because of one judge's dissent in *Ex parte Snider*, 929 So. 2d 447.

*Ex parte Snider* involved a child custody dispute based, in part, on the mother's decision to employ biblical principals in using corporal punishment to discipline the child. *Id.* In his dissent, Alabama Supreme Court Justice Parker wrote, "The right to worship God according to the dictates of one's conscience is the

most cherished star in our constitutional constellation." *Id.* at 459. Accordingly, Justice Parker interpreted ARFA as follows:

> In fact, Alabama's constitutional protection of the right to worship God was designed to be stronger than that of the Constitution of the United States as interpreted by the United States Supreme Court. In response to, among other cases, *Boerne v. Flores*, 521 U.S. 507, 117 S. Ct. 2157, 138 L. Ed. 2d 624 (1997), which struck down the federal Religious Freedom Restoration Act, Alabamians showed that our state motto—"We dare defend our rights"—is no mere slogan by ratifying the Alabama Religious Freedom Amendment in 1999.

*Id.* at 466 n.15. While Justice Parker's dissent provides some interpretation of ARFA, there is no judicial "explanation of how rigidly the term 'burden' is to be used." *Presley*, 2014 WL 7146837, *24. Furthermore, there is little to no Alabama case law providing guidance on what the constitutional provision means.

As a preliminary matter, interpreting ARFA in light of the case law decided under RLUIPA yields the same conclusion the Court reached in Plaintiffs' federal Substantial Burden claim: Plaintiffs' claim would be unsuccessful. In the alternative, even if, as Justice Parker contends, ARFA is "designed to be stronger than that of the Constitution of the United States," this Court refuses to hold a government violates ARFA when its actions incidentally burden a plaintiff's religious exercise. To hold that "any" burden includes those that are minimal, insignificant, or incidental is to adopt an interpretation that runs afoul of the judiciary's efforts in controlling the floodgates of litigation. The difficulty with Plaintiffs' argument is it may very well result in religious organizations seeking redress from the courts for virtually all governmental zoning decisions that produce

results contrary to the organization's wishes. This broad interpretation of "burden" that Plaintiffs seek protection from under ARFA is simply not available in this case.

In conjunction with the parties' competing summary judgment motions, Plaintiffs filed a supplemental Sur-Reply addressing the parties' arguments concerning the interpretation and constitutionality of ARFA. (Doc. 112). Similar to the Court's reasoning, *supra*, Defendant asserts in its reply brief, "Plaintiffs' interpretation of ARFA would lead to an application violative of the Establishment Clause." (Doc. 104, p. 32). Plaintiffs, however, contend they have "only restated its clear text," and thus, Defendant's argument is essentially a challenge to ARFA itself. (Doc. 112, pp. 3-4). This Court does not agree with Plaintiffs' reasoning.

As support for their argument under ARFA, Plaintiffs cite Judge Parker's dissent, which claims, "Alabama's constitutional protection of the right to worship God was designed to be stronger than that of the Constitution of the United States." (Doc 94, p. 32) (citing *Ex parte Snider*, 929 So. 2d at 466 n.15). The Constitution of the United States, however, does not protect burdens that are only incidental to a Plaintiffs' religious exercise. *Lukumi*, 508 U.S. at 533. Thus, to argue ARFA is stronger than protections under the United States Constitution is effectively to argue ARFA could protect burdens that are only incidental to a plaintiff's religious exercise. This Court does not find that to be so. Justice Parker's dissenting opinion[4] is not binding precedent on the Alabama state courts nor is it binding upon the federal courts. We do not interpret Defendant's arguments as claims against

---

[4] It is exactly that-a dissenting opinion and not an opinion afforded the same precedential authority as the majority opinion.

ARFA's constitutionality nor do we find Plaintiffs' Sur-Reply persuasive. Thus, summary judgment is due to be granted for Defendant on Count 6.

### 4. Negligent Misrepresentation (Count 7)

While Plaintiffs do not move for summary judgment on their claim of negligent misrepresentation, Defendant asserts no genuine dispute of material fact exists under the claim.

The elements of a misrepresentation claim under Alabama law are: "(1) a misrepresentation of material fact, (2) made willfully to deceive, without knowledge, or mistakenly, (3) which was reasonably relied on by the plaintiff under the circumstances, and (4) which caused damage as a proximate consequence." *Bryant Bank v. Talmage Kirkland & Co., Inc.*, 155 So. 3d 231, 238 (Ala. 2014) (citations omitted).

The basis for Plaintiffs' negligent misrepresentation claim rests in an alleged misrepresentation made by Hoffman at the April 24, 2015, predevelopment meeting. (Doc. 98, p. 45). Plaintiffs assert Hoffman told them their proposed use would be treated as a religious facility in the zoning process, and Plaintiffs reasonably relied on that representation, but this was not done, which caused harm to the Plaintiffs. *Id.* Defendant argues there was no misrepresentation because Plaintiffs' application for planning approval was ultimately denied under the guidelines of the Zoning Ordinance. (Doc. 104, pp. 32-33). Additionally, Defendant contends Plaintiff cannot show Hoffman's alleged representation was made willfully

with the intent to deceive, Plaintiffs detrimentally relied on the representation, or Plaintiffs were damaged as a proximate result. *Id.* at p. 33.

The record evidence shows Hoffman wrote an email to various City of Mobile employees on April 27, 2015, stating, in relevant part, "We told the potential applicant that the use of the house as a meditation center would require: 1) Planning Approval for worship related use . . . ." (Doc. 93-27). However, whether or not that constituted a misrepresentation is a genuine dispute of material fact. As previously determined under Plaintiffs' Nondiscrimination and Equal Protection Claims, the evidence shows a triable factual issue exists as to whether Defendant ultimately denied Plaintiffs' application under the guidelines of the Zoning Ordinance or as a result of animus towards Plaintiffs' religious beliefs. Thus, the Court cannot conclude, as a matter of law, Defendant misrepresented a material fact, and Defendant's motion for summary judgment on Count 7 is denied.

## V. CONCLUSION

For the reasons stated above, the following is hereby **ORDERED**:

1. Defendant's Motion for Summary Judgment, (Doc. 89), is decided as follows:

> a. Summary judgment as to Counts Two, Five, and Seven is **DENIED**;
>
> b. Summary judgment as to Counts One, Three, Four, and Six is **GRANTED**.

2. Plaintiffs' Motion for Partial Summary Judgment, (Doc. 91), is **DENIED**.

**DONE and ORDERED** this 28th day of September 2018.

/s/ TERRY F. MOORER

**TERRY F. MOORER**
**UNITED STATES DISTRICT JUDGE**