**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

THAI MEDITATION ASSOCIATION  :
OF ALABAMA, INC., *et al.*,    :
           :
  Plaintiffs,      :
           :
vs.          :   CIVIL ACT. NO. 1:16-cv-395-TFM-MU
           :
CITY OF MOBILE, ALABAMA,   :
           :
  Defendant.      :

## <u>MEMORANDUM OPINION AND ORDER</u>

This matter came before the Court for a non-jury trial that commenced on Tuesday, March 12, 2019, and concluded on Wednesday, March 20, 2019, with the Court's announcement of the result. Pursuant to Fed. R. Civ. P. 52(a)(1) the Court issues this opinion with its findings of fact and conclusions of law.[1]

## I.  NATURE OF THE CASE AND PROCEDURAL HISTORY

This action was brought by Plaintiffs Thai Meditation Association of Alabama, Inc.; Sivaporn Nimityongskul ("Mrs. Nimityongskul"); Varin Nimityongskul ("Mr. Nimityongskul"); Serena Nimityongskul; and Prasit Nimityongskul (collectively the "Plaintiffs"). Plaintiffs filed a seven (7) count Complaint against certain municipal defendants. By the time of trial, the City of Mobile ("Defendant" or the "City") was the sole remaining Defendant. This matter arises out of Defendant's denial of certain land use applications to construct a meditation center on the site of

---

[1] "'[T]he judge need only make brief, definite, pertinent findings and conclusions upon the contested matters; there is no necessity for over-elaboration of detail or particularization of facts.'" *Stock Equip. Co., a Unit of Gen. Signal Corp. v. Tenn. Valley Auth.*, 906 F.2d 583, 592 (11th Cir. 1990) (quoting FED. R. CIV. P. 52 advisory committee's note to 1946 amendment).

an existing home that is located in an R-1 single-family residential zoning district. Following the Court's order on the parties' cross-motions for summary judgment (Doc. 127), the case proceeded to trial on three (3) claims: an as-applied nondiscrimination claim brought under the Religious Land Use and Institutionalized Persons Act ("RLUIPA") (Count 2), an as-applied Equal Protection claim brought under the Fourteenth Amendment as enforced by 42 U.S.C. § 1983 (Count 5), and an Alabama state law claim for negligent misrepresentation (Count 7).

In resolving the triable issues, the Court has reviewed and considered the arguments that were presented, the testimony and exhibits that were admitted into evidence during the bench trial, and other portions of the Court's file where appropriate. In addition to the testimony and evidence presented at trial, the Court also made a visit to the 2410 Eloong Drive property, which is the subject of the land use applications and this lawsuit, accompanied by representatives for each of the parties. After full and fair consideration of all of the evidence, the arguments presented and the controlling legal precedent, and an appropriate assessment of the credibility of the witnesses, the Court finds in favor of Defendant on all of the three (3) claims. This memorandum opinion provides the basis for that determination.

## II.    FINDINGS OF FACT

The Court finds the following facts were proven through the evidence that was presented at trial:

1.      The City is a municipality, which has a government. Chapter 64 of the City's Code of Ordinances (the "City's Zoning Ordinance") contains certain land use regulations.

2.      Thai Meditation Association of Alabama, Inc. (the "Association") was established in 2007 and was first located at a home that was located at 4567 Airport Boulevard, Mobile, Alabama (the "4567 Airport Boulevard residence"). The Association's Articles of Incorporation

state, "[t]he corporation has been organized for the following purpose: Teaching and research into growth and development of mind and spirit through meditation and to expand the knowledge of Buddhism." The property was zoned R-1 for single-family residential.

3.      In August 2007, the City received from a resident a complaint about a sign for the Association and its related activities that was posted at the 4567 Airport Boulevard residence. The City assigned an inspector to visit the 4567 Airport Boulevard residence. The inspector told Mrs. Nimityongskul the sign was not permitted and must be removed. The sign was accordingly removed. The inspector also issued a Notice of Violation, which is a warning of possible non-compliance with City zoning regulations and gave the property owner ten (10) days to either cease the violation or apply to the City for planning approval.

4.      On September 14, 2007, Mrs. Nimityongskul applied for planning approval to continue offering meditation classes three (3) times per week at the 4567 Airport Boulevard residence. The application received opposition from area residents who wanted the neighborhood to remain single-family residential without non-residential uses.

5.      On November 1, 2007, City staff issued a staff report for the application in which they recommended it be denied for several reasons, including that the proposed use of the site would require modifications, which may preclude its use as a single-family home and allow the possibility for future variance or rezoning requests. Mrs. Nimityongskul later withdrew her application for planning approval for the 4567 Airport Boulevard residence before the Mobile City Planning Commission (the "Planning Commission") could consider and vote on it.

6.      In 2009, the Association moved to its current location, a shopping center at 3821 Airport Boulevard, Mobile, Alabama (the "3821 Airport Boulevard location"). The new location is the Meditation Center of Alabama (the "Center"). The 3821 Airport Boulevard location is

owned by Nimit Two, LLC, a limited liability company, the members of which are the individual plaintiffs. The Association leased this property from Nimit Two, LLC, and continues to do so today. The Association has rarely paid any rent that it owes under its leases with Nimit Two, LLC.

7. Since the Association relocated to the 3821 Airport Boulevard location in 2009 and opened under its new name, the City has neither sent a zoning inspector to the Center's location nor has the City taken any other action to interfere with the Center's meditation or other practices at that location.

