# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

THAI MEDITATION ASSOCIATION      :
OF ALABAMA, INC., *et al.*,      :
     :
     Plaintiffs,      :
     :
vs.      :     CIV. ACT. NO. 1:16-cv-395-TFM-MU
     :
CITY OF MOBILE, ALABAMA,      :
     :
     Defendant.      :

## MEMORANDUM OPINION AND ORDER

Pending before the Court is the *Motion for Summary Judgment* and brief in support. Docs. 193, 194, both filed April 12, 2021. Defendant, The City of Mobile, motions the Court enter summary judgment in its favor as to the three (3) remaining claims in this matter that are brought pursuant to the Substantial Burden provisions of the Religious Land Use and Incarcerated Persons Act, the Free Exercise Clause of the United States Constitution, and the Alabama Religious Freedom Amendment. Doc. 193. Having considered the motion, the response, the reply, the relevant law, and the arguments that were presented at the oral argument, the motion is **GRANTED**.

Also pending before the Court is *Plaintiffs' Motion for Partial Summary Judgment* and memorandum in support. Docs. 195, 197, both filed April 12, 2021. Plaintiffs Thai Meditation Association of Alabama, Inc., Sivaporn Nimityongskul, Varin Nimityongskul, Serena Nimityongskul, and Prasit Nimityongskul also petition the Court enter summary judgment in their favor as to the three (3) remaining claims in this matter. Doc. 195. Having considered the motion, the response, the reply, the relevant law, and the arguments that were presented at the oral

argument, the motion is **DENIED**.

## I.  PARTIES, JURISDICTION, AND VENUE

In this Memorandum Opinion and Order, Plaintiff Thai Meditation Association of Alabama, Inc., will be referred to as "TMAA," Plaintiff Sivaporn Nimityongskul will be referred to as "Nimit," Plaintiff Varin Nimityongskul will be referred to as "V. Nimit," Plaintiff Serena Nimityongskul will be referred to as "S. Nimit," and Plaintiff Prasit Nimityongskul will be referred to as "P. Nimit."  TMAA, Nimit, V. Nimit, S. Nimit, and P. Nimit will be collectively referred to as "Plaintiffs."  Defendant the City of Mobile will be referred to as either "Defendant" or "the City."

No party contests jurisdiction or venue, and the Court finds adequate support for both.  The district court has subject matter jurisdiction over the claims in this action pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343(a)(3) (civil rights), and supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

The district court has personal jurisdiction over the claims in this action because the events that gave rise to this action occurred within this district, the City is a municipal corporation that is organized and exists under the laws of Alabama, this matter involves land-use regulations that were adopted by the City, and the subject real property is located within the district.  *See Consol. Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1291-92 (11th Cir. 2000) ("Specific jurisdiction arises out of a party's activities in the forum that are related to the cause of action alleged in the complaint. . . . General personal jurisdiction, on the other hand, arises from a defendant's contacts with the forum that are unrelated to the cause of action being litigated.  The due process requirements for general personal jurisdiction are more stringent than for specific personal jurisdiction, and require a showing of continuous and systematic general business contacts between

the defendant and the forum state.").

Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events that gave rise to Plaintiffs' claims occurred, and a substantial part of real property that is the subject of this action is situated, in this judicial district.

## II.     FACTUAL AND PROCEDURAL BACKGROUND

## A.     FACTUAL BACKGROUND

In 2015, Plaintiffs bought property at 2354 and 2410 Eloong Drive ("the Eloong property") for the primary purpose of constructing a Buddhist meditation center on the site.  Doc. 92-4; Doc. 92-29; Doc. 92-30 at 19.  TMAA has a leasehold interest in the Eloong property.  Doc. 92-29.

In September 2015, Nimit submitted an application to the City of Mobile Planning Commission ("the Planning Commission") for planning approval, planned unit development ("PUD"), and subdivision approval (collectively, "the Applications" or "Plaintiffs' Applications") to permit TMAA's development on the Eloong property.  Doc. 93-21.  In the Applications, Plaintiffs sought construction of a 2,400-square foot meditation center building, a 2,000-square foot cottage for visiting monks, a 600-square foot restroom facility, and associated parking.  Doc. 93-22.  The Planning Commission ultimately denied Plaintiffs' Applications, and the Mobile City Council ("the City Council") denied Plaintiffs' appeal, upholding the Planning Commission's decision.  Doc. 92-20 at 2.

### 1.     The Zoning Ordinance

Chapter 64 of the Code of the City of Mobile, Alabama ("the Zoning Ordinance") divides Mobile into fifteen zoning districts, identified in Section 64-3 of the Zoning Ordinance.  Doc. 92-12 at 20-53.  Section 64-3 of the Zoning Ordinance sets forth the specific regulations governing the applicable districts and delineates uses permitted by right and uses requiring planning approval.

*Id.* at 22-53, 137.  If a requested use in a particular zone is not specifically listed, the City's Director of Inspection Services or his agent may determine in which district the use may be permitted by right or with planning approval.  *Id*. at 137.

Under the Zoning Ordinance, a "church or religious facility" is permitted by right in all business districts, but it must receive planning approval to locate in any residential district.  *Id.* at 146.  Accordingly, before a church or religious facility may locate in a residential area, the Planning Commission must determine if the facility's location would be in harmony with, and appropriate for, the residential district.  *Id.* at 137.

The Eloong Property is located in an R-1 Residential District ("R-1 District").  Doc. 93-1. R-1 Districts are composed of primarily "one-family dwellings and small open areas . . . where residential development seems likely to occur."  Doc. 92-12 at 22.  Churches and schools are permitted with planning approval in R-1 Districts because the City wishes to encourage suitable neighborhood environments for families.  *Id.*  Because Plaintiffs sought to build a religious facility in an R-1 District, they were required to apply for planning approval.

### 2.       Plaintiffs' Religious Beliefs

TMAA is a Buddhist religious organization.  Doc. 93-24 at 1.  TMAA's purpose is "[t]eaching and research into growth and development of mind and spirit through meditation and to expand the knowledge of Buddhism."  *Id.*  TMAA is affiliated with the Dhammakaya school of Buddhism, a sect of Theravada Buddhism that is headquartered in Wat Phra Dhammakaya in Pathum Thani, Thailand.  Doc. 93-75 ¶¶ 14-16.  TMAA's religious exercise includes "prayer, meditation, various religious ceremonies, lectures, teaching and learning."  *Id.* ¶ 17.  While there are many different schools of Buddhism, TMAA engages in the meditation technique known as Dhammakaya meditation, which is practiced by thousands of temples in Thailand.  *Id.* ¶¶ 13, 17.

Meditation sessions at TMAA are led by either monks or lay teachers who are trained in Dhammakaya meditation. *Id.* at 17. Plaintiffs believe "Shakyamuni Buddha, the founder of the Buddhist religion, achieved his great spiritual insights as a result of years of meditation, and he taught that mediation is central to following his teachings." *Id.* ¶ 21. Every week, TMAA offers four (4) meditation classes with talks on Buddhist scriptures and morality. *Id.* ¶ 36.

In various public announcements, Plaintiffs explained why religion is not important for meditation. *See, e.g.,* Doc. 92-16. For instance, in a 2010 article that was published by AL.com, Nimit explained, "this meditation center was established in order to teach people how to find inner peace and happiness. My ultimate mission is to spread world peace through inner peace, and have people see that mediation is not to be associated with any one particular, race, culture, and religion . . . ." Doc. 92-16 at 7. TMAA also holds itself out to be a non-profit, non-religious organization on social media and other website directories. *Id.* at 10, 14-15. Further, Nimit stated in her deposition:

> The great thing about meditation is that philosophy/religious belief is not important. Meditation is about consciousness. The beliefs of the mind become trivial. You dive deep into the heart of the matter to gain access to your soul – your inner reality. Therefore, meditation can be practiced by people of different religions or no religion at all.

Doc. 101-2 at 6-7.

Plaintiffs assert they describe their meditation practices as "non-religious" because TMAA is open to all and "following Buddhist teachings does not require rejection of the particular theistic concepts that are central to Judeo-Christian notions of what is meant by 'religion.'" Doc. 94 at 5. In fact, both the Planning Commission and City Council heard testimony to this effect at the hearings in front of each body. *See* Doc. 92-19 at 18 ("The meditation [center] has elicited itself on Facebook and other social media as non-religious to indicate that one does not have to be

Buddhist in order to come learn meditation."), Doc. 93-34 at 12 ("Buddhist liberation is essentially tied to meditation and meditation practice.").