8. At the 3821 Airport Boulevard location, the Center holds meditation classes three (3) nights per week, one (1) day retreats that are held on Saturdays several times a year, and three (3) day retreats that are held on weekends a few times per year. The Center also periodically sponsors events such as lectures. The retreats, lectures, and other events sponsored by the Center are sometimes held at locations other than the 3821 Airport Boulevard location, such as the University of South Alabama, local libraries, and city parks.

9. A predevelopment meeting was held on February 25, 2015, to discuss a property that was owned by the Association and is located at the intersection of Bear Fork Road and University Boulevard, Mobile, Alabama. City employees, Mrs. Nimityongskul, and her real estate agent, William Youngblood, attended the meeting. The subject property was zoned R-1 for single-family residential. One of the purposes of a predevelopment meeting is for the City to tell applicants the necessary steps to attempt to gain approval for a proposed use of property if a proposed use is permitted in the applicable zoning district. City staff also told Mrs. Nimityongskul, based on the information received from her and her representatives, of the City's various regulatory requirements that apply to the proposed project.

10. Bert Hoffman, a planner for the City, and other city employees attended the

February 25, 2015 predevelopment meeting. At the meeting, Hoffman said a meditation center that is religious in nature is allowed on property that is zoned R-1 with planning approval. Hoffman also said, if the meditation center had a different non-religious purpose, the meditation center would require something different than planning approval, such as a rezoning of the property.

11. Mrs. Nimityongskul and Mr. Youngblood attended a second predevelopment meeting with City employees on April 24, 2015. At this meeting, they discussed a property located at 2410 Eloong Drive, Mobile, Alabama (the "Eloong Drive property"), which was zoned R-1 for single-family residential and was available for sale. At this predevelopment meeting, Mrs. Nimityongskul and Mr. Youngblood were told by City staff R-1 zoned property requires approval by the Planning Commission to construct a meditation center. At this meeting, City staff did not question the religious nature of the proposed meditation center facility.

12. At the predevelopment meeting, City staff gave Mr. Youngblood various forms to complete and return to the City so they could be considered by the Planning Commission. The forms included applications for planning approval, subdivision approval, Planned Urban Development ("PUD"), and variance request for non-paved parking, which would be considered by the Board of Zoning Adjustment instead of the Planning Commission. Mr. Youngblood also received the respective meeting schedules for the Planning Commission and Board of Zoning Adjustment.

13. At the April 24, 2015 predevelopment meeting, Mr. Hoffman never said a meditation center would be allowed on property that was zoned R-1 without obtaining planning approval from the Planning Commission.

14. The Eloong Drive property is an improved property with an approximately 5,000

square foot five (5) bedroom single-family home, a detached garage with an apartment, a greenhouse, and a boat dock. The parcel is approximately 6.72 acres and zoned R-1 for single-family residential. The house at the Eloong Drive property would host meditation classes until the proposed meditation center buildings were built.

15. The R-1 zoning district is the largest zoning district in the City and covers a wide variety of properties – developed and undeveloped, urban and rural, large and small, and newer and older parts of the City. The R-1 zoning district within the City has limited uses that are allowed as of right, aside from a single-family home.

16. R-1 zoning districts are described in the City's Zoning Ordinance as follows:

> R-1 districts: One-family residential districts. These districts are composed of both developed and largely undeveloped areas. The developed areas contain mainly one-family dwellings and small open areas, usually subdivided, where residential development seems likely to occur; few two-family and multiple-family dwellings are found in these developed areas. It is anticipated that most of the large undeveloped areas will ultimately be developed for residential use. The district regulations are designed to protect the residential character of the developed areas by prohibiting all commercial activities; to encourage a suitable neighborhood environment for family life by including among the permitted uses such facilities as schools and churches; and to preserve the openness of the areas by requiring certain minimum yard and area standards to be met. Reclassification of the land or other appropriate residential, commercial or industrial categories shall be in accordance with the amendment procedure set forth herein.

17. Under the City's Zoning Ordinance, including its Chart of Permitted Uses, a "church or religious facility" is permitted in an R-1 zone with "planning approval," which is granted by the Planning Commission. The Planning Commission considers all planning approval applications under the following standard:

> Uses in the chart identified by "P" in any column are permitted in that particular district upon approval of their location and site plan by the planning commission as being appropriate with regard to transportation and access, water supply, waste disposal, fire and police protection, and other public facilities; as not causing undue

traffic congestion or creating a traffic hazard; and as being in harmony with the orderly and appropriate development of the district in which the use is located . . . .

This standard is located at section 64-12(1)(b) of the City's Zoning Ordinance ("planning approval criteria"). The Planning Commission may impose conditions on a grant of planning approval.

18. After the April 24, 2015 predevelopment meeting, Mr. Hoffman sent an email to Mrs. Nimityongskul that said her proposal to use the house at the Eloong Drive property as a meditation center would require the following: (1) planning approval for worship related use; (2) PUD because of a second habitable structure on the property; (3) subdivision; and (4) variance for non-paved parking and maneuvering.

19. Steve Dagley, an engineer retained by Mrs. Nimityongskul, knew planning approval from the Planning Commission was required to put a church or religious facility on R-1 zoned property.

20. Prior to the predevelopment meeting, Mrs. Nimityongskul began to exchange offers and counter-offers with the seller of the Eloong Drive property. In her signed Response to Counter-Offer dated April 16, 2015, Mrs. Nimityongskul listed, among other provisions, the following contingencies for the property's use: (1) Buyer must determine that it has the right to construct a separate meditation building on the property; (2) Buyer must determine that it has the right to construct two additional dwellings for guest house purposes, which were to be used by religious monks; (3) Buyer must receive approval from the fire department for this construction; (4) Buyer must be made aware of any parking requirements by the City, including whether such parking may be gravel or must be paved; and (5) Buyer will have until July 6th to be satisfied of these requirements and then be obligated to close. The document that contains these contingencies was drafted by Mrs. Nimityongskul's real estate agent, Mr. Youngblood, who discussed the

document with her.  After the discussion with Mr. Youngblood, Mrs. Nimityongskul signed the document.