### 3.      Plaintiffs' Location History

TMAA began in 2007 at a home located at 4567 Airport Boulevard, Mobile, Alabama. Doc. 93-73 ¶ 23.  A Buddhist monk taught meditation classes at the home.  *Id.*  In August 2007, a citizen complained to the City that Plaintiffs posted a sign that advertised services that were provided inside of the home.  Doc. 93-10 at 1.  A City Inspector came to the home and informed Nimit the sign was not permitted and must be removed.  *Id.*  Nimit removed the sign, and the inspector issued a Notice of Violation.  *Id.* at 1-2.  The Notice gave Plaintiffs ten (10) days to either cease the violation or apply for planning approval.  *Id.* at 2.

On September 14, 2007, Plaintiffs applied for planning approval to continue offering meditation services at the home.  Doc. 93-12.  The application received tremendous community opposition, and many neighbors came to the Planning Commission hearing to oppose the application.  Doc. 1 ¶ 85; Doc. 32 ¶ 85.  Similar to the Applications that are at issue in this case, opposition to Plaintiffs' application for the Airport Boulevard home targeted both legitimate community concerns as well as Plaintiffs' religious beliefs.  For instance, one resident wrote a letter stating:

> There is no concern on their part for the welfare of children growing up in this quiet area, no thought given to the additional traffic and the danger it represents, and no concern for the loss of property value that we will all suffer because of their unwanted intrusion . . . .  While serving with the Air Force in Vietnam many years ago I had the occasion to visit Thailand, where there are countless temples, and the streets are filled with Buddhist priests, wearing their colorful, orange robes.  It was a quaint sight, but I had no desire to bring one back to my neighborhood, and install him there . . . .  We do not want a meditation center, a non-sectarian church, a dental clinic, a service station, a bingo palace, or anything that is alien to family life intruding upon the citizens of this area . . . .

Doc. 93-14.

On November 1, 2007, the Planning Commission recommended denial of Plaintiffs' application based on concerns regarding the possibility for future rezoning or use variance requests, and the lack of compliance with the parking surface, maneuvering, tree and landscaping, and buffering requirements of the Zoning Ordinance.   Doc. 93-13 at 3.   The Planning Commission's Staff Report explained, "the meditation center would likely be a relatively 'quiet' neighbor and might generally be conducive to location in a residential area.  However, as parking improvements and, most likely, building code improvements would be required to accommodate the proposed use, the general compatibility appears to be less favorable."   *Id.*   Plaintiffs later withdrew their application.  Doc. 93-11.

In 2009, Plaintiffs relocated TMAA to its current site at 3821 Airport Boulevard, Mobile, Alabama.  Doc. 93-73 ¶ 6.  The current site is located in a shopping center on a busy street.  *Id.* ¶ 7.  Plaintiffs assert its current location creates significant hardships for their religious exercise because their meditation practice requires a serene environment, they lack sufficient space for visiting monks and overnight retreats, and participants have encountered safety issues while attending classes.  *Id.* ¶¶ 10-16.  The City, however, asserts Plaintiffs' proposed meditation center would not alleviate Plaintiffs' size concerns because it is only 200 square feet larger than its current location, and Plaintiffs own numerous homes throughout the city where they could host visiting monks.  Doc. 100 at 7.  Additionally, the City asserts Plaintiffs have received 100 acres of viable land where they could host their meditation activities.  *Id.*

Plaintiffs aver they received approximately 100 acres of donated land in November 2014 for the purpose of building a meditation center.  Doc. 92-30 at 41-44; Doc. 93-73 ¶ 25.  However, after investigating the property and consulting with their land use professional, Plaintiffs found the donated acreage was not a feasible location.  Doc. 93-73 ¶ 26.  Thus, Plaintiffs began searching

for other property suitable for their meditation practices, and they discovered the Eloong Property. *Id.* ¶ 27.

### 4.    Procedural History of Plaintiffs' Applications

On April 24, 2015, Plaintiffs attended a predevelopment meeting with their attorney and realtor, Bill Youngblood ("Youngblood"), and two City of Mobile Planners, Bert Hoffman ("Hoffman") and Marie Cross York ("York") to discuss the possibility of relocating TMAA to the Eloong property.  Doc. 93-25 at 3; Doc. 93-27.  The purpose of a pre-development meeting is for the City to gather information from applicants or potential applicants about what they are proposing to do at a specific location.  Doc. 93-5 at 3.  Additionally, the City provides applicants information about the process that they must go through in order to obtain approvals.  *Id.*  The City reviews, *inter alia*, the district in which applicants wish to locate and whether the property is a legal lot of record.  *Id.*  Thus, if an applicant's proposed use is not permitted in the district, in which the property is zoned, the City would inform the applicant of such at the predevelopment meeting.  *Id*. at 4.

At the predevelopment meeting for Plaintiffs' potential applications, the discussion centered around concerns about construction as well as the religious nature of their proposed meditation.  Doc. 93-25 at 9.  Following the meeting, the City concluded Plaintiffs' Applications would need the following approvals: "(1) Planning Approval for worship related use; (2) PUD because of a second habitable structure on the property; (3) Subdivision; and (4) Variance for non-paved parking and maneuvering."  Doc. 93-27.

On September 11, 2015, Plaintiffs submitted the Applications to construct a meditation center on the Eloong property.  Doc. 93-21.  The Applications were, then, assigned to York for review and preparation of a Staff Report.   Doc. 93-4 at 5; Doc. 93-25 at 7.   The Planning

Commission issued the first Staff Report for Plaintiffs' Applications on October 15, 2015, which noted:

> The applicant is requesting Planning Approval to allow a meditation center in an R-1, Single-Family Residential District, Planned Unit Development approval to allow multiple buildings on a single building site, and Subdivision approval to create one legal lot of record. Religious facilities require Planning Approval when located in R-1 districts.

Doc. 93-1 at 4. Further, the Staff Report recommended the Applications be held over until the November 19, 2015 Planning Commission meeting so Plaintiffs could revise the Applications to reflect compliance with Engineering, Traffic, and Landscaping requirements. Doc. 93-1 at 6-11. Ultimately, the Applications were reviewed at the October Planning Commission meeting instead of the proposed November meeting.

At the October 15, 2015 Planning Commission meeting, Plaintiffs' Applications were met with strong community opposition. *See* Doc. 93-43. Specifically, a nearby resident of the Eloong property, Tamela Esham ("Esham"), explained every single neighbor in the community opposed the project. *Id.* Some residents opposed the Applications for environmental reasons, and other residents opposed them because of the "lack of information" regarding the proposed project. *Id.* at 12-13.

Additionally, questions were raised whether the proposed meditation center was a religious use, based on Plaintiffs' pronouncements that meditation was non-religious in nature. *Id.* at 7. The Planning Commission's attorney, Doug Anderson ("Anderson"), stated:

> For this to be proper within the zoning ordinance, it has to be a religious use. We're going to need written documentation, more than just an application, that says this is a religious building or religious use. We're going to need documentation to show – to prove that this actually is more than just a yoga or a meditation facility but that it is a religious use[;] otherwise planning approvals is not going to be the proper procedure but a Board of Adjustment variant would be proper . . . . If you can just provide us whatever written documentation other than just saying that it's religious.

>We've got to have something that shows it's not a commercial use but it is a religious use.

*Id.* at 7-8.  Hoffman also informed the Planning Commission his staff "separately did some research trying to determine if it was a religious or non-religious facility based on how it's handled in other cities [,] and [they] found mixed results."  *Id.* at 19.  The Planning Commission recommended holding over Plaintiffs' Applications until the December Planning Commission meeting.  *Id.* at 15-17.

During the time between the October 2015 Planning Commission meeting and the December 2015 holdover meeting, Plaintiffs provided Defendant documentation addressing their religious status.   The documentation included TMAA's articles of incorporation, tax documentation, letters from Buddhist monks, letters from the Dhammakaya Foundation, and a letter from Eric Loomis (an associate professor of Philosophy) that explained the centrality of meditation to the Buddhist religion.  Doc. 93-29 at 3-5; Doc. 93-24; Doc. 93-34 at 10-12.  TMAA's articles of incorporation state, "[t]he corporation has been organized for the following purposes: [t]eaching and research into growth and development of mind and spirit through meditation and to expand the knowledge of Buddhism."  Doc. 93-24 at 1.  Upon receipt of the items, Hoffman consulted Anderson to further evaluate Plaintiffs' religious status.  Doc. 93-45.  In a November 23, 2015 email to Anderson, Hoffman requested, "Doug – If you can give us a legal opinion as to whether the attached documentation is sufficient to determine if the proposed meditation center on Dog River is 'religious' or not, it would be appreciated."  *Id.* at 1.  In response, Anderson asserted:

>I do not think it is.  This shows the IRS has given it tax exempt status as a charity or foundation – there are tests a church has to go through with the IRS to be classified as a church/religious organization.  Just because meditation is part of a religion (my preacher teaches contemplative prayer) does not make the building a church or the owner a religious organization.  Recommend denial.