21.    On June 2, 2015, approximately six (6) weeks after the predevelopment meeting for the Eloong Drive property, Mrs. Nimityongskul entered into a signed Purchase Agreement for the property.  In a signed Addendum to the Purchase Agreement, Mrs. Nimityongskul retained the five (5) contingencies from her Response to Counter-Offer.

22.    This signed Purchase Agreement also gave Mrs. Nimityongskul, through a signed addendum, a right of first refusal for the purchase of the Eloong Drive property, which allowed the property to remain on the market.  The right of first refusal expired on August 21, 2015.  Mrs. Nimityongskul signed the right of first refusal addendum drafted by Mr. Youngblood after a brief discussion with him.

23.    On July 20, 2015, Mrs. Nimityongskul signed a document drafted by Mr. Youngblood that was titled "Removal of Contingencies."  Before Mrs. Nimityongskul signed the Removal of Contingencies, Mr. Youngblood and she discussed the document.  Under the Removal of Contingencies, Mrs. Nimityongskul agreed to remove the contingencies to the sale.  The subject applications were not filed with the City until September 11, 2015, nearly two (2) months after she signed the Removal of Contingencies.

24.    Mrs. Nimityongskul did not communicate with City employees during the period between the April 24, 2015 predevelopment meeting and the purchase date of the Eloong Drive property, August 20, 2015.  Mrs. Nimityongskul paid $690,000.00 for the Eloong Drive property.  A deed was prepared and signed by the seller in favor of Mr. and Mrs. Nimityongskul, Serena Nimityongskul, and Varin Nimityongskul.

25.    The funds for the purchase of the property came from Mr. and Mrs. Nimityongskul.

None of the money for the purchase of the property came from either Serena Nimityongskul, Varin Nimityongskul, or the Association.

26.     The sale of the Eloong Drive property to Mr. and Mrs. Nimityongskul, Serena Nimityongskul, and Varin Nimityongskul closed on August 20, 2015, approximately three (3) weeks prior to the filing of the subject applications with the City.

27.     On or about September 11, 2015, Mrs. Nimityongskul filed applications with the City for planning approval, a PUD, and subdivision approval (collectively the "meditation center applications"). The meditation center applications proposed building a meditation center at the Eloong Drive property. The proposed buildings and other infrastructure that were to be constructed on the property included a 2,400 square foot standalone meditation center building, two (2) 1,600 square foot cottages that would be used for "visiting religious clergy men," a 600 square foot restroom facility, and associated parking and lighting. The application stated planning approval was necessary in an R-1 zone "for worship related use."

28.     The meditation center applications stated meditation classes would be held at the meditation center three (3) times per week in the evenings with approximately thirty (30) attendees per session.

29.     The meditation center applications were revised in November 2015 to eliminate one (1) of the two (2) proposed cottages. The size of the remaining proposed cottage increased to 2,400 square feet.

30.     Under the City's Zoning Ordinance, the Planning Commission decides applications for planning approval, PUD, and subdivision approval. A separate application from Mrs. Nimityongskul to the City sought a variance for non-paved parking, which would be decided by the Board of Zoning Adjustment.

31.     The Planning Commission must hold a public hearing for applications that are received.  Notice is provided by direct mail to persons within a certain radius of the subject property, and a sign is placed at the entrance to the property that states a public hearing is scheduled for the property.

32.     Once received by the City, the meditation center applications were assigned by the City to a staff member to prepare a report in advance of the upcoming Planning Commission hearing.  A staff report examines an application for compliance with the City's various codes and regulatory criteria.

33.     The meditation center applications were put on the Planning Commission's agenda for a hearing that was scheduled for October 15, 2015, the earliest meeting at which the meditation center applications could be considered because of the date they were filed with the City.

34.     Several days prior to the October 15, 2015 Planning Commission meeting, the City's planning staff issued their first staff report for the meditation center applications.  Marie Cross York drafted the staff report, which was reviewed internally by more senior members of the City's Planning and Urban Development department.  In preparing the staff report, Ms. York assembled comments from various City departments such as the fire department, traffic engineering, and others.

35.     Marybeth Bergin, a City traffic engineer, provided comments on the meditation center applications that were incorporated into the staff report.  Ms. Bergin did not assess the offsite impacts of the proposed meditation center because it did not meet the City's threshold of 100 peak-hour trips, a threshold that would have triggered a request for the applicant to provide a traffic study.  Therefore, Ms. Bergin's assessment of the meditation center applications ended where the driveway for the Eloong Drive property met Eloong Drive.

36.     The October 15, 2015 staff report recommended the meditation center applications be held over until a subsequent Planning Commission meeting.  At the October 15, 2015 meeting and at the request of Mrs. Nimityongskul's representative, attorney John Lawler, the Planning Commission held the meditation center applications over to the December 3, 2015 Planning Commission meeting.

37.     Holdover is a common recommendation especially for first-time applications or applications of any complexity.  The staff report listed approximately one dozen areas where the meditation center applications and/or accompanying documents needed additions, corrections, or adjustments to be properly considered by City staff.

38.     Staff reports commonly do not take public input on the applications or the proposed project into consideration.  Public input is frequently not received until after the staff report is prepared and published.  Public input is received by the Planning Commission members from speakers at a public hearing.  Public input is important to the Planning Commission members because it frequently provides those members with additional information and a neighborhood perspective on the project and the area surrounding the property that are not contained in the staff report.