*Id.*

At the December Planning Commission Meeting, the Planning Commission, once again, entertained viewpoints from those in favor of Plaintiffs' Applications as well as those in opposition to them.  Doc. 93-34.  Similar to the October meeting, there was discussion about both Plaintiffs' religious status as well as residents' concerns about the compatibility of the meditation center in the Eloong neighborhood.  *Id.*  Following extensive discussion, the Planning Commission moved to deny Plaintiffs' Applications.  Doc. 93-34 at 44-47.

On December 3, 2015, the Planning Commission issued the Staff Report recommending denial of Plaintiffs' Applications.  Doc. 93-22.  In relevant part, the Staff Report recommended denial because Plaintiffs' proposed use was not "approvable via the Planning Approval process," "multiple buildings cannot be allowed for unapproved use," and "legal counsel of the Planning Commission" determined Plaintiffs had not provided sufficient IRS documentation to be classified as a church or religious facility under the Zoning Ordinance.  *Id.* at 12.  However, Defendant informed Plaintiffs their Applications were denied based on compatibility, site access, and traffic increase.  Doc. 92-17 at 2.  Plaintiffs filed a Notice of Appeal to the City Council seeking reversal of the Planning Commission's denial.  Doc. 92-18.

The week before the City Council reviewed Plaintiffs' appeal, Esham composed an email to City Councilman C.J. Small ("Councilman Small") in which she expressed her concerns about Plaintiffs' proposed construction.  Doc. 93-35.  In Esham's first email to Councilman Small, she expressed her concerns that the meditation center would increase traffic and noise, which would "fundamentally change the nature and character of our residential neighborhood."  *Id.* at 2.  A second email to Councilman Small, however, touched on the religious nature of Plaintiffs' meditation center.  Doc. 93-36 at 1.  In defending Esham's position about TMAA's compatibility within the neighborhood, she wrote Nimit's "version of events that this is a religious issue" is

"inaccurate and misguided."  *Id.*

Another resident of the Eloong neighborhood also reached out to members of the City Council prior to the January appeal meeting.  Resident Greg Marshall ("Marshall") wrote to Councilman John Williams ("Councilman Williams") about a rumor that TMAA would be a "NUDE yoga center."  Doc. 93-53.  Marshall expressed, "[it's] just not compatible with the neighborhood, and it's just a business flying under the veil of religious use exemptions."  *Id.* Councilman Williams responded to the email, "You just saying nude makes me certain NO is the answer.  CJ [Councilman Small] is with us here as well[.]"  *Id.*

The City Council reviewed Plaintiffs' appeal on January 19, 2016.  Doc. 92-19.  After extensive discussion about TMAA's compatibility with the Eloong neighborhood as well as dialogue about Plaintiffs' religious beliefs, the City Council upheld the Planning Commission's decision.  *Id*. at 91.  Plaintiffs' appeal failed by a vote of six to one, with one council member abstaining.  *Id.*

## B.    PROCEDURAL BACKGROUND

This matter was originally filed in this Court on July 26, 2016.  Doc. 1.  This matter arises out of the City's denial of Plaintiffs' zoning applications to construct a Buddhist meditation center in a residential district.  Plaintiffs assert the denial of their zoning applications violated (1) the Religious Land Use and Institutionalized Persons Act's ("RLUIPA") substantial-burden provision, 42 U.S.C. § 2000cc(a)(1), facially and as applied; (2) RLUIPA's nondiscrimination provision, 42 U.S.C. § 2000cc(b)(2), facially and as applied; (3) RLUIPA's equal-terms provision, 42 U.S.C. § 2000cc(b)(1), facially and as applied; (4) the First Amendment's Free Exercise Clause; (5) the Fourteenth Amendment's Equal Protection Clause; (6) Section V of the Alabama Religious Freedom Amendment ("ARFA"), Ala. Const. art. I, § 3.01; and (7) common-law principles

forbidding negligent misrepresentations.  Doc. 1.

The City filed a motion to dismiss certain of Plaintiffs' claims.  Doc. 18.  Each party briefed their position and provided evidentiary support thereof to the Court.  Docs. 19, 25, 26, 29.  The Court granted in part the City's motion to dismiss as to the facial components of Counts 1, 2, and 3, and denied the motion as to Count 7.  Doc. 31.

The parties subsequently filed cross-motions for summary judgment—the City's motion on all counts, and Plaintiffs' motion on Counts 1 through 6.  Docs. 89, 90, 91, 94.  Each party briefed their position and provided evidentiary support thereof to the Court.  Docs. 92, 93, 97, 98, 100, 101, 104, 105, 106, 112.  The Court granted in part the City's motion for summary judgment as to Counts 1, 3, 4, and 6, and denied the motion as to Counts 2, 5, and 7.  Doc. 127.  The Court denied Plaintiffs' motion for partial summary judgment.  *Id.*

This matter proceeded to a bench trial on the remaining Counts 2, 5, and 7, and in addition to the testimony and evidence presented at trial, the Court visited the Eloong property, accompanied by representatives for each of the parties.  Doc. 143.  At the conclusion of the bench trial, the Court found in favor of the City and entered final judgment in its favor.  Docs. 169, 170. Plaintiffs appealed, and the Eleventh Circuit issued an opinion that affirmed in part and vacated in part.  Docs. 173, 187, 189.  Of relevance to the posture of the case now, the opinion vacated this Court's decision to grant the City's motion for summary judgment as to Counts 1, 4, and 6.  Doc. 187.  It affirmed the remainder of the original determinations.

The Court set this matter for a telephonic scheduling conference that was held on February 25, 2021, after which the Court entered a briefing schedule order for the parties to submit renewed motions for summary judgment for the pending Counts in this matter.  *See* Docs. 190, 191, 192. The parties timely filed cross-motions for summary judgment, and responses and replies thereto,

and the Court set the matter to hear oral argument for the motions, which was held on November 3, 2021.  *See* Docs. 193, 194, 195, 196, 197, 200, 201, 203, 204, 209, 210, 211.  Therefore, the renewed cross-motions for summary judgment are fully briefed and ripe for adjudication.

### III.    STANDARD OF REVIEW

A party in a lawsuit may move a court to enter summary judgment before trial.  FED. R. CIV. P. 56(a), (b).  Summary judgment is appropriate when the moving party establishes there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a); *see also Greenberg v. BellSouth Telecomms., Inc.*, 498 F.3d 1258, 1263 (11th Cir. 2007) ("Summary judgment is appropriate 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine [dispute] as to any material fact and that the moving party is entitled to judgment as a matter of law.'").  "[T]he substantive law will identify which facts are material."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986); *see also Ritchey v. S. Nuclear Operating Co.,* 423 F. App'x 955 (11th Cir. 2011) (quoting *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510).[1]  At the summary judgment juncture, the court does not "weigh the evidence and determine the truth of the matter," but solely "determine[s] whether there is a genuine issue for trial."  *Anderson*, 477 U.S. at 249, 106 S. Ct. at 2511.  Only disputes about the material facts will preclude the granting of summary judgment.  *Id*.

The movant bears the initial burden of proof.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986).  A party must support its assertion that there is no

---

[1] In this Circuit, "[u]npublished opinions are not considered binding precedent, but they may be cited as persuasive authority." 11th Cir. R. 36-2 (effective Dec. 1, 2014); *see also Henry v. Comm'r of Soc. Sec.*, 802 F.3d 1264, 1267 n.1 (11th Cir. 2015) (per curiam) ("Cases printed in the Federal Appendix are cited as persuasive authority.").

genuine issue of material fact by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." FED. R. CIV. P. 56(c)(1).  The admissibility of evidence is subject to the same standards and rules that govern admissibility of evidence at trial. *Clemons v. Dougherty County*, 684 F.2d 1365, 1369 n.5 (11th Cir. 1982) (citing *Pan-Islamic Trade Corp. v. Exxon Corp.*, 632 F.2d 539, 556 (5th Cir. 1980)).

Once the movant meets its burden under Fed. R. Civ. P. 56, the non-movant must go beyond the pleadings and designate specific facts showing there is a genuine issue for trial. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986).  "A genuine issue of material fact exists when 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Moore ex rel. Moore v. Reese*, 637 F.3d 1220, 1232 (11th Cir. 2011) (quoting *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510).  The court must view the facts and draw all reasonable inferences in favor of the non-moving party.  *Id.* (citing *Rosario v. Am. Corrective Counseling Servs., Inc.*, 506 F.3d 1039, 1043 (11th Cir. 2007)); *Greenberg*, 498 F.3d at 1265 ("We view the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion.").  On cross-motions for summary judgment, "the facts are viewed in the light most favorable to the non-moving party on each motion."  *Chavez v. Mercantil CommerceBank, N.A.*, 701 F.3d 896, 899 (11th Cir. 2012) (citing *Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328, 1331 (11th Cir. 2005)).  However, to avoid summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586, 106 S. Ct. at 1356

(citations omitted).  Conclusory assertions, unsupported by specific facts, that are presented in affidavits opposing the motion for summary judgment are likewise insufficient to defeat a proper motion for summary judgment.  *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177, 3188, 111 L. Ed. 2d 695 (1990).  "Speculation does not create a *genuine* issue of fact."  *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005) (citation omitted).  If the evidence is merely colorable or is not significantly probative, summary judgment may be granted.  *See Anderson*, 477 U.S. at 249-50, 106 S. Ct. at 2511 (emphasis in original) (citations omitted).  In short, summary judgment is proper after adequate time for discovery and upon motion against a party who fails to make a showing that is sufficient to establish the existence of an element that is essential to that party's case.  *Celotex*, 477 U.S. at 322, 106 S. Ct. at 2552.