39.     The Planning Commission is not bound by the recommendations of City staff contained in the staff report.  It is not unusual for the Planning Commission to vote to do something different than what the staff report recommends, and public input may be a reason.

40.     At the October 15, 2015 Planning Commission meeting, the Planning Commission members were told by a speaker from the neighborhood there was significant neighborhood opposition to the meditation center proposal and a petition with more than 180 signatures from area residents who were opposed to the meditation center project had been prepared and circulated.

41.     At trial, Plaintiffs presented evidence that demonstrated the activities conducted by the Association at the Center's 3821 Airport Boulevard location were based upon Buddhist religious beliefs.

42.     At trial, evidence that the Center frequently characterized itself over the years as a "nonreligious organization" in various publications, including flyers, social media such as Facebook, and elsewhere also was presented.    In addition, the meditation activity was characterized by the Center as "nonreligious" in certain of its promotional materials.  This included one promotional flyer for an August 25, 2015 event that characterized the meditation as a "nonreligious meditation technique."  This promotional flyer was created before the Center filed applications with the City.  After the meditation center applications were filed with the City, local residents raised questions about whether the proposed meditation center was a "church or religious facility" that would qualify for planning approval consideration based on the public pronouncements from the Center that labeled itself and/or the meditation that was practiced at the Center as "nonreligious."

43.     During the week prior to the December 3, 2015 Planning Commission hearing, Mrs. Nimityongskul invited some area neighbors to the Center's 3821 Airport Boulevard location to discuss the proposed meditation center project.  At this meeting, Mrs. Nimityongskul told the neighbors the Center's form of meditation was non-religious.

44.     At the October 15, 2015 Planning Commission meeting, the Planning Commission's legal counsel, Douglas Anderson, requested Mrs. Nimityongskul provide the City with documentation that verified the requested use was a religious use.  In November 2015, City staff forwarded to Mr. Anderson certain documentation received from Mr. Lawler.  Mr. Anderson initially determined the documentation did not establish the meditation center use was religious.

City staff subsequently issued a staff report that was dated December 3, 2015, in which they recommended the application be denied and re-filed to seek a use variance or rezoning. The staff report was finalized and published several days prior to the December 3, 2015 Planning Commission hearing.

45.     At the December 3, 2015 Planning Commission meeting, Mr. Lawler argued to the Planning Commission members the meditation center applications should be considered under the planning approval criteria that is found in section 64-12(1)(b) of the City's Zoning Ordinance. Mr. Lawler argued the proposed meditation center fit not only under the "church or religious facility" use found in the City's Zoning Ordinance's Chart of Permitted Uses (which use is allowed in an R-1 zone with a grant of planning approval from the Planning Commission), but also within several other uses that are allowed in an R-1 zone with a grant of planning approval from the Planning Commission.

46.     The December 3, 2015 Planning Commission meeting was well attended by those who were both for and against the meditation center project. The Planning Commission members heard from speakers on both sides of the issue. While certain of the speakers who opposed the project referenced the Center's characterization of itself and its meditation as non-religious, the speakers also addressed several other concerns with the project, including the following:

- The lack of compatibility of the meditation center construction, which would add three (3) new buildings to the site that totaled 5,400 square feet, with the existing neighborhood and surrounding single-family residences.

- The frequency and timing of the activity proposed for the project that would include meditation classes that would occur three (3) evenings per week with approximately thirty (30) attendees per class in addition to occasional weekend retreats.

- The access to the site through Riverside Drive and Eloong Drive. Riverside Drive is a windy, curvy road with no sidewalks or shoulders, while Eloong Drive is a very narrow drive of substandard width where two (2) cars can only pass one another with difficulty. Eloong Drive does not have sidewalks, center striping, or a

shoulder, and was only paved a couple of years prior to the filing of the meditation center applications.

- Increased traffic on Eloong Drive, a dead-end street that serves only fourteen (14) residential homes on Eloong Drive. To enter or exit the neighborhood, all of these residents have to pass the driveway for the Eloong Drive property.

- Allowing a new non-residential use for the first time on the longtime site of a single-family home, which was to remain in use as a home.

- The cumulative environmental impacts from increases in traffic, lighting, noise, and storm water runoff.

47. During the December 3, 2015 Planning Commission meeting, James Watkins commented to the Planning Commission members that they should consider the meditation center applications by applying the planning approval criteria found in section 64(12)(1)(b) of the City's Zoning Ordinance.

48. Prior to the vote on the meditation center applications, Mr. Anderson also told the Planning Commission members they should apply the planning approval criteria found in section 64(12)(1)(b) of the City's Zoning Ordinance to the meditation center application.

49. On December 3, 2015, the Planning Commission unanimously voted to deny the meditation center applications. The applications for subdivision and PUD were denied based upon the Planning Commission's denial.

50. A Letter of Decision was subsequently issued by Richard Olsen, the City's Deputy Director of Planning and Zoning, in which he cited three reasons for the denial: 1) incompatibility with the surrounding area, 2) insufficient access to the site for the proposed use, and 3) increased traffic on a substandard street. The Planning Commission members heard speakers' concerns about each one of these issues as well as others at the December 3, 2015 Planning Commission meeting.

51.     Decisions by the Planning Commission can be appealed to the Mobile City Council (the "City Council"), and Mrs. Nimityongskul timely appealed the denial of the meditation center applications.

52.     The City Council heard the appeal at its January 19, 2016 meeting and heard from speakers who were both for and against the meditation center applications.  Prior to the hearing, City Council members received emails from citizens who expressed their support/opposition to the meditation center applications.