## IV.     DISCUSSION AND ANALYSIS

### A.     RLUIPA – Substantial Burden Provision (Count 1)

Count 1 of Plaintiffs' Complaint asserts a claim that Defendant violated the substantial burden provision of RLUIPA.

Congress enacted RLUIPA "'in order to provide a very broad protection for religious liberty.'"  *Holt v. Hobbs*, 574 U.S. 352, 356, 135 S. Ct. 853, 859, 190 L. Ed. 2d 747 (2015) (citation omitted).  RLUIPA concerns two areas of government activity:  land use regulation—the provision at issue in this case—and religious exercise by institutionalized persons.  42 U.S.C. § 2000cc; 42 U.S.C. § 2000cc-1.

In pertinent part, RLUIPA's "substantial burden" provision provides:

No government shall impose or implement a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution, unless the government demonstrates that imposition of the burden on that person, assembly, or institution – (A) is in furtherance of a compelling governmental interest; and (B) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc(a)(1).  The question of "substantial burden" is a "question of law for courts to decide."  *Eternal World Television Network, Inc. v. Sec'y of U.S. Dept. of Health and Human Servs.*, 818 F.3d 1122, 1144 (11th Cir. 2016).  "To invoke the protection of § (a) of RLUIPA, plaintiffs bear the burden of first demonstrating that the regulation substantially burdens religious exercise."  *Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1225 (11th Cir. 2004) [hereinafter *Midrash*].

Under RLUIPA, "the term 'religious exercise' includes any exercise of religion, whether or not compelled by, or central to, a system of religious belief."  42 U.S.C. § 2000cc-5(7)(A). Additionally, "[t]he use, building, or conversion of real property for the purpose of religious exercise shall be considered to be religious exercise of the person or entity that uses or intends to use the property for that purpose."  *Id*.  "In passing RLUIPA, Congress recognized that places of assembly are needed to facilitate religious practice, as well as the possibility that local governments may use zoning regulations to prevent religious groups from using land for such purposes." *Midrash*, 366 F.3d at 1226.  In the Eleventh Circuit's opinion, it agreed with this Court's previous determination that building a center with the alleged purpose of teaching Dhammakaya meditation falls squarely within RLUIPA's definition of "religious exercise."  *Thai Meditation Ass'n of Ala., Inc. v. City of Mobile*, 980 F.3d 821, 831-32 (11th Cir. 2020) [hereinafter *TMAA II*].

"[T]he plaintiff shall bear the burden of persuasion on whether the law (including a regulation) . . . substantially burdens the plaintiff's exercise of religion."  42 U.S.C. § 2000cc-2(b). The Supreme Court's line of Free Exercise cases has been instructive in defining the term "substantial burden" under RLUIPA.  *See, e.g., Lyng v. Nw. Indian Cemetery Protective Ass'n*., 485 U.S. 439, 450, 108 S. Ct. 1319, 1326, 99 L. Ed. 2d 534 (1988) (specifying no substantial burden exists where a regulation does not have a "tendency to coerce individuals into acting

contrary to their religious beliefs"); *Sherbert v. Verner*, 374 U.S. 398, 404, 83 S. Ct. 1790, 1794, 10 L. Ed. 2d 965 (1963) (determining a substantial burden existed where an individual was required to "choose between following the precepts of her religion and forfeiting benefits, on the one hand, and abandoning one of the precepts of her religion . . . on the other"); *but see Bowen v. Roy*, 476 U.S. 693, 707-08, 106 S. Ct. 2147, 2155-57, 90 L. Ed. 2d 735 (1986) (no substantial burden existed where government action simply interfered, but did not coerce, the individual's religious beliefs).

Based on the Supreme Court's combined articulations of substantial burdens under the Free Exercise Clause, the Eleventh Circuit held in *Midrash* a "'[s]ubstantial burden' requires something more than an incidental effect on religious exercise." 366 F.3d at 1227.  Such burdens "must place more than inconvenience on religious exercise; [it] is akin to significant pressure which directly coerces the religious adherent to conform his or her behavior accordingly." *Id.*  As an example of conduct that would suffice to demonstrate a substantial burden, the Eleventh Circuit stated, "an individual's exercise of religion is 'substantially burdened' if a regulation completely prevents the individual from engaging in religiously mandated activity, or if the regulation requires participation in an activity prohibited by religion." *Id.* (internal citations omitted).  However, "a burden need not be found insuperable to be held substantial." *Westchester Day Sch. v. Village of Mamaroneck*, 504 F.3d 338, 349 (2nd Cir. 2007) [hereinafter *Westchester Day School*].  Though the Eleventh Circuit has held the question of substantial burden is a question of law for courts to decide, the Supreme Court's line of Free Exercise cases "has made clear that the substantial burden hurdle is high and that determining its existence is fact intensive." *Church of Scientology of Ga., Inc. v. City of Sandy Springs*, 843 F. Supp. 2d 1328, 1354-55 (N.D. Ga. 2013) (citations omitted).

The Eleventh Circuit has instructed this Court to consider certain factors to determine

whether to find a substantial burden:

- [W]hether the plaintiffs have demonstrated a genuine need for new or more space – for instance, to accommodate a growing congregation[2] or to facilitate additional services or programming[3];

- the extent to which the City's decision, and the application of its zoning policy more generally, effectively deprives the plaintiffs of any viable means by which to engage in protected religious exercise[4];

- whether there is a meaningful "nexus" between the allegedly coerced or impeded conduct and the plaintiffs' religious exercise[5];

- whether the City's decisionmaking process concerning the plaintiffs' applications reflects any arbitrariness of the sort that might evince animus or otherwise suggests that the plaintiffs have been, are being, or will be (to use a

---

[2] *See, e.g., Bethel World Outreach Ministries v. Montgomery Cty. Council*, 706 F.3d 548, 558 (4th Cir. 2013) [hereinafter *Bethel World Outreach*] (finding a substantial burden where insufficient space to accommodate a large congregation caused the church to have multiple, shorter services, thereby interfering with Communion and cutting short the church's "Altar Call" practice); *see also Sts. Constantine & Helen Greek Orthodox Church, Inc. v. City of New Berlin*, 396 F.3d 895, 898-901 (7th Cir. 2005) [hereinafter *Sts. Constantine & Helen*]; *Int'l Church of Foursquare Gospel v. City of San Leandro*, 673 F.3d 1059, 1069 (9th Cir. 2011); *Chabad Lubavitch of Litchfield Cty., Inc. v. Litchfield Historic Dist. Comm'n*, 768 F.3d 183, 188-90 (2d Cir. 2014).

[3] *See, e.g., Jesus Christ is the Answer Ministries, Inc. v. Baltimore County*, 915 F.3d 256, 261 (4th Cir. 2019) [hereinafter *Jesus Christ is the Answer Ministries*] (observing that a burden is "usually" substantial "where use of the property would serve an unmet religious need"); *see also Bethel World Outreach*, 706 F.3d at 522, 558 (providing educational programs and counseling at a church); *Westchester Day Sch.*, 504 F.3d at 347-48, 352 (2nd Cir. 2007) (expanding the offerings at a religious school).

[4] *See, e.g., Bethel World Outreach*, 706 F.3d at 557-58 (observing that a substantial burden may exist "even though other suitable properties might be available, because the 'delay, uncertainty, and expense' of selling the current property and finding a new one are themselves burdensome" (quoting *Sts. Constantine & Helen*, 396 F.3d at 899-901); *Westchester Day Sch.*, 504 F.3d at 352 (considering whether the applicant has "quick, reliable, and financially feasible alternatives . . . to meet its religious needs absent its obtaining the construction permit").

[5] *See, e.g., Westchester Day Sch.*, 504 F.3d at 349 ("There must exist a close nexus between the coerced or impeded conduct and the institution's religious exercise for such conduct to be a substantial burden on that religious exercise.").

technical term of art) jerked around[6];

- whether the City's denial of the plaintiffs' zoning applications was final or whether, instead, the plaintiffs had (or have) an opportunity to submit modified applications that might satisfy the City's objections[7]; and

- whether the alleged burden is properly attributable to the government (as where, for instance, a plaintiff had a reasonable expectation of using its property for religious exercise)[8] or whether the burden is instead self-imposed (as where the plaintiff had no such expectation or demonstrated an unwillingness to modify its proposal in order to comply with applicable zoning requirements[9]).