53.     At the January 19, 2016 City Council meeting, speakers who opposed the meditation center applications told the City Council members of their concerns with the project: (1) issues with the project's compatibility with the existing single-family residential neighborhood, (2) issues of access through narrow and substandard Eloong Drive, (3) issues of increased traffic on Eloong Drive and Riverside Drive from the meditation center activities, and (4) other concerns about cumulative increases in noise, lighting, traffic, and storm water runoff from the construction and proposed use.

54.     The City Council voted at the January 19, 2016 meeting to deny the appeal with no members voting in favor and one (1) abstention.

55.     In March 2016, two (2) meditation retreats were publicized and promoted by the Center and were held at the Eloong Drive property.  The first event was a one (1) day Saturday retreat and the second event was a three (3) day weekend retreat that was held between March 25 and 27, 2016.  Both of these meditation events were held at the Eloong Drive property without interference by the City despite the fact that they violated the property's R-1 zoning.  The City received complaints about these meditation retreats from neighboring landowners.

56.     After the Center advertised a third meditation retreat that was to be held at the Eloong Drive property in June 2016, the City filed a lawsuit in state court against the Association and the property's owners asking a judge to determine whether the meditation retreats violated the City's Zoning Ordinance and, if so, to enter an injunction to preclude such meditation retreats at the property.

57.     The state court lawsuit was settled with an agreement by the Association and the Eloong Drive property's owners that they would not hold meditation retreats at the property without obtaining the City's approval.

58.     In July 2016, the Association signed a written lease agreement to lease the Eloong Drive property.

59.     On July 18, 2016, a proof of claim was filed with the City by Mrs. Nimityongskul. No proof of claim has been filed with the City by either Mr. Nimityongskul, Serena Nimityongskul, or Varin Nimityongskul.

60.     Evidence of certain other land use applications that were submitted to the City, predominantly by churches, was admitted.  However, several of these land use applications concerned only modifications or expansions to church parking lots or greenspace, including the applications of Port City Church of Christ, St. Dominic, and St. Ignatius.  Several other applications sought to utilize already-existing church or school buildings that were located on a site that was previously used as a church or school, including the applications of Dunnaway (renovation of existing school buildings that were previously used as a school), ICM Foundation (use of building that was previously used as a church), Mobile Terrace Christian Center (building that was previously used as community center and was approved to be rebuilt as a youth center), and New Home Baptist Church (use of building that was previously used as a church).

61.     Other land use applications that were admitted were for alterations or additions to existing buildings that were already located on a church site, including the applications of Ashland Place United Methodist, Lily Baptist Church (addition of offices and handicap-accessible restrooms), and Smith Memorial AME Church (addition of a kitchen).  Other applications sought to replace buildings that were destroyed by a natural disaster, including an application by the Alba Club (replace a clubhouse that was destroyed in 2005's Hurricane Katrina) that had been present on the site since 1921 (prior to the City's annexation of the area) and an application by Sweet Pilgrim Baptist Church to rebuild on the same site where a church was destroyed during the 2012 Christmas Day tornado.

62.     Several land use applications that were admitted were for churches that originally located on their present site prior to 1967, when the City's Zoning Ordinance first required planning approval for churches.  Such churches included Ashland Place United Methodist, Lily Baptist, St. Dominic, and St. Ignatius.  Several of the land use applications were from more than five (5) years prior to the 2015 meditation center application with some from more than ten (10) years prior, including the Alba Club (2006), Ashland Place United Methodist (2009), Gates of Praise (2001), New Home Baptist (2002), Port City Church of Christ (2005), and St. Dominic (2007).

63.     Several of the applications that were admitted were for churches that are located on streets that are standard city rights-of-ways and, in some instances, major city streets.  These churches include Ashland Place United Methodist, Gates of Praise, ICM Foundation, Port City Church of Christ, Redeemed Community Church, St. Dominic, and St. Ignatius.

64.     Evidence was also presented that none of these other applications received opposition when the applications came before the Planning Commission.

### III. STANDARD OF REVIEW

As stated by the Middle District of Alabama in *LaFleur v. Wallace State Community College*, 955 F. Supp. 1406 (M.D. Ala. 1996):

> The burden of proof in civil cases is the same regardless of whether the finder of fact is a judge in a bench trial or a jury. *Cabrera v. Jakabovitz*, 24 F.3d 372, 380 (2d Cir.), *cert. denied*, 513 U.S. 876, 115 S. Ct. 205, 130 L. Ed. 2d 135 (1994). That is, a plaintiff bears the burden of satisfying the finder of fact that he or she has proven every element of his or her claim by a preponderance of the evidence. A preponderance of the evidence means such evidence as, when considered with that opposed to it, has more convincing force, and demonstrates that what is sought to be proved "is more likely true than not true." *See* Pattern Jury Instructions (Civil Cases) of the District Judges Assoc. of the Eleventh Circuit, Basic Instruction No. 6.1 (1990).
>
> In bench trials, the judge serves as the sole fact-finder and, thus, assumes the role of the jury. In this capacity, the judge's function includes weighing the evidence, evaluating the credibility of witnesses, and deciding questions of fact, as well as issues of law. *Childrey v. Bennett*, 997 F.2d 830, 834 (11th Cir. 1993) (holding that "it is the exclusive province of the judge in non-jury trials to assess the credibility of witnesses and to assign weight to their testimony").

*LaFleur*, 955 F. Supp. at 1411.