*TMAA II*, 980 F.3d at 831-32.

Defendant argues it did not exert significant pressure that directly coerced Plaintiffs to conform their behavior but merely denied planning approval to build the site plan as submitted for the Eloong property because the plan would convert a residence to a meditation center and add several thousand square feet of new buildings, which did not meet the City's Zoning Ordinance §

---

[6] *See, e.g., Westchester Day Sch.*, 504 F.3d at 352 (emphasizing that a zoning board's decisionmaking was characterized by "an arbitrary blindness to the facts"); *Roman Catholic Bishop of Springfield* [*v. City of Springfield*], 724 F.3d [78,] 96-97 [(1st Cir. 2013)] [hereinafter *Roman Catholic Bishop of Springfield*] (observing that evidence that "regulators disregard[ed] objective criteria and instead act[ed] adversely to a religious organization based on the objections of a 'small but influential' group in the community" counsels in favor of finding a substantial burden (quoting *Westchester Day Sch.*, 504 F.3d at 346)).

[7] *See, e.g., Westchester Day Sch.*, 504 F.3d at 349 ("[W]hether the denial of the application was absolute is important; if there is a reasonable opportunity for the institution to submit a modified application, the denial does not place substantial pressure on [a plaintiff] to change its behavior."); *see also Bethel World Outreach Ministries*, 706 F.3d at 558 (emphasizing that whether the denial is conditional or absolute is a factor to consider in the substantial-burden analysis).

[8] *See, e.g., Jesus Christ is the Answer Ministries*, 915 F.3d at 261; *Bethel World Outreach*, 706 F.3d at 557.

[9] *See, e.g., Guru Nanak Sikh Soc. of Yuba City v. County of Sutter*, 456 F.3d 978, 989-90 (9th Cir. 2006) [hereinafter *Guru Nanak Sikh Society*]; *see also Andon, LLC v. City of Newport News*, 813 F.3d 510, 515 (4th Cir. 2016) [hereinafter *Andon, LLC*]; *Livingston Christian Sch. v. Genoa Charter Twp.*, 858 F.3d 996, 1004 (6th Cir. 2017) [hereinafter *Livingston Christian Schools*]; *Petra Presbyterian Church v. Village of Northbrook*, 489 F.3d 846, 851 (7th Cir. 2007) [hereinafter *Petra Presbyterian Church*].

64-12(1)(b) as determined by the City's Planning Commission and City Council.  Doc. 194 at 13.

Defendant argues Plaintiffs cannot show a "substantial burden" because they have other options

in the City to which to locate that allow religious facilities as of right or with planning approval.

*Id.*  Further, Defendant argues Plaintiffs cannot show "significant pressure" or coercion as to their

religious practice because Plaintiffs admit they continue to engage in the same meditation activity

and at the same frequency at the Airport Boulevard location.  *Id.*  Plaintiffs argue Defendant's

argument that Plaintiff's cannot show a substantial burden as long as there are other options within

the City would effectively nullify RLUIPA's substantial burden provisions.  Doc. 201 at 5-10.

As to the additional factors that the Eleventh Circuit instructed this Court consider to

determine whether to find a substantial burden, the Court will address each factor, and the parties'

arguments as to those factors, in turn.

- **Whether the plaintiffs have demonstrated a genuine need for new or more space-for instance, to accommodate a growing congregation or to facilitate additional services or programming**

Plaintiffs argue their religious exercise includes meditation, retreats, interaction with

monks, and other activities and they need a serene, meditative atmosphere that is impossible at

their Airport Boulevard location.  Doc. 197 at 24.  Plaintiffs argue they require a location where

they can host meditation retreats for participants to develop meditative concentration as well as

monks, and a safe location is also important to Plaintiffs.  *Id.* at 25.  Additionally, Plaintiffs submit

new declarations that show:

[(1)]    Plaintiffs have had to alter the way they teach meditation, foregoing the silent meditation dictated by their religious beliefs due to the influence of outside noises due to the busy commercial area.

[(2)]    Outside noises seriously interfere with beginners being able to develop the serenity and concentration that are essential to developing effective meditation.

[(3)]    An inability to host meditation retreats at a purpose-built facility requires

teachers to change the way they would normally conduct retreats.

[(4)]   Retreats are essential for attendees to deepen their understanding of the Buddhist tradition and progress in their practice.

[(5)]   Attendees at retreats now cannot take the usual vows that they would for one of these retreats, such as abstaining from solid foods after 12pm, abstaining from outside distractions and abstaining from luxuries such as soft beds.  Attendees forego these religious observances.

[(6)]   The Association cannot host retreats during which members take ordination vows, which is a religious practice within *Dhammakaya* Buddhism.   When members have sought to participate in this practice in the past, they have had to travel to Atlanta, and this religious exercise has not been available to all because of the necessary travel.  It is impossible for the Association to conduct this rite because it currently lacks an appropriate facility.

[(7)]   Part of the temporary ordination retreats include "robing ceremonies," a practice in which the Association cannot currently engage.

[(8)]   The inability to host monks for regular teaching and visits further prevents it from performing religious ceremonies such as food and alms offerings.  If the Association were able to host monks under appropriate conditions, it would be able to engage in these religious observances.

[(9)]   An ability to host monks regularly, and at a site where they can be observed, would also allow members of the Association to observe the habits and daily practice of monks, which permits them to deepen their practice beyond the basics of meditation.

[(10)]  Proximity to monks is vital to learning the habits that are part of the Buddhist path to Enlightenment.  Housing monks away from the rest of the community inhibits this religious practice.

[(11)]  The ability to regularly host monks, as well as to have a purpose-built facility, will increase the *sangha*, or community, for members, including promoting a sense of ownership.  The importance of the *sangha* is an extremely important religious concept, based in scripture.

[(12)]  With a purpose-built facility, the Association would be able to offer volunteer opportunities that would deepen the spiritual practices of attendees.

[(13)]  An adequate meditation center would also allow the Association to host families, which would provide for the ability to instruct children while their parents meditate.  This is a crucial practice for allowing children to become comfortable with Buddhist practice, have their questions answered, and be brought up in

Buddhism.

Doc. 201 at 11-12 (internal quotation marks and internal citations and omitted).

Defendant argues the planned meditation center is roughly equivalent in size to that of their existing space – 2400 versus 2200 square feet, respectively – and Plaintiffs plan to keep roughly the same schedule of weeknight meditation classes, monthly Saturday retreats, and occasional weekend retreats at the Eloong property as were held at the Airport Boulevard location. Doc. 194 at 16. Defendant also argue Plaintiffs established the meditation center at its current location, the Eloong property does not have religious significance beyond the general quality of tranquility, and Plaintiffs have not shown other suitable properties in the city are unavailable. *Id.*

The Court finds Plaintiffs have shown, for the purposes of summary judgment, a genuine need for new or more space to facilitate additional programming.

- **Extent to which the City's decision, and the application of its zoning policy more generally, effectively deprives the plaintiffs of any viable means by which to engage in protected religious exercise**

Plaintiffs argue they do not have an alternate location that can accommodate its religious needs, which is especially true in light of the fact that the City's basis to deny Plaintiffs' Applications – to preserve the nature of the R-1 district – could apply to many other locations that would be suitable for Plaintiffs, who require a quiet, serene environment for their religious exercise. Doc. 197 at 25; Doc. 201 at 14. Plaintiffs also argue they do not own property that they can develop as a Buddhist meditation center. Doc. 201 at 14. Further, to locate new property in a suitable setting, they would have to find available property, hire professionals to develop a new site plan and zoning application, oppose local hostility, avoid the concerns that would exist for any quiet suitable location that would also be located adjacent to residential properties, navigate the planning approval process, and obtain approval from the Planning Commission and City Council.

*Id.* at 14-15.  Defendant argues 11%, or 8,800 acres, of the City is zoned for a church or religious facility to locate as of right and approximately 65% of the City is zoned for a church or religious facility to locate with planning approval.  Doc. 194 at 17.  Defendant also argues the denial of planning approval was based on criteria in the Zoning Ordinance and Plaintiffs continue to conduct meditation events at their current location as well as various other locations such as local libraries, colleges and universities, and parks.  *Id.*

For this factor, in the remand order for this case, the Eleventh Circuit cites to *Bethel World Outreach*, 706 F.3d at 557-58, and *Westchester Day Sch.*, 504 F.3d at 352.  *See TMAA II*, 980 F.3d at 832 n.7. The Eleventh Circuit explains the court in *Bethel World Outreach* observed "a substantial burden may exist even though other suitable properties might be available, because the delay, uncertainty, and expense of selling the current property and finding a new one are themselves burdensome."  *Id.* (internal quotation marks and citations omitted).  The Eleventh Circuit explains the court in *Westchester Day School* considered "whether the applicant has quick, reliable, and financially feasible alternatives . . . to meet its religious needs absent its obtaining the construction permit."  *Id.* (internal quotation marks and citation omitted).