Questions that turn on a finding of intent (here, the intent to discriminate) are findings that the trial court is uniquely suited to make by virtue of credibility determinations. *See, e.g., Evans v. Books-A-Million*, 762 F.3d 1288, 1299-1300 (11th Cir. 2014).

### IV. CONCLUSIONS OF LAW

#### A. RLUIPA Non-Discrimination Claim and Equal Protection Claim

Plaintiffs had two remaining federal claims against Defendant that went to trial: a claim under the nondiscrimination provision of the Religious Land Use and Institutionalized Persons Act ("RLUIPA"), 42 USC § 2000cc(b)(2), and a claim under 42 U.S.C § 1983 for a violation of the Equal Protection Clause of the Fourteenth Amendment. The legal standards governing these two claims, as construed by the Eleventh Circuit, are nearly identical and are discussed together below:

### i.     Legal Standard

RLUIPA's nondiscrimination provision states, "No government shall impose or implement a land use regulation that discriminates against any assembly or institution on the basis of religion or religious denomination." 42 U.S.C. § 2000cc(b)(2). Plaintiffs bear the initial burden to produce prima facie evidence that supports a claim under RLUIPA's nondiscrimination provision. *Church of Scientology of Ga., Inc. v. City of Sandy Springs*, 843 F. Supp. 2d 1328, 1360 (N.D. Ga. 2012) (citing *Primera Iglesia Bautista Hispana of Boca Raton, Inc. v. Broward County*, 450 F.3d 1295, 1308 (11th Cir. 2006) [hereinafter *Primera*]).

The Eleventh Circuit has identified three types of equal protection/nondiscrimination violations: "(1) a statute that facially differentiates between religious assemblies or institutions; (2) a facially neutral statute that is nevertheless "gerrymandered" to place a burden solely on a particular religious assembly or institution; or (3) a truly neutral statute that is selectively enforced against one religious denomination as opposed to another." *Id.* at 1377 (citing *Primera*, 450 F.3d at 1308) (footnote omitted). The parties agree this case only involves the third type of violation, a selective enforcement claim. *See Thai Meditation Ass'n of Ala., Inc. v. City of Mobile*, 349 F. Supp. 3d 1165, 1199 (S.D. Ala. 2018).

The selective enforcement analysis for RLUIPA nondiscrimination and equal protection claims is essentially the same. *See Church of Scientology of Ga, Inc.*, 843 F. Supp. 2d at 1360-62 (applying equal protection analysis to RLUIPA nondiscrimination claim). As to the nondiscrimination claim under RLUIPA, the test has been stated as follows:

> To prevail on a claim that the City's Ordinance was applied to Plaintiff[s], and not other religious institutions or assemblies (basically a selective enforcement claim), Plaintiff[s] must show (1) [they were] treated differently from other similarly situated religious assemblies or institutions, and (2) that the City unequally applied a facially neutral ordinance for the purpose of discriminating against Plaintiff[s].

*Id.* at 1361 (citing *Campbell v. Rainbow City,* 434 F.3d 1306, 1314 (11th Cir. 2006)).[2]

As to whether Plaintiffs identified a similarly situated comparator, for any religious assembly or institution to be similarly situated to Plaintiffs, it "must be prima facie identical in all relevant respects." *Id.* at 1362 (citing *Campbell*, 434 F.3d at 1314). "In the zoning context, a showing that two projects were similarly situated requires some specificity." *Id.* (citing *Campbell*, 434 F.3d at 1314). The decision requires a close review of the circumstances of both projects. *See Church of Our Savior v. City of Jacksonville Beach*, 108 F. Supp. 3d 1259, 1266 (M.D. Fla. 2015). "[P]rojects which seek different types of variances are not similarly situated." *Campbell*, 434 F.3d at 1314 (citing *Purze v. Village of Withrop Harbor*, 286 F.3d 452, 455-56 (7th Cir. 2002)).

In the Equal Protection context, the Eleventh Circuit has explained the rationale of the "similarly situated" requirement as follows:

> The reason that there is a "similarly situated" requirement in the first place is that at their heart, equal protection claims, even "class of one" claims, are basically claims of discrimination. *McDonald* [*v. Village of Winnetka*], 371 F.3d [992,] 1009 [(7th Cir. 2004)]. To maintain this focus on discrimination, and to avoid constitutionalizing every state regulatory dispute, we are obliged to apply the "similarly situated" requirement with rigor.

*Griffin Indus., Inc. v. Irvin*, 496 F.3d 1189, 1207 (11th Cir. 2007). The "similarly situated" standard is imposed in the Eleventh Circuit to prevent courts from second-guessing a reasonable decision. *See Trask v. Secretary, Dep't of Veterans Affairs*, 822 F.3d 1179, 1192 (11th Cir. 2016) (citing *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1091 (11th Cir. 2004)).

Under the legal standards set forth above, the land use applications that were submitted

---

[2] Similarly, the Equal Protection selective enforcement analysis requires Plaintiffs to demonstrate "(1) that they were treated differently from other similarly situated individuals, and (2) that [the City] unequally applied a facially neutral ordinance for the purpose of discriminating against Plaintiffs." *Campbell*, 434 F.3d at 1314.

into evidence cannot serve as comparators to the meditation center applications. The relevant characteristics of the meditation center applications and Eloong Drive property are as follows: (1) the construction of multiple new buildings for a first-time non-residential use on an R-1 property that contains a single-family residence, which would continue to be used as such; (2) a location on a substandard or narrow right of way on Eloong Drive that is shared with other residences, and the corresponding increases in traffic thereon; and (3) the frequency of use (at least three (3) nights per week along with other days of usage during scheduled one (1) to three (3) day weekend retreats several times a year). Also relevant is the degree of community opposition to the application that was presented to the decision-making bodies–the City Planning Commission and City Council. Accordingly, this Court concludes none of the other land use applications that were admitted into evidence are similarly situated to the application for the meditation center.