As to this factor, Plaintiffs would experience "delay, uncertainty, and expense" if they decide to sell the Eloong property and search for a suitable alternate location to build a meditation center.  As Plaintiffs argue, in order to build their meditation center at an alternate location, they would need to locate property that they can afford, is suitable for their needs, hire professionals to develop a new site plan, and possibly navigate the planning approval process, depending on the zoning classification of the property.  Further, as Plaintiffs argue, they do not have "quick, reliable, and financially feasible alternatives" because their Airport Boulevard location does not accommodate all of their requirements for a meditation center and they do not own property that

they can develop into such, since the 100 acres of donated land that they hold was determined by their land-use professional to be an unfeasible location.  However, as the City argues, 11%, or 8,800 acres, of the City is zoned for a church or religious facility to locate as of right, approximately 65% of the City is zoned for a church or religious facility to locate with planning approval, and the denial of planning approval was based on criteria in the Zoning Ordinance that would be applied to any other R-1 zoned property that Plaintiffs might choose to build their meditation center.

The Court finds Plaintiffs have shown, for the purposes of summary judgment, the City's decision effectively deprives them of any viable means by which to engage in protected religious exercise, but the application of the City's Zoning Ordinance generally does not since the meditation center could be located at a commercially zoned property as of right.

- **Whether there is a meaningful "nexus" between the allegedly coerced or impeded conduct and the plaintiffs' religious exercise**

Plaintiffs argue the proposed use of the Eloong property includes facilities for Buddhist religious worship that are either not available or inadequate at Plaintiffs' Airport Boulevard location.  Doc. 197 at 6-7.  Defendant argues Plaintiffs' complaints of impeded conduct were previously determined by this Court to either not implicate religious exercise or are mere inconveniences, which do not rise to the level of a substantial burden.  Doc. 194 at 19 (citing Doc. 127 at 30-31).  Defendant also argues the only nexus between its decision and religious exercise is the denial of planning approval prevents Plaintiffs from building their submitted site plan on the subject property, but they may continue their religious exercise at their Airport Boulevard location and other locations within the city where they have held events, meditate at the Eloong property, establish a facility for religious exercise at a property in the city that is zoned for such as of right, or seek planning approval for a property in the city where such approval is required.  *Id.* at 19-20.

For this factor, in the order on remand, the Eleventh Circuit cites to *Westchester Day School*, 504 F.3d at 349.  *TMAA II*, 980 F.3d at 832 n.8.  From *Westchester Day School*, the Eleventh Circuit quotes, "[t]here must exist a close nexus between the coerced or impeded conduct and the institution's religious exercise for such conduct to be a substantial burden on that religious exercise."  *Id.* (citation omitted).  As an example of such a nexus, the court in *Westchester Day School* proposed:

> Imagine, for example a situation where a school could easily rearrange existing classrooms to meet its religious needs in the face of a rejected application to renovate.  In such case, the denial would not substantially threaten the institution's religious exercise, and there would be no substantial burden, even though the school was refused the opportunity to expand its facilities.

504 F.3d at 349.

As to this factor, the Court finds Plaintiffs are able to continue their religious activities at the Airport Boulevard location and other locations throughout the city, but the denial of planning approval impedes their ability to offer, and participate in, the expanded religious programming that their proposed meditation center was designed to accommodate.

- **Whether the City's decisionmaking process concerning the plaintiffs' applications reflects any arbitrariness of the sort that might evince animus or otherwise suggests that the plaintiffs have been, are being, or will be (to use a technical term of art) jerked around**

Plaintiffs argue officials with the City made false statements to ensure the planning approval was denied, the City violated its own ordinances, false minutes were drafted, failed to provide a results agenda, failed to recognize the religious nature of the use, treated Plaintiffs' Applications differently, refused to consider conditions pursuant to the City's practice, manipulated the reasons that the planning approval was denied, and focused on the religious nature of the use instead of land-use concerns.  Doc. 197 at 26-27.  Defendant argues Plaintiffs' Applications were subjected to proper procedure: a public hearing before the Planning

Commission that included speakers for and against Plaintiffs' Applications for which a transcript was produced and an appeal to the City Council, which also included a public hearing that included speakers for and against Plaintiffs' Applications as well as a public vote. Doc. 194 at 20. Defendant argues Plaintiffs have not produced evidence that shows they were not allowed to present evidence, in whatever form, at the hearings and neither the Zoning Ordinance nor the criteria to be applied to Plaintiffs' Applications were amended. *Id.* Defendant argues abundant evidence was presented to the Planning Commission and City Council that supported the findings that the proposed meditation center was incompatible in a single-family residential neighborhood, access to the Eloong property is substandard, and a meditation center would cause traffic concerns. *Id.* at 21.

Here, the Eleventh Circuit cites to *Westchester Day School*, 504 F.3d at 352, and *Roman Catholic Bishop of Springfield*, 724 F.3d at 96-97. *TMAA II*, 980 F.3d at 832 n.9. The Eleventh Circuit observed the court in *Westchester Day School* emphasized a zoning board's decisionmaking was characterized by "an arbitrary blindness to the facts." *Id.* (citation omitted). Indeed, the court in *Westchester Day School* concluded:

> In sum, the record convincingly demonstrates that the zoning decision in this case was characterized not simply by the occasional errors that can attend the task of government but by an arbitrary blindness to the facts. As the district court correctly concluded, such a zoning ruling fails to comply with New York law.

504 F.3d at 351-52. The Eleventh Circuit states the court in *Roman Catholic Bishop of Springfield* observed evidence that "regulators disregard[ed] objective criteria and instead act[ed] adversely to a religious organization based on the objections of a small but influential group in the community" counsels in favor of a finding of a substantial burden. *TMAA II*, 980 F.3d at 832 n.9 (internal quotation marks and citations omitted).

As to this factor, while there was vocal community opposition to Plaintiffs' Applications

for a meditation center to be built at the Eloong property, the concerns that were voiced by area residents at the Planning Commission meeting and the City Council appeal were in regard to the proposed meditation center's compatibility with the surrounding single-family residential homes, the frequency of activities that would be held at the proposed meditation center, the substandard road on which the Eloong property is located, the potential increase in traffic if the meditation center was built, and the conversion of a longtime residence for a non-residential use.  The confusion as to the religious nature of the meditation center was self-inflicted due to newspaper articles, various publications, social media posts, and promotional materials that asserted meditation is a nonreligious activity.  Regardless, the Planning Commission applied the planning approval criteria to Plaintiffs' Applications and they were denied due to a lack of compatibility, concerns about access to the site, and increased traffic on a substandard road all of which were issues that were presented at the Planning Commission meeting and were consistent with planning approval criteria from the Zoning Ordinance.  After another public hearing, the City Council denied Plaintiffs' appeal of the Planning Commission's decision for the same reasons that were provided by the Planning Commission.  Ultimately, the reasons for which Plaintiffs' Applications were denied were not based on Plaintiffs' Buddhist faith but objective criteria that would have been applied to any religious use of the Eloong property that would have altered the single-family residential nature of the surrounding neighborhood.

The Court finds the City's decisionmaking process in regard to Plaintiffs' Application does not reflect arbitrariness.

- **Whether the City's denial of the plaintiffs' zoning applications was final or whether, instead, the plaintiffs had (or have) an opportunity to submit modified applications that might satisfy the City's objections**

Plaintiffs argue, despite their willingness to revise their project to meet any concerns, the

denial of their Applications was complete and final, there was not an indication that a modified application may have been approved, and the City admitted it failed to consider any less restrictive means of achieving its interests.  Doc. 197 at 27.  Defendant argues the Zoning Ordinance does not prohibit Plaintiffs from submitting a modified application that considers the Planning Commission's reasons for the denial of their Applications and a new site plan would be evaluated under the same planning approval criteria.  Doc. 194 at 21-22.

For this factor, the Eleventh Circuit again cites to *Westchester Day School*, 504 F.3d at 349, and *Bethel World Outreach*, 706 F.3d at 558.  *TMAA II*, 980 F.3d at 832 n.10.  The Eleventh Circuit quotes, "whether the denial of the application was absolute is important; if there is a reasonable opportunity for the institution to submit a modified application, the denial does not place substantial pressure on [a plaintiff] to change its behavior."  *Id.* (citation omitted).  The court in *Westchester Day School* expounded, "[o]f course, a conditional denial may represent a substantial burden if the condition itself is a burden on free exercise, the required modifications are economically unfeasible, or where a zoning board's stated willingness to consider a modified plan is disingenuous."  504 F.3d at 349.  The Eleventh Circuit observed the court in *Bethel World Outreach* emphasized whether the denial is conditional or absolute is a factor to consider in the substantial-burden analysis.  *TMAA II*, 980 F.3d at 832 n.10 (citation omitted).