Even if Plaintiffs had identified a similarly situated comparator, they failed to demonstrate the actions of the decision-making bodies were motivated by discriminatory intent. It is well-established that a plaintiff challenging an action as discriminatory must go further than identifying disparate treatment and must prove the decision-making body acted with discriminatory intent. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264-65, 97 S. Ct. 555, 563, 50 L. Ed. 2d 450 (1977) [hereafter *Arlington Heights*]. To prevail on either an Equal Protection claim or a nondiscrimination RLUIPA claim, a plaintiff must show a defendant unequally applied a facially neutral statute that results in intentional discrimination. *Church of Scientology of Ga., Inc.*, 843 F. Supp. 2d at 1372. "Mere error or mistake in judgment when applying a facially neutral statute does not violate the Equal Protection clause." *E & T Realty v. Strickland*, 830 F.2d 1107, 1114 (11th Cir. 1987). "Even arbitrary administration of a statute, without purposeful discrimination, does not violate the equal protection clause." *Id.* (citations omitted).

Recognizing in the land use context that legislative and administrative actions are rarely motivated by one purpose only, the Supreme Court in *Arlington Heights* held that a plaintiff must establish that the challenged decision was at least motivated in part by a discriminatory purpose but not that it was the primary, or dominant purpose.   429 U.S. at 266, 97 S. Ct. [at 564].

A plaintiff may either show intentional discrimination through direct evidence or establish an inference of discrimination through circumstantial evidence.  *See, e.g., Covenant Christian Ministries, Inc.* [*v. City of Marietta*], [2008 WL 8866408, at *15,] 2008 U.S. Dist. LEXIS 54304, at *46-47 [(N.D. Ga. Mar. 31, 2008)]; *Reaching Heart Int'l, Inc.* [*v. Prince George's County*], 584 F. Supp. 2d [766,] 782-82 [(D. Md. Nov. 4, 2008)].  "Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available."  *Arlington Heights*, 429 U.S. at 265, 97 S. Ct. [at 564].  Only the most blatant remarks, the intent of which could be nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence of discrimination.  *Wilson* [ ], 376 F.3d [at] 1086 [ ] (discussing employment discrimination).  Comments or conduct falling short of this mark may be relevant circumstantial evidence.  *Id.*

Because the very nature of legislative and administrative action makes it difficult to ascertain the intent of the acting body, the Eleventh Circuit has recognized several factors that are probative of whether a decision-making body was motivated by discriminatory intent.  *Jean v. Nelson*, 711 F.2d [1455,] 1486 [(11th Cir. 1983)].  First, evidence of the "impact" of the legislative/administrative decision, i.e. whether it "bears more heavily on one [religion] than another," alone may demonstrate the existence of a consistent pattern of discriminatory action by the decision-making body.  *Id.* (citing *Arlington Heights*, 429 U.S. at 266, 97 S. Ct. 555).  However, in cases where proof of impact alone is insufficient, where a stark pattern of discrimination is not evident, the courts should consider the following types of circumstantial evidence: (1) historical background of the decision, particularly if it reveals a series of official actions taken for invidious purposes, (2) the specific sequence of events leading up to the challenged decision, (3) departures from the normal procedural sequence, as well as substantive departures, (4) legislative or administrative history, especially where there are contemporary statements by members of the decision-making body, minutes of its meetings, or reports, (5) foreseeability of discriminatory impact, (6) knowledge of discriminatory impact, and (7) the availability of less discriminatory alternatives. *Id.* at 1485-86; *Arlington Heights*, 429 U.S. at 265-66, 97 S. Ct. 555; *see also Reaching Hearts Int'l, Inc.*, 584 F. Supp. 2d at 781 (evaluating religious discrimination claim under equal protection clause and RLUIPA in land use context).

While it is rare for a government to expressly offer religion as its reason to exclude a church, and discrimination may often lurk behind universally acceptable reasons such as traffic, it is also true that "zoning laws inherently distinguish between uses

and necessarily involve selection and categorization, often restricting religious assemblies." *Midrash* [*Sephardi, Inc. v. Town of Surfside*], 366 F.3d [1214,] 1234 [(11th Cir. 2004)] (citing [*Church of the*] *Lukumi* [*Babalu Aye, Inc. v. City of Hialeah*], 508 U.S. [520,] 542-43, 113 S. Ct. 2217[, 2231-32, 124 L. Ed. 2d 472 (1993)]). "All laws are selective to some extent . . . [but] inequality results when a legislature decides that the governmental interests it seeks to advance are worthy of being pursued only against conduct with a religious motivation." *Id.*

*Church of Scientology of Ga., Inc.*, 843 F. Supp. 2d at 1371.

To prevail on a § 1983 claim such as the Equal Protection claim that is asserted here, or on the nondiscrimination RLUIPA claim, a final policymaker must ratify not only the challenged decision itself, but also the discriminatory basis for it. *Matthews v. Columbia County*, 294 F.3d 1294, 1298 (11th Cir. 2002); *see also Church of Scientology of Ga, Inc., 843 F.Supp.2d at 1377 (discussing Matthews*, 294 F.3d at 1298, in the context of an RLUIPA nondiscrimination claim). "Final policymaking authority over a particular subject area does not vest in an official whose decisions in the area are subject to meaningful administrative review." *Scala v. City of Winter Park*, 116 F.3d 1396, 1401 (11th Cir. 1997). The Eleventh Circuit has held that "[w]hen such review procedures are in place, we have often found that the subordinate official does not exercise final policymaking authority." *Willingham v. City of Valparaiso*, 638 F. App'x 903, 907 (11th Cir. 2016) (citations omitted). Additionally, "an improper motive of one of the members [of a decision-making body] is not imputed to the rest of the [decision-making body]." *Campbell*, 434 F.3d at 1313 (citing *Matthews*, 294 F.3d at 1297). In order to find for the Plaintiffs, the evidence must demonstrate that a majority of the members of the decision-making body acted with an unconstitutional motive. *Matthews,* 294 F.3d at 1297.