As to this factor, Plaintiffs are able to submit a modified application for the proposed meditation center.  Plaintiffs have not shown either the Planning Commission or the City Council would not give reasonable consideration to such a modified application.  *See Westchester Day School*, 504 F.3d at 352 ("Yet the [Zoning Board of Appeals of the Village of Mamroneck ("ZBA")] chose to instead deny the application in its entirety.  It is evident that in the eyes of the ZBA's members, the denial was final since all of them discarded their notes after voting on the

application. . . . [T]he district court determined that ZBA members were not credible when they testified they would give reasonable consideration to another application by [Westchester Day School]. When the board's expressed willingness to consider a modified proposal is insincere, we do not require an institution to file a proposal before determining that its religious exercise has been substantially burdened."). While Plaintiffs argue the Planning Commission's reasons to deny Plaintiffs' Applications could have been addressed in the planning approval process, ultimately the Planning Commission and the City Council had the power to approve or deny the Applications and are not beholden to the recommendation offered in the staff report. Finally, while Plaintiffs argue the local residents would protest any additional traffic to the Eloong property, Plaintiffs have not shown either the Planning Commission or the City Council would deny a modified application that would address that issue.

- **Whether the alleged burden is properly attributable to the government (as where, for instance, a plaintiff had a reasonable expectation of using its property for religious exercise) or whether the burden is instead self-imposed (as where the plaintiff had no such expectation or demonstrated an unwillingness to modify its proposal in order to comply with applicable zoning requirements)**

Plaintiffs argue their expectation to use the Eloong property as a meditation center was reasonable because the Zoning Ordinance permits churches and schools with planning approval in R-1 Districts and is encouraged, no other church or religious facility had been denied planning approval, and because of the size of the Eloong property, it can accommodate the proposed use as a meditation center. Doc. 197 at 27. Further, Plaintiffs argue the City planners did not provide negative comments at either the predevelopment meeting or in the staff reports until Plaintiffs' religious status was questioned, a reason to deny their Applications was never provided by the City until the Planning Commission's decision, and the City admitted there was not a basis to deny Plaintiffs' Applications since appropriate conditions could have been attached to the approval. *Id.*

at 28.  Finally, Plaintiffs argue they agreed to every mitigation measure that was suggested by the City planners and were willing to agree to any reasonable conditions attached to approval of their Applications.  *Id.*  Defendant argues Plaintiffs were aware the Eloong property was zoned R-1 and planning approval would be required to locate a church or a religious facility on it and Nimit applied for planning approval in 2007 to establish a meditation center in a residence in a single-family neighborhood and withdrew the application before the Planning Commission could vote on it due to neighborhood opposition.  Doc. 194 at 22.  Defendant also argues Nimit made her purchase offer for the Eloong property contingent on whether she was granted the right to build the meditation center but waived the contingency and closed on the property before she submitted the Applications to the City.  *Id.*

For this factor, in its remand opinion, the Eleventh Circuit cites to *Jesus Christ is the Answer Ministries*, 915 F.3d at 261, and *Bethel World Outreach*, 706 F.3d at 557, to support the proposition that a burden is properly attributable to the government if a plaintiff has a reasonable expectation of using its property for religious exercise.  *TMAA II*, 980 F.3d at 832 n.11.  In *Jesus Christ is the Answer Ministries*, the court found the plaintiff sufficiently alleged she had a reasonable expectation to use the subject property as a church because such a use was permitted on the property as of right as long as the "site plans comp[lied] to the extent possible with [applicable] requirements and [could] otherwise be expected to be compatible with the character and general welfare of the surrounding residential premises."  915 F.3d at 261 (internal quotation marks and citations omitted).  In *Bethel World Outreach*, the defendant county permitted churches on the subject property with certain approvals, which were not guaranteed, but the court stated such "rais[ed] a question of material fact as to whether the plaintiff had a reasonable expectation of being able to build a church."  706 F.3d at 557.

The Eleventh Circuit cites to *Guru Nanak Sikh Society*, 456 F.3d at 989-90, *Andon, LLC*, 813 F.3d at 515, *Livingston Christian Schools*, 858 F.3d at 1004, and *Petra Presbyterian Church*, 489 F.3d at 851, to support the proposition that a burden may be self-imposed if the plaintiff did not have a reasonable expectation of using its property for religious exercise or demonstrated an unwillingness to modify its proposal in order to comply with applicable zoning requirements. *TMAA II*, 980 F.3d at 832 n.12.  In *Guru Nanak Sikh Society*, the plaintiff applied for a conditional use permit ("CUP") in a zone that allowed churches to be built if a CUP is granted, but the county planning commission rejected the application due to neighbors' complaints about noise and traffic despite the county services department's recommendation to approve the application because of mitigation measures agreed to by the plaintiff.  456 F.3d at 989.  The plaintiff then applied for a second CUP that proposed a smaller temple with the same capacity on a much larger parcel of agricultural land to mitigate the impact of noise and traffic, which was approved by the county service department and planning commission, but the county board of supervisors denied the application because it would lead to "leapfrog development," a reason that the county could use to effectively deny churches access to all such agricultural land despite other churches that were already located on agriculturally zoned land.  *Id.* at 990.  As such, the court in *Guru Nanak Sikh Society* found "[t]he net effect of the County's two denials – including their underlying rationales and disregard for Guru Nanak's accepted mitigation conditions – is to shrink the large amount of land theoretically available to Guru Nanak under the Zoning Code to several scattered parcels that the County may or may not ultimately approve" and found the county imposed a substantial burden on the plaintiff's religious exercise.  *Id.* at 991-92.  In *Andon, LLC*, the court found the plaintiffs did not have a reasonable expectation that the property could be used as a church because it was not a permitted site for a community facility such as a church, it had not met applicable setback

requirements for that type of use for at least fourteen (14) years, and the zoning administrator informed Andon, LLC, the application would not be approved for failure to meet the setback requirement.  813 F.3d at 515.  In *Livingston Christian Schools*, the court noted a burden is not substantial when the plaintiff imposes the burden on itself like the plaintiff that leased its former property, where it would be able to operate, to another organization after the plaintiff's special-use permit application for another property was denied and before related litigation began.  858 F.3d at 1009.  Finally, in *Petra Presbyterian Church*, the court found the plaintiff did not have a reasonable expectation to obtain a permit to build a church because it knew the permit would be denied and it assumed the risk of selling the property to find an alternate site for the church.  489 F.3d at 851.

> This factor was addressed in the Court's previous summary judgment order:
>
> A fundamental role of local governments in zoning matters is to evaluate whether a religious organization's use can be accommodated in the area in which it seeks to locate.  To strip a municipality of that determinative power would be to usurp a central function of local government and, in effect, impermissibly favor religious uses over secular uses.  RLUIPA should not be interpreted in a way that undermines the legitimate responsibility of local governments in implementing land use regulations. . . .
>
> Defendant's considerations and stated reasons for denying Plaintiffs' first application should have implied to Plaintiffs there was a possibility those same concerns would arise in their applications for the Eloong property.  Plaintiffs should have been on notice compatibility would be an issue, especially since their proposed site on the Eloong property is much larger than its initial location on Airport Boulevard and their proposed construction for their Applications is on a much larger scale than the proposal on their first application.  Accordingly, Plaintiffs should have known proposed parking improvements and building code improvements, especially those on a larger scale, may be unfavorable in the same zoning district for which TMAA was first deemed incompatible.

Doc. 127 at 32-33, 35.  In spite of this prior history, Nimit waived the contingency in her purchase offer for the Eloong property that was based on whether she was granted the right to build the meditation center.

1.      **Conclusion**

Based on the above standard and factors the Court was directed to consider, it concludes Plaintiffs have not demonstrated the City's zoning decisions substantially burdened their religious exercise, and even if Plaintiffs' religious exercise was substantially burdened by the denial of their Applications, the Court finds the decision was the least restrictive means to further the City's compelling interest in its Zoning Ordinance, as further discussed below.  Accordingly, summary judgment is due to be granted for Defendant on Count 1.

**B.      First Amendment – Free Exercise (Count 4)**

Count 4 of Plaintiffs' Complaint asserts a claim that Defendant violated the Free Exercise Clause of the First Amendment.

The First Amendment to the United States Constitution, which applies to the states through the Fourteenth Amendment, provides "Congress shall make no law . . . prohibiting the free exercise of religion."  U.S. CONST. amend. I.  "At a minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons."  *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532, 113 S. Ct. 2217, 2226, 124 L. Ed. 2d 472 (1993) [hereinafter *Lukumi*] (citations omitted).