In this case, the relevant decision-making bodies are the Planning Commission and, on appeal, the City Council. Plaintiffs failed to prove by a preponderance of the evidence the Planning Commission or City Council intended to discriminate against Plaintiffs on the basis of Plaintiffs'

religious beliefs when the Planning Commission and City Council voted to deny the meditation center applications. Direct evidence of discriminatory intent by the decision-making bodies was not presented, and the circumstantial evidence does not support a finding of discriminatory intent based on the *Arlington Heights* factors.

The evidence at trial showed, at the December 3, 2015 Planning Commission hearing, the Planning Commission heard a variety of concerns from area residents who opposed the meditation center applications and the meditation center project. These concerns included issues of compatibility of the proposal with the surrounding single-family residential homes, the frequency of the activities proposed for the meditation center, concerns over the narrowness and substandard width of Eloong Drive, concerns over the ability of Eloong Drive and Riverside Drive to handle the additional traffic that would be generated by the proposed use, and concerns of the establishment of a new non-residential use for the first time on the site of a longtime residence.

While the Planning Commission was presented with questions of whether the meditation center was a church or religious facility, there was no evidence presented that these questions served as a motivating factor for the vote of the Planning Commission. Also, evidence was not presented that the Planning Commission voted to deny the meditation center applications because the intention of the Planning Commission was to discriminate against Plaintiffs because of Plaintiffs' religious beliefs.

The evidence presented showed the Planning Commission was told by several persons at the December 3, 2015 Planning Commission meeting they should apply the planning approval criteria, which is found in the City's Zoning Ordinance at section 64-12(1)(b), to the application. These persons included Mr. Lawler, attorney for Mrs. Nimityongskul; Mr. Watkins, the chair of the Planning Commission; and Mr. Anderson, attorney for the Planning Commission. The

Planning Commission members voted unanimously to deny planning approval and the other approvals sought. A Letter of Denial that was subsequently issued by the City, pursuant to the City's Zoning Ordinance, cited reasons that included a lack of compatibility, concerns over access to the site, and increasing traffic on a substandard street, all of which were concerns that were presented to the Planning Commission at the December 3, 2015 hearing. Those reasons for denial were consistent with the planning approval criteria found in the City's Zoning Ordinance.

When the City Council held the appeal hearing on January 19, 2016, neighboring residents opposed to the meditation center applications again presented their concerns to the City Council. Six of the City Council members voted to deny the appeal and one member abstained from the vote. No evidence was presented to show the City Council voted to deny the appeal with the intent to discriminate against Plaintiffs because of Plaintiffs' religious beliefs.

Accordingly, because Plaintiffs failed to prove by a preponderance of the evidence the Planning Commission or City Council intended to discriminate against Plaintiffs on the basis of their religious beliefs, the Court finds in favor of Defendants.

**B.     Negligent Misrepresentation**

Under Alabama law, "[t]he elements of a misrepresentation claim are 1) a misrepresentation of material fact, 2) made willfully to deceive, recklessly, without knowledge, or mistakenly, 3) which was reasonably relied on by the plaintiff under the circumstances, and 4) which caused damage as a proximate consequence." *Bryant Bank v. Talmage Kirkland & Co., Inc.,* 155 So. 3d 231, 238 (Ala. 2014).

The evidence confirms Mrs. Nimityongskul and/or her agents and representatives were aware by the conclusion of the April 24, 2015 predevelopment meeting with City employees, including Mr. Hoffman, that obtaining planning approval from the Planning Commission was

required in order to build the meditation center on the Eloong Drive property because it was zoned R-1 for single-family residential. At the conclusion of that meeting, Mrs. Nimityongskul and/or her agents and representatives were given blank applications to fill out and file with the City for the Planning Commission (and Board of Zoning Adjustment, in the case of the non-paved parking variance) to consider whether planning approval should be granted.

There is no evidence that Mr. Hoffman allegedly told Mrs. Nimityongskul and her representatives at the April 2015 predevelopment meeting her application would be treated as a church or religious facility and Mr. Hoffman's intent was not to do so. Similarly, there is no evidence Mr. Hoffman's intent was to deceive Mrs. Nimityongskul by his statement.

In addition to failing to prove intent, Plaintiffs failed to demonstrate the element of reasonable reliance. Mrs. Nimityongskul conclusively knew the Planning Commission would ultimately determine whether to grant planning approval. Plaintiffs also failed to demonstrate any damages that arose from such misrepresentation since the application was ultimately considered under the planning approval criteria that was applicable to a "church or religious facility," and the evidence at trial confirmed Plaintiffs closed on the purchase of the subject property and removed all sale contingencies prior to submitting the meditation center applications to the City.

## V.      CONCLUSION

Based on the foregoing, the Court finds in favor of Defendant as to all claims before the Court. A separate judgment will be entered.

**DONE** and **ORDERED** this the 23rd day of May 2019.

/s/ Terry F. Moorer
TERRY F. MOORER
UNITED STATES DISTRICT JUDGE