> In addressing the constitutional protection for free exercise of religion, [the Supreme Court's] cases establish the general proposition that a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice.

*Id.* at 531, 113 S. Ct. at 2226 (citation omitted).

"Neutrality and general applicability are interrelated, and . . . failure to satisfy one requirement is a likely indication that the other has not been satisfied."  *Id.*  "The neutrality inquiry

asks whether 'the object of a law is to infringe upon or restrict practices because of their religious motivation.'" *Keeton v. Anderson-Wiley*, 664 F.3d 865, 879 (11th Cir. 2011) (quoting *Lukumi*, 508 U.S. at 533, 113 S. Ct. at 2227).  "The general applicability prong asks whether the government has 'in a selective manner impose[d] burdens only on conduct motivated by religious belief.'" *Id.* (quoting *Lukumi*, 508 U.S. at 543, 113 S. Ct. at 2232) (alteration in original).  Thus, even if a law is facially neutral, the Court must evaluate whether the law is neutral in operation.  *See Lukumi*, 508 U.S. at 534, 113 S. Ct. at 2227 ("The Free Exercise Clause protects against governmental hostility which is masked, as well as overt.").  "Official action that targets religious conduct for distinctive treatment cannot be shielded by mere compliance with the requirement of facial neutrality."  *Id*.  A law that is not neutral and generally applicable must be "justified by a compelling government interest and must be narrowly tailored to advance that interest."  *Id.* at 531-32; 113 S. Ct. at 2226.  However, a law that is neutral and generally applicable "need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice."  *Id.* at 531, 113 S. Ct. at 226. (citation omitted).

Similar to the Substantial Burden prong under RLUIPA, the determination of the "general applicability" of a law under the Free Exercise Clause is a question of governmental burden upon religious conduct.  *Compare id.* at 543 *with* U.S.C. § 2000cc(a)(1).  Accordingly, as asserted in Plaintiffs' RLUIPA Substantial Burden argument, *supra*, Plaintiffs contend Defendant has burdened their right to freely exercise their religion.  Doc. 197 at 23-28.  However, Plaintiffs argue they are not required to demonstrate the burden imposed on their religious exercise is "substantial" (as required under RLUIPA) to prove a violation of the Free Exercise Clause.  Doc. 197 at 22-23.  Furthermore, Plaintiffs claim Defendant's denial of their Applications is subject to strict scrutiny because the denial was an individualized assessment and was not applied in a neutral and general

manner to their religious group.  Doc. 197 at 21.  Plaintiffs' argument is based on the Supreme

Court's decision in *Roman Catholic Diocese of Brooklyn v. Cuomo*, --- U.S. ---, 141 S. Ct. 63, 208

L. Ed. 2d 206 (2020) [hereinafter *Roman Catholic Diocese of Brooklyn*], in which the Supreme

Court stated, "[b]ecause the challenged restrictions are not 'neutral' and of 'general applicability,'

they must satisfy 'strict scrutiny,' and this means that they must be 'narrowly tailored' to serve a

'compelling' state interest."  --- U.S. at ---, 141 S. Ct. at 67 (quoting *Lukumi*, 508 U.S. at 546);

Doc. 197 at 21-22.

Defendant argues *Roman Catholic Diocese of Brooklyn* did not overturn Free Exercise

jurisprudence that is applicable to land-use cases and does not align with RLUIPA because the law

applies to land-use regulations that utilize individualized assessments and requires claimants to

show a substantial burden before strict scrutiny is applied.  Doc. 200 at 27 (citing 42 U.S.C. §

2000cc(a)(2)(C)).  Defendant argues the Zoning Ordinance is a neutral and generally applicable

law, which is subject to only rational basis scrutiny.  Doc. 200 at 28-29.  Defendant asserts, "the

Zoning Ordinance requirements for R-1 properties apply identically to secular and religious

applicants not allowed as of right in R-1, a district allowing very few uses as of right other than

single-family residential."  *Id.*  Defendant further argues the denial of Plaintiffs' Applications only

incidentally affected Plaintiffs' religious practice.  Doc. 194 at 26-27.

Plaintiffs have not shown the Zoning Ordinance targeted religious practices or imposed

burdens on religious conduct in a selective manner.  Therefore, rational basis review applies.

*Keeton*, 664 F.3d at 880.  Further, the Court cannot conclude Defendant's denial of Plaintiffs'

Applications constitutes a violation of the Free Exercise Clause of the First Amendment.  As

demonstrated in the Court's findings under RLUIPA's Substantial Burden provision, the burdens

Plaintiffs experience are nothing more than inconveniences incidental to Defendant's denial of

their Applications.  Defendant's denial does not restrict Plaintiffs' current religious practice but, rather, prevents a change in their religious practice.  Furthermore, the Free Exercise Clause is not blanket authorization for a religious organization to build a place of worship on any property it deems ideal.  Accordingly, Plaintiffs' inconveniences do not rise to a constitutionally impermissible infringement on free exercise, and summary judgment is due to be granted for Defendant on Count 4.

**C.     Alabama Religious Freedom Amendment (Count 6)**

Count 6 of Plaintiffs' Complaint asserts a claim under Section V of ARFA.

ARFA provides in relevant part:

(a)    Government shall not burden a person's freedom of religion even if the burden results from a rule of general applicability, except as provided in subsection (b).

(b)    Government may burden a person's freedom of religion only if it demonstrates that application of the burden to the person:

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling interest.

ALA. CONST. art. I, § 3.01(V).  Based on the language of ARFA, the Eleventh Circuit, in its remand order, determined strict scrutiny is triggered by any burden that is imposed by the government, "even an incidental or insubstantial one."  *TMAA II*, 980 F.3d at 841.

The Court has determined Defendant has not imposed a substantial burden on Plaintiffs' religious exercise under RLUIPA.  However, the Court concluded under the Free Exercise Clause, Defendant's actions constitute an incidental burden on their religious exercise, which, as the Eleventh Circuit determined, would trigger strict scrutiny under ARFA.  Therefore, Defendant must demonstrate the denial of Plaintiffs' Applications was "in furtherance of a compelling

governmental interest" and was "the least restrictive means of furthering that compelling interest." ALA. CONST. art. I, § 3.01(V)(b)(1) and (2).

Defendant argues it has a compelling interest in zoning and the safety of its residents, there are districts within the City where religious organizations may operate as a matter of right, and to allow the meditation center at the Eloong property would be inconsistent with the City's policy objectives. Doc. 194 at 23-24. Defendant argues it denied Plaintiffs' Applications to convert a single-family residence into a meditation center because it would have added thousands of square feet of new non-residential buildings in a longstanding residential neighborhood, which would have permanently changed the character of the property and the surrounding neighborhood, and there were not conditions that would have mitigated the impact of the meditation center. Doc. 200 at 26. Finally, Defendant argues the Eloong property had substandard access and related traffic concerns and would have been a threat to public safety because of a lack of sidewalks for foot traffic. *Id.* at 27. Plaintiffs argue Defendant failed to explain how Plaintiffs' use, which is encouraged by the Zoning Ordinance in an R-1 district, threatens Defendant's interest in zoning or how the use would jeopardize safety. Doc. 201 at 22-25. Further, Plaintiffs argue Defendant fails to show it used the least restrictive means to further its compelling interest. *Id.* at 25.

The City has a compelling interest in enforcing its Zoning Ordinance, which for a use that requires planning approval, considers the location and site plan and whether they are "appropriate with regard to transportation and access, water supply, waste disposal, fire and police protection, and other public facilities; as not causing undue traffic congestion or creating a traffic hazard; and as being in harmony with the orderly and appropriate development of the district in which the use is located." Doc. 92-12 at 137. Here, the City's interest in transportation and access, traffic, and harmony with the orderly and appropriate development of the R-1 district were implicated by the

proposed meditation center.  The City's interest to preserve the character of the property and the surrounding neighborhood could not have been alleviated by conditional approval and, therefore, denial of the Plaintiffs' Application was the least restrictive means to further the City's compelling interest in its Zoning Ordinance.

Accordingly, summary judgment is due to be granted for Defendant on Count 6.

## V.     CONCLUSION

For the reasons stated above, the following is hereby **ORDERED** as follows:

(1)     Defendant's Motion for Summary Judgment, (Doc. 193) is **GRANTED**, and Plaintiffs' Counts 1, 4, and 6 are **DISMISSED with prejudice**; and

(2)     Plaintiffs' Motion for Partial Summary Judgment (Doc. 195) is **DENIED**.

A separate judgment that is consistent with this memorandum opinion and order will be entered pursuant to Fed. R. Civ. P. 58.

**DONE and ORDERED** this 21st day of April 2022.

/s/ TERRY F. MOORER
**TERRY F. MOORER**
**UNITED STATES DISTRICT JUDGE**